# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| MCNEIL NUTRITIONALS, LLC, | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 06-5336 (JRP) |
| v. | : | |
| | : | |
| HEARTLAND SWEETENERS LLC AND | : | |
| HEARTLAND PACKAGING CORP., | : | |
| Defendants. | : | |
| | : | |

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

---

Abbe F. Fletman (PA 52896)
Lizanne V. Hackett (PA 89751)
FLASTER/GREENBERG P.C.
Eight Penn Center
1628 JFK Blvd., 15th Floor
Philadelphia, PA 19103
Tel: 215-279-9393
Fax: 215-279-9394

Of Counsel:
William L. O'Connor
George A. Dremonas
DANN PECAR NEWMAN
& KLEIMAN
One American Square
Suite 2300
Indianapolis, IN 46282

Dated: March 6, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................................iv

INTRODUCTION ...................................................................................................1

PROPOSED FINDINGS OF FACT..........................................................................5

A.    The Parties ........................................................................................5

B.    Procedural History ...........................................................................6

C.    Private-Label Goods and Store Brands............................................6

D.    Size of the Private-Label Market......................................................8

E.    No Intent by Stores to Confuse Consumers .....................................8

F.    Sugar Substitutes in General ...........................................................9

G.    Saccharin ...........................................................................................9

H.    Aspartame .........................................................................................10

I.    Sucralose ...........................................................................................11

J.    Changes to McNeil's Splenda Box Designs ....................................13

K.    Changes to McNeil's Granular Bag Designs....................................16

L.    Successive Changes to Splenda Packets ..........................................17

M.    The New Splenda Box Compared to Safeway's Box ........................17

N.    The New Splenda Box Compared to Ahold's Box ...........................18

O.    The New Splenda Box Compared to Food Lion's Box......................20

P.    The New Splenda Granular Bag Compared to Food Lion's
      Granular Bag ....................................................................................21

Q.    The New Splenda Granular Bag Compared to Ahold's Granular Bag .................22

R.    The New Splenda Packet Compared to Food Lion's Packet.................23

S.    The New Splenda Packet Compared to Ahold's Packet ......................24

T.    New Splenda Packet Compared to Safeway's Packet .........................24

U.   McNeil's Marketing Focuses on the "Made From,
     Tastes Like Sugar" Seal ......................................................................... 25

V.   Color Coding in Sugar and Sugar Substitutes. ....................................... 27

W.   Common Features of All Sweetener Packages ......................................... 30

X.   Common Features of Grocery Store Sugar Aisles .................................. 31

Y.   Attributes of Average Consumers ........................................................... 33

Z.   Packaging Supplied By Heartland ........................................................... 33

AA.  Heartland's Lack of Intent ....................................................................... 37

BB.  Harm Created by McNeil's Requested Preliminary-
     Injunctive Relief ...................................................................................... 38

PROPOSED CONCLUSIONS OF LAW ............................................................ 40

I.   BECAUSE MCNEIL SEEKS A MANDATORY
     INJUNCTION, IT MUST BE HELD TO THE STANDARD
     OF PROVING A SUBSTANTIAL LIKELIHOOD OF
     SUCCESS ON THE MERITS. .................................................................. 40

II.  MCNEIL'S EVIDENCE IS INSUFFICIENT TO SHOW
     THAT IT HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS
     ON ITS TRADE DRESS CLAIM............................................................. 42

     A.   McNeil Fails To Demonstrate That There Is a
          Substantial Likelihood That an Appreciable Number
          of Reasonably Prudent Consumers Will Be Confused
          by the Store-Brand Packaging. ........................................................ 46

          Factor 1:  The well-known store-brand logos,
          along with other distinctive and unique features,
          safeguard against consumer confusion............................................ 48

          Factor 2:  Splenda's claimed trade-dress elements are
          common in the sweetener industry, and therefore fail to
          warrant protection. ......................................................................... 53

          Factor 3:  Consumers are particularly aware of the
          store-brand industry and thus will not be confused by
          the store-brands packaging. ........................................................... 54

          Factors 4 and 6:  McNeil's strike-force consumer with
          bad eyesight and income far in excess of the average
          median does not qualify as a reasonably prudent shopper. ............ 56

Factor 5:  Heartland did not intend to confuse consumers. ............................ 59

Factor 7, 8 and 9:  The food stores marketing efforts prevent
confusion. .................................................................................................... 62

Factor 10:  The differences between the packaging and the
individual packets preclude source confusion, as well as initial-
or post-sale confusion................................................................................... 63

B.  A Preliminary Injunction Cannot Issue Because McNeil Fails
To Show It Is Likely To Prove That the Store-Brand Packaging
Employs Any Non-Functional, Uncommon Elements........................................ 66

C.  Preliminary Injunctive Relief Is Further Unwarranted
Because McNeil Fails to Demonstrate That It Is
Substantially Likely to Prove That Splenda's Trade Dress
Is Inherently Distinctive or Has Acquired Secondary
Meaning......................................................................................................... 76

D.  McNeil Does Not Meet Its Burden on Its Anti-Dilution Claim;
It Has Presented No Evidence That Actual Dilution Has
Occurred or That Splenda's Packaging Is Famous in
Pennsylvania................................................................................................... 85

E.  Having Failed to Show Likelihood of Success on the Merits,
McNeil's Claim of Irreparable Harm Also Fails.................................................. 88

F.  McNeil Fails to Show That Its Potential Harm Outweighs
the Harm Heartland and the Non-Party Supermarkets Will
Suffer if an Injunction Is Issued ..................................................................... 89

G.  Permitting the Lower-Priced Store-Brands to Remain on the
Market Pending Final Disposition Best Serves the Public
Interest. ........................................................................................................ 92

III.  IF INJUNCTIVE WERE AWARDED, A $1 MILLION BOND
WOULD BE WARRANTED TO ADEQUATELY PROTECT HEARTLAND'S
INTERESTS............................................................................................................ 92

CONCLUSION ........................................................................................................ 95

# TABLE OF AUTHORITIES

## Federal Cases

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000) ......................................................................... 45

*Acierno v. New Castle County*, 40 F.3d 645 (3d Cir. 1994) ....................................... 40, 76

*American Home Products Corp. v. Barr Laboratories, Inc.*, 656 F. Supp.
    1058 (D.N.J.), aff'd, 384 F.2d 368 (3d Cir. 1987) .................................... 42, 45

*August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616 (7th Cir. 1995) ...................... 70, 72, 87

*Bayline Partners, L.P. v. Weyerhaeuser Co.*, 1994 WL 286337,
    31 U.S.P.Q.2d 1051 (N.D. Cal. Feb. 17, 1994) .......................................... 64

*Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801 (2d Cir. 1973) ........................ 61

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
    489 U.S. 141 (1989) ............................................................................. 42, 45

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
    973 F.2d 1033 (2d Cir. 1992) .......................................................... 43, 48, 77

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
    921 F.2d 467 (3d Cir. 1990) .................................................................... 77

*Checkpoint Systems v. Check Point Software Technologies, Inc.*,
    269 F.3d 270 (3d Cir. 2001) .................................................................... 61

*Chere Amie, Inc. v. Windstar Apparel, Corp.*,
    191 F. Supp. 2d 343 (S.D.N.Y. 2001) ........................................................ 41

*Christian v. Alloy, Inc.*, 2004 WL 1375274,
    (S.D.N.Y. Jun. 17, 2004) ....................................................................... 41

*Conopco*, 46 F.3d at 1556 ................................................................................ 48

*Conopco, Inc.,* 46 F.3d at 1563-64 .................................................................... 60

*Cumberland Packing Corp. v. Monsanto Co.*,
    140 F. Supp. 2d 241 (E.D.N.Y. 2001) ............................................ 45, 52, 58, 65, 67

*Deere & Co. v. Farmhand, Inc.*, 560 F. Supp. 85 (D.C. Iowa 1982),
    aff'd, 721 F.2d 253 (8th Cir. 1983) ................................................ 43, 64, 68, 69

*Denmark v. Russ Berrie & Co.*, 290 F.3d 548 (3d Cir. 2002)...........................................57

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996) ...........................61, 63

*Duraco Products, Inc. v. Joy Plastic Enters., Inc.*,
    40 F.3d 1431 (3d Cir. 1994) ...................................................................43, 64, 80

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.*,
    625 F. Supp. 571 (D.N.J. 1985) ...........................................................56, 77

*Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571 (Fed. Cir. 1995).......................................72

*Euro Pro Corp. v. Tristar Products, Inc.*, 172 F. Supp. 2d 567
    (D.N.J. 2001) ..................................................................................79, 80

*Farberware, Inc. v. Mr. Coffee, Inc.*,
    740 F. Supp. 291 (D. Del. 1990) .......................................................87

*First Brands v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir. 1987)....................................79

*Freixenet S.A. v. Admiral Wine & Liquor Co.*,
    731 F.2d 148 (3d Cir. 1984) ...............................................................40, 42

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*,
    111 F.3d 993 (2d Cir. 1997)..................................................................41

*Gray v. Meijer, Inc.*, 295 F.3d 641 (6th Cir. 2002) ..........................................................52

*Gucci America, Inc. v. Daffy's Inc.*, 354 F.3d 228 (3d Cir. 2003).............................62, 63

*Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500 (M.D. Pa. 1998).........................83

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
    456 U.S. 844..................................................................64, 66, 77, 78

*J&J Snack Foods, Corp. v. Nestle USA, Inc.*,
    149 F. Supp. 2d 136 (D.N.J. 2001) .....................................................59

*J.G. Wentworth, S.S.C. Ltd. Partnership v. Settlement Funding LLC*,
    No. 06-0597, 2007 WL 30115 (E.D. Pa. Jan. 4, 2007) ...................................42

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir. 1995).....................................................................64

*Keene Corp. v. Paraflex Industry, Inc.*, 653 F.2d 822 (3d Cir.1981)...............................69

*Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111 (1938) ...............................................43

*Klein-Becker USA, LLC v. Product Quest Manufacturing, Inc.,*
    429 F. Supp. 2d 1248 (D. Utah 2005) ............................................................ 40, 44, 50

*Kroger Co. v. Johnson & Johnson,* 570 F. Supp. 1055
    (S.D. Ohio 1983) ......................................................................................................... 44

*Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.,*
    65 F.3d 1063 (2d Cir. 1995)................................................................................... 74, 78

*Mazurek v. Armstrong,* 520 U.S. 968 (1997) ...................................................................... 40

*McGregor-Doniger, Inc. v. Drizzle Inc.,* 599 F.2d 1126 (2d Cir. 1979).......................... 56

*McKeon Products Inc. v. Flents Products Co.,*
    2003 WL 23100262, 69 U.S.P.Q.2d 1032
    (E.D. Mich. Nov. 19, 2003).................................... 44, 48, 58, 59, 60, 70, 71, 83, 84, 86

*McNeil-PPC, Inc. v. Merisant Co.,*
    2004 WL 3316380 (D.P.R. Jul. 29, 2004)............................................................. 75, 76

*Mead Johnson & Co. v. Abbott Laboratories,*
    201 F.3d 883, 888 (7th Cir. 2000)......................................................................... 88, 89

*Moseley v. V Secret Catalogue, Inc.,* 537 U.S. 418 (2003)......................................... 81, 82

*National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.,*
    254 F. Supp. 2d 527, 577 (E.D. Pa. 2003) ................................................................. 88

*Nor-Am Chem. Co. v. O. M. Scott & Sons Co.,*
    1987 WL 13742 (E.D. Pa. Jul. 15, 1987) ................................................................... 68

*Oral Research Laboratories, Inc., v. L. Perrigo Co.,*
    864 F.2d 149 (Fed. Cir. 1988)..................................................................................... 41

*Paddington Corp. v. Attiki Importers & Distributors, Inc.,*
    996 F.2d 577 (2d Cir. 1993).................................................................................. 73, 75

*Pfizer, Inc. v. Perrigo, Co.,* 988 F. Supp 686 (S.D.N.Y. 1997)  ...................................... 50

*Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159 (1995)......................................... 66

*Sanofi-Synthelabo v. Apotex Inc.,* 470 F.3d 1368 (Fed. Cir. 2006)................................. 88

*Scanvec Amiable Ltd. v. Chang,* 2002 WL 32341772
    (E.D. Pa. Nov. 1, 2002) ............................................................................................... 88

*Scott Fetzer Co. v. Gehring,* 288 F. Supp. 2d 696 (E.D. Pa. 2003)................................. 82

*Shire US Inc. v. Barr Laboratories Inc.*, 329 F.3d 348
(3d Cir. 2003) ................................................................. 40, 41, 66

*Site Microsurgical System, Inc. v. Surgin Surgical Instrumentation, Inc.*,
855 F. Supp. 1450 (E.D. Pa. 1994) ........................................... 88

*Smithkline Beckman Corp. v. Pennex Prods. Co.*,
605 F. Supp. 746 (E.D. Pa. 1985) ................................... 53, 54, 55

*Sportvision, Inc. v. Sportsmedia Technology Corp.*,
2005 WL 1869350 (N.D. Cal. Aug. 4, 2005) ............................... 69

*Star Ind. v. Bacardi & Co. Ltd.*, 412 F.3d 373 (2d Cir. 2005) ........................... 57

*Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, 1995 WL 550585
(E.D. Pa. Sep. 14, 1995) .................................................. 43, 65

*Tang v. Hwang*, 799 F. Supp. 499 (E.D. Pa. 1992) ........................................ 57

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
532 U.S. 23 (2001) ...................................................... 42, 45, 64

*Transgro, Inc. v. AJAC Transmission Parts Corp.*,
768 F.2d 1001 (9th Cir. 1985) ................................................ 68

*Turtle Wax, Inc. v. First Brands Corp.*,
781 F. Supp. 1314 (N.D. Ill. 1991) ...................................... 73, 80

*Universal City Studios, Inc. v. Nintendo Co.*,
746 F.2d 112 (2d Cir. 1984) .................................................. 56

*Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189 (3d Cir. 1995) ...................... 43, 45

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000) ........................................................... 75

*Warner Brothers, Inc. v. American Broadcasting Cos.*,
720 F.2d 231 (2d Cir. 1983) .................................................. 56

*Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 398-99
(D.N.J. 1989) ........................ 48, 49, 50, 52, 53, 60, 64, 65, 72, 79, 84, 85, 87

*World Wrestling Federation Entertainment Inc. v. Big Dog Holdings, Inc.*,
280 F. Supp. 2d 413 (W.D. Pa. 2003) ........................................ 77

*Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*,
259 F.3d 25 (1st Cir. 2001) ............................................... 72, 76

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001) ...................................... 74

**Federal Statutes and Rules**

15 U.S.C. § 1125(a)(1)(A) ......................................................................................... 42

15 U.S.C. § 1125(a)(3) ......................................................................................... 63, 64

15 U.S.C. § 1125(c)(1) (enacted November 29, 1999,
  effective through October 5, 2006) ............................................................ 82

Fed. R. Evid. 803(8) ........................................................................................... 33

Fed. R. Evid. 902(b) ........................................................................................... 33

**State Statutes**

54 Pa. Cons. Stat. Ann. § 1124 (2007) .................................................... 81, 82

**Other Authorities**

Andrew C. Finch, *When Imitation Is the Sincerest Form of Flattery:
  Private Label Products and the Role of Intention in Determining
  Trade Dress Infringement*, 63 U. Chi. L. Rev. 1243, 1255 (1996) .............................. 59

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
  § 7.26(1) (3d ed. 1992) ........................................................................... 64

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
  § 8:1 (4d ed. 1996) ........................................................................... 42

## INTRODUCTION

Plaintiff McNeil Nutritionals, LLC ("McNeil"), the maker of the sucralose-based no-calorie sweetener Splenda® ("Splenda"), seeks the extraordinary remedy of prohibiting defendants Heartland Sweeteners LLC and Heartland Packaging Corp. (collectively, "Heartland")[1] from selling sucralose-based store-brand sweeteners in packaging that McNeil claims infringes upon its "trade dress." Not only does McNeil seek to prohibit the sale of competing sucralose-based products, it further demands a recall of all such products from retail stores that are not even parties to this action. After a two-day evidentiary hearing and extensive briefing, however, McNeil simply has not made a showing sufficient to obtain this draconian relief, or indeed any injunctive relief.

McNeil fundamentally has failed to show that it is substantially likely[2] to prove that an appreciable number of reasonably prudent consumers have been confused by any one of the 17 different packages at issue.[3] The Court must undertake a separate analysis of each of these packages.

The only evidence of purported confusion McNeil has presented is the packages themselves; the opinion of its own "worldwide president," based only on the packaging, and the limited testimony of a single consumer. This showing is insufficient.

---

[1]     Although McNeil has named it as a defendant, Heartland Packaging Corp. is not involved in the sucralose business. Gelov, 2/7/07 Tr. 8:12-14.

[2]     Because McNeil seeks a mandatory injunction, it shoulders the heightened burden to demonstrate that it is substantially likely to succeed on the merits. As demonstrated below, however, McNeil fails to establish an entitlement to an injunction even under the more relaxed "likely to succeed" standard.

[3]     They include the following products distributed by Heartland: the two Safeway Sucralose boxes (100- and 200-count) and packets contained in those boxes; the Ahold packaging, consisting of six boxes (100- and 200-count to each of Giant, Stop & Shop, and Tops), packets contained in the boxes, and three flexible bags (one to each respective store); and the two Food Lion boxes (100- and 200-count), packets contained in boxes, and Food Lion flexible bags.

The packages, as detailed below: (1) are significantly different from the Splenda packages, (2) use a color scheme common to food packaging and used in the sweetener category even before Splenda entered the market; (3) employ photographic elements (coffee cups, cold beverages, baked good, etc.) that are common to all sweeteners; (4) prominently display store names and logos; (5) adopt generic names that differ noticeably from McNeil's fanciful name, "Splenda"; (6) are found in retail stores that contain numerous other cues to consumers that the packages at issue are store brands, including lower pricing; and (7) do not use the two elements that are the only constants in Splenda's packaging: its name in a white-oval "cloud," and the white "made from sugar, tastes like sugar" seal.  McNeil, moreover, has changed its packages and packets more than once, including the background color yellow.[4]

While McNeil Worldwide President Debra Sandler testified that she believes consumers are confused by the McNeil packaging as compared to the store-brand packaging, she did so with no basis other than the purported similarity among the packages, discussed above.  Sandler, 1/26/07 Tr. 59:18-24.[5]

McNeil relies heavily on the testimony of Margaret Grossman, the only actual consumer to testify.  Grossman is not a typical consumer, and her testimony reflects such a lack of observation that, standing alone, it cannot be found persuasive.  Grossman's testimony revealed

---

[4]     The Heartland Safeway, Ahold, and Food Lion packages employ shades of yellow that have not changed and that differ from both Splenda yellows.  The Safeway Sucralose box contains what appears to be a yellowish wooden tabletop, a different yellow in the top right-hand corner and a third yellow in the top left-hand corner.  The Ahold packaging fades from a more-intense yellow at the top to a less intense yellow at the bottom.  The Food Lion package employs two different shades of yellow, with a strip on the left-hand side that is distinctly darker than the right-hand side.  McNeil claims that it is not trying to forbid the use of yellow, but that in effect is the relief it seeks.  Such relief is improper, however, because McNeil fails to demonstrate that consumers are confused by store-brand sucralose products that use the color yellow or that the use of yellow is nonfunctional.

[5]     For the Court's convenience, Heartland's proposed findings and conclusions use the same version of the transcripts McNeil cites in its finding and conclusions, the Microsoft Word version.  All transcript citations use the form: Name of witness, [Date] Tr. page:line(s).

that she is in a top income bracket and pays no attention to pricing, unlike most shoppers, whose

family annual median income is less than $50,000.  In addition, she shops exceedingly quickly

and without her reading glasses.  Not only did she buy Safeway Sucralose instead of Splenda,

but, during a later shopping trip, she mistakenly bought a 400-count box of Splenda instead of a

200-count box because she failed to see it on the shelf.  Grossman Tr. 39:11-21.  As she admitted,

"I grabbed too fast."  *Id.*   Moreover, she requires reading glasses, does not wear them when she

shops and, as a result, could not even see the pricing information on the store shelf when she

bought the Safeway Sucralose.  *Id.* at 34:15-35:8, 39:16-17.  Finally, even if the Court credits

Grossman's testimony at all, it goes only to the Safeway products and cannot be used as a basis to

enjoin the Food Lion or Ahold boxes, flexible bags, or packets.

       In addition to failing to show likelihood of success on the merits on confusion, McNeil

has utterly failed in its burden to show non-functionality.  Sugar, aspartame, saccharin and

sucralose are all white powders.  Consumers choose different artificial sweeteners for a variety of

reasons, be they health, taste, or the chemical properties of each.  The sweetener industry, as

McNeil admits, has color-coded its chemical ingredients: saccharin - red/pink; aspartame - blue;

and sucralose - yellow.  Supreme Court precedent and other controlling authority hold that a

competitor may adopt the color scheme of an existing product to demonstrate to consumers that

the competing product shares the same attributes as the incumbent.  Use of yellow allows food

stores to convey to consumers that their sucralose products share the same attributes as the

sucralose in Splenda and, conversely, are different from what McNeil itself characterizes as a

"sea of blue [aspartame-based] and pink [saccharin-based] packaged competitors."  McNeil

Conclusions ¶ 14.

       The availability of colors other than blue, pink and yellow does not diminish yellow's

functionality in the sweetener category.  This is particularly true in that yellow is superior to these

other colors in its appetite appeal, as demonstrated by McNeil's considered rejection of green, purple and orange as the background color for Splenda's packaging.  The graphic elements (e.g., coffee cup, baked good, etc.) of the store-brand packaging are similarly functional, advising consumers of the recommended uses for the product.  Finally, undisputed evidence establishes that packaging size and shape is dictated by the product's composition and equipment available in the industry.

McNeil additionally fails to prove that its packaging is inherently distinctive or has acquired secondary meaning.  To the contrary, Splenda's packaging is composed largely of common or functional elements, including: (1) a yellow and blue color scheme used by a number of other sweeteners even before Splenda entered the market and by many other food products; (2) the use of blue italicized letters for the product name, a feature employed by numerous sweeteners; (3) pictures of beverages, fruit and baked goods, commonly found on sweetener packages; and (4) package sizes dictated by manufacturing equipment and product consistency.  The exceptions to this rule are the Splenda name and logo (with the white oval cloud, blue swoosh and recently added stardust) and its "made from sugar, tastes like sugar" seal -- neither of which is used in a single one of the store brand products.[6]  There is simply no evidence that consumers connect Splenda's packaging -- as opposed to its logo or seal -- to identify the source of the goods.  To the contrary, McNeil itself often employs the Splenda logo without the incorporation of either yellow or blue.

McNeil's Pennsylvania anti-dilution claim similarly lacks evidentiary support.  McNeil has come forward with no evidence of an actual reduction of the capacity of its purported trade

---

[6]     Due to a printing error, an initial run of certain Ahold boxes contained a saying similar to the Splenda "made from sugar, tastes like sugar" seal, although in a different graphic representation.  Those boxes are no longer being produced and thus would not be the subject of any injunction under consideration by this Court.

dress to identify its goods.  Indeed, McNeil has no proof that consumers even identify its products by their packaging, once the Splenda logo and seal, which are found nowhere on any Heartland product, are removed from the analysis.

Having failed to prove likelihood of success of the merits, no finding of irreparable harm can follow.  In addition, the harm that would be inflicted on Heartland, the affected food stores and ultimately the consumers outweighs any interests of McNeil.  Similarly, given the thinness of McNeil's "proof," the public interest would be best served by allowing Heartland to continue to sell its products, which are generally less expensive than Splenda, pending final resolution of this matter.

Finally, McNeil sounds the theme that Heartland is somehow seeking "special status" for private-label goods.  *See, e.g.*, McNeil Conclusions ¶ 75.  McNeil is mistaken.  Heartland seeks only that this Court apply well-established principles of trade dress and equitable relief law.  Those principles require a plaintiff, who bears the burden of proof, to come forward with evidence, not speculation, as the basis of its request for relief.  McNeil fails this test.  For all of these reasons, the Court should deny McNeil's request for a preliminary injunction.

## PROPOSED FINDINGS OF FACT

A.    **The Parties**

1.    Heartland is a manufacturer of private-label artificial tabletop sweetener products. Gelov, 2/7/07 Tr. 8:6-8.

2.    McNeil is a wholly owned subsidiary of Johnson & Johnson.  Sandler, 1/26/07 Tr. 32:14-17.  McNeil markets consumer products, including Splenda; Benecol, a butter or margarine substitute; and Lactaid, lactose-free milk.

**B.     Procedural History**

3.     On December 5, 2006, McNeil filed its complaint in this matter and, on December

14, 2006, McNeil filed a motion for preliminary injunction.

4.     On January 26, 2007 and February 7, 2007, the Court held evidentiary hearings on

McNeil's preliminary-injunction motion.

**C.     Private-Label Goods and Store Brands**

5.     Private-label products are typically those manufactured or provided by one

company for offer under another company's brand.  Canaan, 1/26/07 Tr. 163:15-21[7]; Declaration

of David Canaan ("Canaan Decl.") ¶ 13.  *See also* Declaration of Teodor Gelov ("Gelov Decl.") ¶

4[8] (A private-label brand is a brand that is owned by the product's reseller, i.e., the retailer,

instead of by the brand's manufacturer.)

6.     Such products generally are made with the same active ingredient as, or otherwise

are similar to, the particular name-brand product with which the private-label brand competes.

Gelov Decl. ¶ 7.

7.     Store brands are a type of private labels.  Canaan, 1/26/07 Tr. 163:19-25; Canaan

Decl. ¶ 17.

8.     In the case of store brands, the store name, such as Giant, Safeway, or Food Lion,

is the brand name.  Canaan, 1/26/07 Tr. 170:19-20.  In contrast, the name of the product is

generally a generic descriptive name because the point of store brands is to "promote the store."

---

[7]     The Court qualified David Canaan, president of Laurel Group, brand development
advisors, as an expert in marketing, brand development and package design.  Canaan, 1/26/07 Tr.
161:12-16.  Canaan has more than 30 years of experience in national and private-label branding,
including for a leading no-calorie sweetener.  *Id.* 153:4-13, 155:9-162:13.

[8]     Teodor Gelov, Heartland's president, has approximately 13 years of private-label industry
experience.  Gelov, 2/7/07 Tr. 8:11-12; Gelov Decl. ¶¶ 1, 3.

*Id.* 170:22-24.  As Canaan testified: "I'm coming to Safeway, I want to buy Safeway products, because if I go to Albertson's, then I'm not buying Safeway products . . . ."  *Id.* 170:25-27.

9.      Examples of store brands marketed under the store name are found at Exhibits A21-A30, BB, III, JJJ, QQQ, RRR, S, SSS.

10.     The purpose of a store brand is to enhance the retailer's image, to strengthen its relationship with consumers, and to inspire loyalty to a particular chain of stores.  Canaan Decl. ¶ 19.

11.     Before consumers enter a store, they of course see the name of the store on a large sign above the door.  Sandler, 1/26/07 Tr. 113:4-8.  In addition, grocery store names frequently appear throughout the store.  *Id.* 113:9-11.

12.     In addition to the consumer being fully aware of the store he or she is in, store brands generally prominently display the name of the store on the packaging for their proprietary products.  *See* Exs. A20-A24, III, QQQ.

13.     Store brands trace their history to 1883.  "So, for 140 years supermarkets and other distribution have used private label as a way to give consumers choice," Canaan testified.  *Id.* 164:4-7.

14.     Since then, consumers have developed a high level of awareness of such brands. The Private Label Manufacturers Association (PMLA), in a study conducted by the Gallup organization, has reported that, in 2005, more than 90 percent of consumers polled said they were familiar with store brands and 83 percent said they bought them regularly.  *Id.* 168:15-22; Canaan Decl. ¶ 22.

15.     Store brands are typically found on grocery shelves next to the analogous national brand.  *See* Exs. A19-A30.  Consumers are "very, very used to this type of presentation of private label and national brands."  Canaan, 1/26/07 Tr. 164:15-16.

**D.    Size of the Private-Label Market**

16.    The market for private-label products is vast.  Gelov Decl. ¶ 11.  For example, in 2004 in the United States, private-label food and beverage products generated $38 billion in sales or 16.8 percent of the total $225.4 billion retail U.S. food and beverage category.  *Id.*

17.    As of 2005, private-label sales represented 20 percent of all U.S. supermarket, drug chain and mass merchandiser sales and totaled $50 billion.  Canaan, 1/26/07 Tr. 170:9-11; Canaan Decl. ¶ 14.  The types of private-label products number in the tens of thousands.  *Id.* 168:21-22.

18.    Private-label products generally are about 25 percent less expensive than national-brand competitors.  Canaan, 1/26/07 Tr. 170:13-15, 175:27-176:2 (31 percent price differential between Splenda and Giant store brand sucralose); Exs. A26-A29; Canaan Decl. ¶ 15.  In 2005, that represented $15.8 billion in savings to consumers.  Canaan Decl. ¶ 15

19.    Not surprisingly, any consumer who visits a neighborhood drugstore, supermarket, or mass retailer will find numerous private-label products, including, among other things, over-the-counter drugs, packaged and processed foods, cleaners, beverages and health and beauty aids.  *See* Exs. A19-A30, A39-A42.

**E.    No Intent by Stores to Confuse Consumers**

20.    The private-label industry benefits consumers by offering products comparable to name brands at lower prices.  Sandler, 1/26/07 Tr. 83:12-14; Gelov Decl. ¶ 12.

21.    The intent of retailers that market store brands is not to confuse consumers as confusion would conflict with the retailers' goals of: (a) inviting comparison so that consumers have choices among products, and (b) identifying the store brand name with its products to instill loyalty and to encourage consumers to feel they must shop at that particular store to get those particular products.  Canaan, 1/26/07 Tr. 164:26-27, 171: 16-172:5; Canaan Decl. ¶ 21.

8

22.     A grocery chain such as Food Lion, Giant, Stop & Shop, Tops, or Safeway wants consumers to have confidence in its brand products and therefore shop at its store instead of at the competition.  Canaan Decl. ¶ 21.

**F.     Sugar Substitutes in General**

23.     A sugar substitute (also called an artificial or no-calorie sweetener) is a food additive that is marketed as an alternative to sugar that provides sweetness without calories. Sandler, 1/26/07 Tr. 34:17-19.

24.     Consumers buy sugar substitutes for a variety of reasons that include:

- Blood-sugar disorders, including diabetes.  Sugar substitutes are recommended for the 20.8 million children and adults with diabetes, who represent seven percent of the U.S. population.
- Obesity, weight loss, and fitness.
- Tooth decay.

Canaan Decl. ¶ 24; Gelov Decl. ¶ 18.

25.     The current market leaders in sugar substitutes are: Sweet'N Low, which is made with saccharin; Equal, which is made with aspartame; and Splenda, which is made with sucralose and marketed by plaintiff McNeil.  Sandler, 1/26/07 Tr. 35:3-14; Gelov Decl. ¶ 20.

**G.     Saccharin**

26.     In 1957, Cumberland Packaging Corp. ("Cumberland") first introduced saccharin as a tabletop sweetener in the form of the brand Sweet'N Low.  Gelov Decl. ¶ 22.

27.     Sweet'N Low's packaging is predominantly pink and red and contains a photograph of a cup of coffee on a saucer.  Canaan, 1/26/07 Tr. 174:21-27.  Individual Sweet'N Low packets are pink.  Sandler, 1/26/07 Tr. 41:22-24; Ex. 9B; Gelov Decl. ¶ 23.

28.     Since the introduction of Sweet'N Low, competing companies have offered into the market alternative saccharin-based sugar substitutes, which generally cost less than Sweet'N Low.  Gelov Decl. ¶ 24.

29.     These alternative saccharin-based sweeteners include the Sweetmate brand, Sweet Thing, and Sweet Plus, as well as numerous private-label products.  Gelov Decl. ¶ 25; *see also* Sandler, 1/26/07 Tr. 86:10-25 (discussing Sweet Crystals, a saccharin product sold in the discount chain Dollar Stores).  They are primarily sold in red and pink packages, the same as Sweet'N Low.  Sandler, 1/26/07 Tr. 84:7-11, 86:10-25; Exs. A20, A39, V; Gelov Decl. ¶ 25; *see also* Ex. 2 to Fletman Decl; Ex. 7 to Hubbs Decl.; Canaan Decl. ¶ 33.

30.     In fact, the recognized industry standard is for saccharin-based sweeteners to be sold in red and/or pink packaging.  Gelov Decl. ¶ 25.  This practice informs consumers that the particular product is made primarily with saccharin and, in the case of store-brand products, that the item competes with Sweet'N Low.  *Id.*

31.     Nearly all grocery store chains sell a private-label saccharin sweetener that compares to the national brand in form, function, and packaging design.  *Id.* ¶ 26.

**H.     <u>Aspartame</u>**

32.     In 1982, Merisant Co. introduced a new sugar substitute into the United States market: aspartame, which Merisant markets under the Equal brand.  *Id.* ¶ 27.

33.     Equal's packaging is primarily blue.  Sandler, 1/26/07 Tr. 81:21-14; Canaan, 1/26/07 Tr. 174:28-175:4; Exs. I, LLL; Gelov Decl. ¶ 28.  Equal packets are also blue.  Sandler, 1/26/06 Tr. 82:16-17; *see also* Ex. Q.

34.     Equal's 3.5-ounce box (containing 100 packets) pictures a coffee cup on a saucer and an individual sweetener packet.  Gelov Decl. ¶ 28.

35.     In late 1992, a number of companies, including Cumberland, the maker of Sweet'N Low, entered the aspartame market.  Gelov Decl. ¶ 29.  Currently, the Cumberland brand, NatraTaste; Sweet Thing; and numerous private-label products all compete with Equal.  *Id.* ¶ 30.

36.     Aspartame-based sweeteners primarily are sold in blue packaging, the same as Equal.  Sandler, 1/26/07 Tr. 87:16-88:24 (admitting that Giant store brand, Genuardi's store brand and NatraTaste are all aspartame products marketed in blue boxes); Canaan, 1/26/07 Tr. 177:10-15 (noting that Giant aspartame package is blue), Gelov Decl. ¶ 30; Exs. BB, U.

37.     Nearly all grocery store chains sell a private label aspartame sweetener that compares to the national brand in form, function, and packaging design.  Gelov Decl. ¶ 31.

**I.     <u>Sucralose</u>**

38.     First discovered in 1976, sucralose is a chlorinated sucrose molecule.  Sandler, 1/26/07 Tr. 36:1; Gelov Decl. ¶ 33.

39.     In September 2000, plaintiff McNeil launched Splenda, the first sugar substitute made with sucralose, in United States retail stores.  Sandler, 1/26/07 Tr. 33:27-28.

40.     After considering and rejecting orange, purple and green, McNeil selected yellow as the background color for the Splenda's packaging.  *Id.* 142:11-27.

41.     Although Domino sugar, a dominant sugar brand, already used yellow packaging with blue lettering on a white background, McNeil also chose to use yellow packaging with blue lettering to market Splenda products.  *See* Sandler, 1/26/07 Tr. 98:13-24, Canaan, 1/26/07 Tr. 172:19-24, 173:8-10; Canaan Decl. ¶ 27; Ex. DD, Ex. KK.  McNeil was aware of Domino's use of yellow packaging with blue writing on a white background when it selected its packaging color scheme.  Sandler, 1/26/07 Tr. 101:6-9.

42.     Domino Pure D'Lite, a blend of sugar and sugar substitutes, also uses yellow packaging with blue lettering.  Ex. UUU; Sandler, 1/26/07 Tr. 101:10-21; Gelov, 2/7/07 Tr. 45:28-46:8.

11

43.     Domino is a national sugar brand that is widely available not only in the Northeast but, for example, in Arizona, California, Illinois, Indiana, North Dakota, Ohio and Texas.  Gelov, 2/7/07 Tr. 19:9-17.

44.     Other sugar products also use yellow packaging with blue writing.  Sandler, 1/26/07 Tr. 98:25-99:1 (Kroger); 99:2-10 (Stop & Shop); Canaan, *id.* 173:16-18.

45.     Before Splenda entered the market, Sugar Twin, a saccharin-based sugar substitute, also used yellow packaging and blue lettering.[9]  Sandler, 1/26/07 Tr. 100:1-5; Gelov, 2/7/07 Tr. 17:26-18:18; Gelov Decl. n.2; Ex. CC-1.  McNeil was aware of Sugar Twin's use of yellow packaging and blue writing when it chose its colors for Splenda.  Sander, 1/26/07 Tr. 101:1-5.

46.     Sugar Twin's packets, likewise, are yellow with blue lettering.  Sandler, 1/26/07 Tr. 107:25-108:5, Ex. M; Canaan Decl. ¶ 30; *see also* Ex. 8 to Gelov Decl.; Ex. 1 to Fletman Decl.; http://www.sugartwin.com/pi.cfm.

47.     Even no-calorie sweeteners that do not use a yellow background for their packaging commonly use blue type for the product name.  Sandler, 1/26/07 Tr. 130:7-13 (admitting blue product name for Sweet'N Low and NatraTaste); Gelov, 2/7/07 Tr. 19:26-21:5; Ex. Z (Sweet'N Low); Ex. LLL (Equal packet); Ex. BB (NatraTaste packet box).

48.     McNeil has positioned Splenda to compete with sugar as well as with other no-calorie sweeteners.  Sandler, 1/26/07 Tr. 97:20-98:4.

---

[9]     McNeil attempts to suggest that because Sugar Twin is "a small and declining business," Sandler, 1/26/07 Tr. 76:8-9, the Court should not consider it when determining whether consumers are likely to be confused between the Splenda packages and the Heartland packages. McNeil Conclusions ¶¶ 20-21.  Sugar Twin, however, is widely available in grocery stores throughout the United States.  *See, e.g.,* Declaration of David Kessler ¶¶ 15-16 (Sugar Twin is available in all of Safeway's 1,545 U.S. stores.)

49.     Many other food products use a yellow-and-blue color scheme.  Sandler, 1/26/07

Tr. 102:23-26; Canaan Decl. ¶ 30.  For example, Juicy Fruit gum, Snapple lemonade, Bisquick,

Butterfinger candy bars, Nestle Nesquik, Crystal Light and Sunsweet juice all use yellow

packaging with blue writing.  Gelov, 2/7/07 Tr. 16:7-16, 16:22; Canaan, 1/26/07 Tr. 179:8-17;

*see also* Exs. A43, II (Kellogg's Caramel Nut Crunch), JJ (All Grain Crackers), NN (Crystal

Light), MM (Argo corn starch), PP (Pop Tarts).

**J.     Changes to McNeil's Splenda Box Designs**

50.     In 2000, McNeil began selling Splenda in the box depicted below ("Original

Splenda Box").  Ex. K.



51.     According to McNeil's Worldwide president Debra Sandler, the "primary

elements" of Splenda's trade dress as reflected in the Original Splenda Box are:

- the yellow color of the packaging;
- the "mottled" effect of the yellow coloring;
- the Splenda name, which (a) is written in script form in graduating blue color with a yellow outline; (b) has a "sort of half circle" below it; (c) and, "important[ly]," has a "white cloud" enveloping it;
- the picture of a white coffee cup with a Splenda packet;
- the picture of iced tea with lemon; and
- the "made from sugar, tastes like sugar" seal located in the bottom left-hand corner of the packaging.

Sandler, 1/26/07 Tr. 46:14-47:23.

52.     In 2006, McNeil significantly changed the package design for Splenda's 100- and

200-packet count boxes from the Original Splenda Box to the packaging reflected in Ex. L ("New

Splenda Box").  *Id.* 95:16-19, 97:4-5; Ex. K; Ex. L.

53.     Indeed, since McNeil first introduced Splenda and its packaging in 2000, "virtually everything was changed to some degree," except the Splenda logo "remained relatively close" and the "made from sugar, tastes like sugar" seal "has remained relatively consistent." Gelov, 2/7/07 Tr. 23:13-24:16; *compare* Ex. K (Original Splenda Box), *with* Ex. L (New Splenda Box).

54.     McNeil is in the process of replacing the Old Splenda Box with the New Splenda Box on store shelves so that, going forward, stores sell the new packaging exclusively.  Sandler, 1/26/07 Tr. 90: 7-11.

55.     Pictures of the Original Splenda Box (Ex. K) versus the New Splenda Box (Ex. L) are below.



56.     The packaging for the Splenda's 100 packet and 200 packet boxes is identical, with the exception of the box size and the number of packets.  *Id.* 95:20-23.

57.     Through its packaging changes, McNeil altered every one of Splenda's alleged "primary" trade dress elements.  *Id.* 48:5.  For instance, McNeil:

- made the color yellow on Splenda's box "more intense" such that consumers would notice a difference in the two colors, *id*. 90:26-91:6, 95:24-27;

- "did away with most of the mottled look," *id*. 49:6-7;

- changed the outline around the Splenda name from yellow to white, *id*. 91:25-28; 96:4-6; Gelov, 2/7/07 Tr. 24:5-11;

- moved the picture of the white coffee cup with a Splenda packet from the right to the left side of the box and changed the angle of the view of the coffee cup, Sandler, 1/26/07 Tr. 96:9-16;

- changed the picture of iced tea with lemon by eliminating the iced tea pitcher, adding a few berries to the glass of iced tea and changing the angle of the iced-tea glass, *id*. 96:17-23; and

- changed the placement of the "made from sugar, tastes like sugar" seal, *id*. 93:26-94:4.

58.     Additionally, McNeil added stars in a curved pattern on the left side of the New

Splenda Box, *id*. at 92:1-8, 93:2-6;[10] changed the font on the statement, "Ideal for the Whole

Family," located at the top of the package, *id*. 91:7-14; and added the word "packets" in large

script, *id*. at 48:17-19, 96:24-25.  *See also* Gelov, 2/7/07 Tr. 24:22-25.

59.     Moreover, McNeil is willing to make temporary changes to its packages for

promotional purposes.  Just last month, McNeil was selling a 200-packet Splenda package

("Bonus Pack Package") that was significantly different from either the Original Splenda Box or

the New Splenda Box.  *See* Ex. A to Second Supplemental Declaration of Teodor Gelov in

Support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction ("Gelov 2d

Supp. Decl.").[11]

60.     The Bonus Pack Package differs from the Original Splenda Box and the New

Splenda Box because it depicts a standard ½ cup measuring cup on the front of the package,

which covers the central coffee-cup image.  Gelov 2d Supp. Decl. ¶ 5.  Inside the depiction of the

measuring cup is the text, "Bonus Pack.  Sweet Sample Includes ½ Cup Splenda® No Calorie

Sweetener, Granulated, For Baking Your Favorite Recipes."  *Id.*  The yellow measuring cup is

outlined with a red circle and the text inside the measuring cup depiction is red and blue.  *Id.*

Also different from the Original Splenda Box and New Splenda Box is a red triangle on the upper

right-hand corner of the Bonus Pack Package, which says, "Sample On Back."  *Id.*  The Bonus

Pack Package is wrapped in clear plastic and includes a ½ cup package of granulated Splenda

enclosed within the plastic at the back of the package.  *Id.*

---

[10]     Equal's packaging also contains stars in a curved pattern.  *Id*. 92:26-93:6; Ex. Q.

[11]     Pending before the Court is Heartland's motion for permission to supplement the record
with Gelov's additional declaration.

**K.**      <u>Changes to McNeil's Granular Bag Designs</u>

61.      In addition to marketing Splenda in boxes of packets in retail stores, McNeil also sells flexible bags of granulated Splenda for use in cooking and baking.  Sandler, 1/26/07 Tr. 47:13-16.

62.      McNeil made similar changes to its granular-product packaging as it did to its boxes of packets.  Sandler, 1/26/07 Tr. 49:8-11.  Pictures of the old Splenda granular bag, Ex. 1C, and the new Splenda granular bag, Ex. H, are below.



63.      For example, McNeil changed the color of its granulated packaging to a more intense yellow; eliminated most of the "mottled look"; added stars by the Splenda name; and added the statement "granulated" in large script.  Sandler, 1/26/07 Tr. 49:6-7, 91:2-6, 92:1-17, 94:7-10.

64.      Moreover, McNeil added and removed photographic elements from its granular bag.  For instance, McNeil added, for the first time, a picture of a white coffee cup and fruit in a clear bowl on its granular bag and removed the picture of cereal in a white bowl.  Sandler, 1/26/07 Tr. 93:7-25; Gelov, 2/7/07 Tr. 45:16-18.  Additionally, McNeil changed the pie pictured on its granular bag from peach pie to mixed berry pie.  *Id*. at 93:18-21.

**L.**   **Successive Changes to Splenda Packets**



65.     McNeil also has changed the appearance of its individual packets on at least two

occasions.  First, McNeil changed the yellow border around Splenda's packets to blue.  Later,

McNeil added stars to Splenda's packets above the Splenda name.  Some of the starred packets

also employ a "fortune-cookie approach," replacing the nutritional facts typically on the back of

the packets with sayings such as, "Surrender to the sweetness."  Sandler, 1/26/07 Tr. 109:15-110-

13[12]; *see also* Exs. N, O, P, pictured above.

**M.**   **The New Splenda Box Compared to Safeway's Box**



66.     The New Splenda Box, Ex. KKK, differs in significant respects from Safeway's

Sucralose box, Ex. SSS, both of which are pictured above:

- *The product names differ.*  McNeil's products contain the name "Splenda," and Safeway's
  product is named the generic "Sucralose."  Sandler, 1/26/07 Tr. 114:6-15.

- *The product names are located in different places.*  Splenda is centered at the top of the
  package, and Sucralose is at the bottom of the box, flush left.  *Id.* 114:16-20.

- *The product names are visually distinct.*  Splenda contains stars next to its name and a
  white cloud surrounds the name "Splenda."  *Id.* 118:26-119:1-8.  Both of these elements

---

[12]     Equal's individual packets also employ this "fortune cookie approach."  *Id.* 112:6-16.

are absent from the Sucralose name -- and, for that matter, from the Sucralose package. *Id*.

- *Sucralose employs a major design element absent from Splenda.* Sucralose contains a white "S" element "that leads your eye down to the [trademarked] Safeway name and logo," i*d*. 116:19-26, and bisects the packaging into two different colors, Gelov, 2/7/07 Tr. 28:5-8. Additionally, the bottom of the Sucralose box contains a white border absent from Splenda.

- *The source name on the front of Sucralose is absent from Splenda.* The Sucralose box states "Safeway" in three locations on the front of the package. *Id*. 27:20-25. In contrast, the names "McNeil" or "Johnson & Johnson" are not contained anywhere on the front of Splenda's packaging. Sandler, 1/26/07 Tr. 115:15-23.

- *Sucralose and Splenda contain different photographic elements, placed in different locations, and shot at different angles.* For example, Sucralose contains a picture of a mug of coffee on the left side of the package, while Splenda contains a picture of a cup of coffee with a saucer centered on the package and the angle of the mug versus the cup are different. *Id*. 114:21-115:14. Splenda contains a picture of iced tea, but Sucralose contains no cold-beverage picture. *Id*. 116:27-117:9. In addition, Sucralose contains a bowl of berries and a packet caddy, both of which are absent from Splenda. *Id*. 117:10-16; Gelov, 2/7/07 Tr. 27:10-11.

- *Sucralose and Splenda contain different circular elements, placed in different locations*. Splenda contains its white "made from sugar, tastes like sugar" seal in the bottom, left-hand corner of the package, while Sucralose has no corresponding seal. Sandler, 1/26/07 Tr. 117:17-118:18. Furthermore, Sucralose contains a blue circular "poker chip," Gelov, 2/7/07 Tr. 27:12-19, on the right side of its packaging, which states "100 Individual Packets," Sandler, 1/26/07 Tr. 118:12-18. Splenda has no similar poker-chip element; rather, as discussed above, Splenda states "packets" in prominent script on its package, Sandler, 1/26/07 Tr. 48:14-19, 96:24-25.

- *Sucralose and Splenda boxes are different sizes.* Sucralose is narrower in depth and shorter in height than Splenda is. Sandler, 1/26/07 Tr. 119:15-120:2; Gelov, 2/7/07 Tr. 13:18-21.

- *Splenda's and Sucralose's texts target different consumers.* Splenda states that it is "Ideal for the Whole Family," Ex. K, while Sucralose states that it is "Suitable for people with diabetes," Ex. JJJ.

**N.**   **The New Splenda Box Compared to Ahold's Box**



67.     The New Splenda Box, Ex. L, differs in several respects from the Ahold-brand

(Giant, Stop & Shop, and Tops) boxes, Ex. TTT (both of which are pictured above in the 200-

packet variety):[13]

- *The product names differ*.  McNeil's products contain its trademarked name "Splenda," and the Ahold products contain the generic, descriptive name "Sweetener."  Sandler, 1/26/07 Tr. 121:16-19; Gelov, 2/7/07 Tr. 26:11-12.

- *The product names are visually distinct*.  Splenda contains stars to the left of and above its name, and a white cloud surrounds the name "Splenda."  Sandler, 1/26/07 Tr. 123:10-20; Gelov, 2/7/07 Tr. 26:10; Ex. 2A.  Sweetener has neither of these elements, Ex. 3A; instead, it has a blue banner stating "Calorie Free" directly under its name.  Sandler, 1/26/07 Tr. 123:21-23; Ex. 3A.

- *Sweetener has a major design element absent from Splenda.*  Sweetener has a white rectangular frame absent from Splenda.  Sandler, 1/26/07 Tr. 122:15-22; Gelov, 2/7/07 Tr. 26:18-19.

- *The respective food store name is on the front of Sweetener.*  Sandler, 1/26/07 Tr. 122:4-14.  In contrast, the names "McNeil" or "Johnson & Johnson" are not located anywhere on the front of Splenda's packaging -- instead, "McNeil Nutritionals, LLC" is in small type on the side of the Splenda box.  Sandler, 1/26/07 Tr. 125:17-24.

- *Sweetener and Splenda contain different photographic elements, placed in different locations, and shot at different angles*.  For example, Splenda contains pictures of a spoon, glass of iced tea, and two individual Splenda packets; all of these photographic elements are absent from Sweetener.  *Id.* 122:1-2, 23-25; Gelov, 2/7/07 Tr. 26:14-15; Exs. 2A, 2B.  Conversely, Sweetener contains whole cut lemons and a glass of lemonade -- elements Splenda lacks.  *Id.* 122:1-26-28; Gelov, 2/7/07 Tr. 26:14-15; Exs. 2A, 3A.  Further, although both Sweetener and Splenda contain cups of coffee, Splenda's cup is contained at the bottom center of its package, while Sweetener's is at the bottom right; the two cups are different sizes; and the camera angle on the two cups is different.  *Id.* 121:20-28.

- *Sweetener contains no circular seal element*.  Splenda contains its white "made from sugar, tastes like sugar" seal in the bottom, left-hand corner of the package; Sweetener has no corresponding seal or any other circular element on its packaging.  *Id.* 123:7-9.

- *Sweetener has a ribbon element that Splenda lacks.*  On the left side of the Sweetener box, there is a blue ribbon that states "Each packet as sweet as two teaspoons of sugar."  Splenda has no similar ribbon element and no corresponding statement.  *Id.* 123:1-6; Exs. 2A, 3A.

- *Sweetener and Splenda 100-packet boxes are different sizes.*  Sucralose is narrower in depth and shorter in height than Splenda is.  Sandler, 1/26/07 Tr. 124:2-5.

---

[13]     Giant's, Stop & Shop's, and Top's Sweetener boxes are identical, except that each contains its respective store's name.  Sandler, 1/26/07 Tr. 121:6-10, 122:4-14.

**O.    The New Splenda Box Compared to Food Lion's Box**



68.    The New Splenda Box, Ex. KKK, differs in several respects from Food Lion's

Sweet Choice box, Ex. III (both of which are pictured above in 100-packet version):

- *The product names differ.*  McNeil's products contain its trademarked name "Splenda," and Food Lion's product contains its trademarked name "Sweet Choice."  Sandler, 1/26/07 Tr. 124:7-17.

- *The product names are located in different places.*  "Splenda" is centered at the top of the package, and "Sweet Choice" is at the bottom, centered.  *Id.* 124:18-20.

- *The product names are visually different.*  Unlike Splenda, Sweet Choice has no stars and no white oval cloud, and Sweet Choice" is underlined, with the statement "No calorie sweetener" within the underline.  *Id.* 124:18-27, 125:5-6

- *The source name on the front of Sweet Choice is absent from Splenda.*  The Sweet Choice box contains the prominent, black Food Lion name and lion logo on the upper left-hand side of the box.  *Id.* 125:17-20; Ex. III.  The names "McNeil" or "Johnson & Johnson" are not located anywhere on the front of Splenda's packaging -- instead, "McNeil Nutritionals, LLC" is in small type on the side of the Splenda box.  Sandler, 1/26/07 Tr. 125:21-24.

- *Sweet Choice employs a major design element absent from Splenda.*  Namely, Sweet Choice's packaging is divided into two rectangles; the left rectangle, which contains the trademarked Food Lion logo, is darker in color.  *Id.* 125:25:126:4.  Food Lion employs this vertical element design feature in its other private-label packaging.  Gelov, 2/7/07 Tr. 25:4-11.

- *Sweet Choice and Splenda contain different photographic elements, placed in different locations, and shot at different angles.*  For example, Splenda contains a picture of one glass of iced tea on the far right side, while Sweet Choice contains two glasses and a pitcher of what appears to be lemonade in the left/center of the box, Sandler, 1/26/07 Tr. 126:5-16; Ex. III.  Splenda pictures a single lemon wedge, while Sweet Choice pictures several cut lemons.  Sandler, 1/26/07 Tr. 126:17-27; Exs. KKK, III.  Splenda contains a picture of a cup of coffee with a saucer centered on the package, while Sweet Choice pictures a mug of coffee on the right side of the package, and the camera angle on the cup and mug are different.  Sandler, 1/26/07 Tr. 114:21-24; Exs. KKK, III.  Finally, Splenda pictures individual packets, and Sweet Choice has no packets.  Exs. KKK, III.

- *Sweet Choice contains no circular seal element and no "packets" statement in script.*  Splenda contains its white "made from sugar, tastes like sugar" seal in the bottom, left-

hand corner of the package and the descriptive term "packets" in script.  Sandler, 1/26/07
Tr. 127:2-4; Ex. KKK.  Sweet Choice has no corresponding seal (nor, for that matter, any
circular element on its packaging) and no script "packets" statement.  Sandler, 1/26/07 Tr.
127:5-6; Ex. III.

- *Sweet Choice and Splenda boxes are different sizes.*  Sucralose is narrower in depth and
shorter in height than Splenda is.  Gelov, 2/7/07 Tr. 13:5-21; Exs. KKK, III.

*See also* Gelov, 2/7/07 Tr. 24:17-25:11 (discussing differences between Sweet Choice and new

Splenda packaging).

      69.    Safeway does not sell a granular product.  Gelov, 2/7/07 Tr. 40:19-23.

**P.**    **The New Splenda Granular Bag Compared to Food Lion's Granular Bag**



      70.    Like their respective boxes, Splenda's new granular bag, Ex. H, and Food Lion's

Sweet Choice granular bag, Ex. RRR (both of which are pictured above), also differ significantly:

- *Splenda's flexible bag is a brighter, deeper yellow than Sweet Choice's flexible bag.*  Exs.
H, RRR.

- *The product names differ, as do the location of the product names*.  McNeil's granular
products has its trademarked, fanciful "Splenda" name at the top, center of the bag, while
the Food Lion granular product has a generic, descriptive name, "Sweet Choice" at the
bottom of the bag.  Exs. H, RRR.

- *The product names are visually distinct*.  Splenda contains stars next to and above its
name and an enveloping white cloud.  Sweet Choice has no stars and no cloud
surrounding its name; instead, "Sweet Choice" is underlined, and contains the statement
"No calorie sweetener" within the underline.  Ex. RRR.

- *The source name on the front of Sweet Choice is absent from Splenda*.  The Sweet Choice
box contains the prominent, black trademarked Food Lion name and lion logo on the
upper left-hand side of the bag; Splenda has no equivalent element.  Exs. H, RRR.

- *Sweet Choice has a major design element absent from Splenda.*  Consistent with Food
Lion's other private-label packaging, Sweet Choice is divided into two rectangles, and the

left side, which contains the trademarked Food Lion logo, is darker in color.  Gelov, 2/7/07 Tr. 25:4-11, 43:3-7; Ex. RRR.

- *Sweet Choice's and Splenda's flexible bags contain different photographic elements and other elements differ in their location and camera angles.*  Splenda pictures a piece of mixed berry pie and a cup of coffee, while Sweet Choice pictures a loaf of banana nut bread and a cup of granulated sweetener with a scoop.  Exs. H, RRR.  The bowl of fruit on both packages (which Splenda adopted for the first time in its new packaging, Gelov, 2/7/07 Tr. 45:14-15) differs in that the Splenda fruit bowl contains peaches and is located on the left side, Ex. H, while the Sweet Choice fruit bowl contains no peaches and is located in the center of the bag, Ex. RRR.  The respective fruit bowls have different camera angles as well.  Id.

- *Sweet Choice contains no circular seal element and no "granulated" statement in script.*  Splenda contains its white "made from sugar, tastes like sugar" seal in the bottom, left-hand corner of the package and its addition of the descriptive term "packets" in script.  Ex. H.  Sweet Choice has no corresponding seal (nor any circular element) and no script "packets" statement.  Ex. RRR.

**Q.**     **The New Splenda Granular Bag Compared to Ahold's Granular Bag**



71.     Splenda's new granular bag, Ex. H, and the granular bags of the three Ahold

brands, *e.g.* Ex. QQQ (pictured above), are also visually distinct:

- *Splenda's bag is a brighter, deeper* yellow *than the Sweetener bags.*  Gelov, 2/7/07 Tr. 45:9-10; Exs. H, QQQ.

- *The different product names are visually distinct.*  McNeil's products contain its trademarked, fanciful name "Splenda," and the Ahold products contain the generic-sounding name "Sweetener."  Gelov, 2/7/07 Tr. 45:6-8; Ex. QQQ.  A white, oval cloud surrounds the name "Splenda," while Sweetener has no such cloud effect.  Further, Sweetener has a blue banner stating "Calorie Free" directly under its name, which is absent from Splenda.  Exs. H, QQQ.

- *Sweetener has a major design element absent from Splenda:*  Sweetener employs a white rectangular frame, which Splenda lacks.  *Id.*

- *The* respective *food store name and logo are on the front of Sweetener.*  Ex. QQQ.  In contrast, the names "McNeil Nutritionals" or "Johnson & Johnson" are not located anywhere on the front of Splenda.  Ex. H.

- *Sweetener and Splenda contain different photographic elements.*  Splenda pictures a mixed berry pie piece and a bowl of fruit, while Sweetener pictures a piece of cheesecake and bowl of cereal.  Gelov, 2/7/07 Tr. 45:12-15; Ex. H, QQQ.[14]

- *Sweetener contains no circular seal element and no script stating "granulated."*  Splenda contains its white "made from sugar, tastes like sugar" seal in the bottom, left-hand corner of the package.  Ex. H.  Splenda also contains the statement "granulated" in prominent script, Gelov, 2/7/07 Tr. 45:10-11; Ex. H, followed by the statements "Great for Cooking and Baking" and "Measure Cup for Cup Like Sugar," Ex. H.  Sweetener has no corresponding seal and no equivalent script statements.  Ex. QQQ.

**R.    The New Splenda Packet Compared to Food Lion's Packet**



72.     Splenda's new blue-bordered packet, Ex. O, and Food Lion's Sweet Choice

packet, Ex. NNN (both pictured above), significantly differ in appearance:

- *Splenda and Sweet Choice packets differ in color.*  Splenda's yellow is custom made, while Sweet Choice is a standard, stock yellow, which looks different from Splenda's yellow.  Gelov, 2/7/07 Tr. 35:25-36:24.

- *The color of the writing on the two packets are different.*  The writing on the Splenda is blue; the writing on the Sweet Choice packet is black.  Exs. O, NNN.

- *The different product names are visually distinct.*  McNeil's packets contain its trademarked, fanciful name "Splenda" in blue font at the top of the packets, while Food Lion's generic-sounding name "Sweet Choice" is in black font at the bottom of the packets.  "Splenda" is highlighted by a blue, half-circle underline effect, while "Sweet Choice" is underlined with a black, straight underline.  *Id.*

- *Splenda employs a major design element absent from Sweet Choice.*  Splenda uses a rectangular frame; Sweet Choice does not.  *Id.*

- *The Food Lion trademarked name and logo are prominent on Sweet Choice*; Splenda has no corresponding elements.  *Id.*

---

[14]     The only common photographic element, a cup of coffee, was pictured on Sweetener first; Splenda adopted this element when it changed its packaging.  Sandler, 1/26/07 Tr. 94:18-21; Gelov, 2/7/07 Tr. 45:16-18.

**S.   The New Splenda Packet Compared to Ahold's Packet**



73.     Splenda's new blue-bordered packet, Ex. O, significantly differs from the packets

of the three Ahold stores, *e.g.* Ex. OOO (both pictured above):

- *The Splenda and Sweetener packets differ in color.*  Splenda's yellow is custom made, while Sweetener is a standard, stock yellow.  Gelov, 2/7/07 Tr. 35:25-36:24.

- *The product names differ.*  McNeil's packets contain its trademarked, fanciful name "Splenda," while Ahold's packets have the generic-sounding name "Sweetener."  Exs. O, OOO.

- *The product names are visually distinct.*   "Splenda" is highlighted by a blue, half-circle underline effect, while "Sweetener" has no underline effect and, instead, contains a banner has a blue banner stating "Calorie Free" -- which banner element is absent from Splenda. *Id.*

- *Splenda uses a major design element absent from Sweetener.*  Splenda has a rectangular frame; Sweetener does not.  *Id.*

**T.   The New Splenda Packet Compared to Safeway's Packet**



74.     Finally, Splenda's new blue-bordered packet, Ex. O, and Safeway's Sucralose

packet, Ex. MMM (both of which are pictured above), also differ significantly:

- *The Splenda and Sucralose packets differ in color.*  Splenda's yellow is custom made, while Sweetener is a standard, stock yellow.  Gelov, 2/7/07 Tr. 35:25-36:24.

- *The product names differ.*  McNeil's packets contain its trademarked, fanciful name "Splenda," while Safeway's packets have the generic-sounding name "Sucralose."  Exs. O, OOO.

- *The product names are visually distinct.* "Splenda" is highlighted by a blue, half-circle underline effect, while "Sucralose" has no underline effect and uses a thicker, bolder font. *Id.*

- *The Safeway name trademarked name and logo are prominent on Sucralose*; Splenda has no corresponding elements. *Id.*

- *Sucralose has a thicker, bolder border effect than Splenda*. *Id.*

75.     For the reasons discussed above in sections M, N, and O, the Original Splenda Box also differs from Safeway's, Food Lion's, Ahold's boxes.

76.     Likewise, for the reasons discussed above in sections P and Q, the McNeil's original granular bag differs from Food Lion and Ahold's granular bags. *See also* Gelov, 2/7/07 Tr. 42:14-43:7 (discussing differences between the old Splenda granular bag and Food Lion's granular bag), 44:9-45:1 (same as to the old Splenda granular bag and Ahold's granular bag).

77.     Finally, for the reasons discussed above in sections R, S, and T, the old Splenda packets differ from Food Lion's, Ahold's, and Safeway's packets.

**U.     McNeil's Marketing Focuses on the "Made From, Tastes Like Sugar" Seal**

78.     McNeil has heavily marketed the "made from sugar, tastes like sugar" seal. Gelov, 2/7/07 Tr. 32:14-15.

79.     While McNeil claims it "has devoted substantial resources to market and promote the Splenda trade dress," McNeil Finding 8, McNeil elsewhere has admitted that its advertising and marketing to the contrary was focused on "one core proposition . . . from the beginning, made from sugar, tastes like sugar . . . ."  1/30/07 Transcript in *Merisant Company v. McNeil Nutritionals, LLC*, C.A. No. 04-5504 (E.D. Pa.) ("Merisant Tr.") 29:3-5 (argument of Steve A. Zalesin on behalf of McNeil), the relevant pages of which are attached as Exhibit A.[15]

---

[15]     *Merisant Company v. McNeil Nutritionals, LLC,* Civ. A. No. 04-5504 (E.D. Pa.) is a false-advertising lawsuit regarding the slogan, "made from sugar, tastes like sugar."  It is pending in this Court before the Honorable Gene E. K. Pratter.  The suit contends that the slogan is not only literally false, but also "misleads consumers into believing that Splenda contains actual

80.     On January 30, 2007, McNeil lawyer Zalesin, who also represents McNeil in this

matter, explained to Judge Gene E.K. Pratter of this Court that, from the time Splenda was

launched, it was positioned "[p]rimary, tastes like sugar because it's made from sugar, and then

secondarily, it can be used anywhere that sugar can, including cooking and baking."  Merisant Tr.

13:24-14:4; *see also id.* 12:19-13:3 ("And when McNeil finally launched the product and it hit

store shelves in September of that year 2000, its packaging featured the one claim that McNeil

had publicly identified as the defining feature of the product.  In that seal you see in the preceding

slide, the, 'made from sugar, tastes like sugar seal,' which appeared on every box of Splenda

from the day it was launched and continues to this day.  Not only on the box itself, but on every

packet, every individual packet of Splenda, which is up on the screen there, has that claim, 'Made

from sugar, so it tastes like sugar.'"); 13:15-18 ("[T]he proposition that resonates with consumers

is the fact that Splenda is made from sugar and tastes like sugar, and so ads will focus on the

origin of the product, the sugar origins."); 14:14-16 ("McNeil was entering the market with an

extremely high profile and well financed product with a made from sugar, tastes like sugar

positioning."); 15:20-22 (McNeil "was going to launch a high profile T.V. campaign introducing

Splenda and its properties as being related to and derived from sugar."); 16:4-6 ("And again, very

prominently, it's made from sugar so it tastes like sugar, but it's calorie free.  No deviation ever

from that core marketing message.")

81.     Zalesin further explained that the most important feature of Splenda's packaging

was not its: (1) background color; (2) blue lettering; (3) "unique blue color-fade motif on product

name," McNeil Findings ¶ 18; (4) italicized font for the product name; (5) product name

beginning with an "S" in larger script; (6) white background highlighting or outlining product

_____

sugar and is a natural product."  *Merisant* Compl. ¶ 1.  In a memorandum and opinion entered on
March 2, 2007, the Court denied McNeil's motion for summary judgment.

name; (7) package size; (8) pictorial elements; (9) layout; or (10) packet coloring or layout.  To the contrary, describing Splenda's packaging, Zalesin stated that it "[a]lways used that very prominent , made from sugar, tastes like sugar seal, and the made from sugar so it tastes like sugar tag line, on every single package."  Merisant Tr. 17:19-21.

82.     He further explained that every Splenda ad "all feature this, Splenda is made from sugar so it tastes like sugar, tag line."  Tr. 17:25-18:1; *see also id.* 22:1-10 ("ad after ad after ad" features "made from sugar, tastes like sugar" tag line).

83.     In fact, Zalesin stated that McNeil's marketing of Splenda focused "almost to the exclusion of everything else, on this core marketing proposition that they had adopted in -- really before the launch of the product in early 2000, made from sugar, tastes like sugar." *Id.* 29:17-21.

84.     McNeil marketing expenditures are aimed not at establishing consumer recognition of its purportedly distinctive packaging, but rather on "building the business on that one core proposition that they focused on from the beginning, made from sugar, tastes like sugar . . . ."  Merisant Tr. 29:2-5.  As Zalesin continued, "The identity of the brand is built upon this, made from sugar, tastes like sugar heritage, and this is the result of McNeil's marketing efforts." *Id.* 29:8-12.

## V.      Color Coding in Sugar and Sugar Substitutes

85.     As the number of sugar and sugar substitutes has proliferated, color-coding in packaging has developed as a means of differentiating products and quickly identifying the active ingredient in a given product.  Sandler, 1/26/07 Tr. 77:14-15 (admitting that sweetener packets are "a color identified category"); Gelov, 2/7/07 Tr. 47:11-13; Canaan Decl. ¶ 25.

86.     As McNeil's Sandler testified:

> **Q.** If you went this morning and you bought a cup of coffee at a coffee stand, am I correct that you would be likely to see a display of packets

that would at least include white packets, pink packets, blue packets, yellow packets and maybe even brown packets?
**A.** That's correct. They tend to be all one color in one area, all the pink together, all the yellow together, all the blue together and so forth.
**Q.** Okay. And that -- that color coding enables the consumer to find the type of sweetener that he or she is looking for?
**A.** Yes.

Sandler, 1/26/07 Tr. 111:21-112:5.

87.     Canaan testified: "Color indicates . . . a very easy way to tell the difference between saccharine. . .aspartame, sucralose and that type of coloration services the customer so they're not confused and buying the wrong product." Canaan, 1/26/06 Tr. 180:17-20. Similarly, Gelov testified: "[T]he trade, meaning people involved in this tabletop industry, which is the customers and the consumers, have moved -- have gone to color coding." Gelov, 2/7/07 Tr. 87:22-24. "And the trade even refers to it as pink, blue, and yellow. Do you have any pink, do you have any yellow, do you have any blue. This is . . . how the retailers communicate with me and even how the consumers communicate -- yellow, pink, blue." *Id.* 88:17-22; *see also* Grossman Tr. 22:19-22 (Q. Are you familiar with any other no calorie sweeteners? A. The pink one and the blue one. I never can remember their names."); McNeil Findings ¶ 7 ("Sweet'N Low, the leading saccharin brand, has long been marketed in red and white (or, more recently, pink) packaging, and in pink single-serving packets . . . Equal, the best selling aspartame brand, has been distributed in blue packets . . . and in a distinctive blue box."); *id.* ¶ 14 ("in a sea of blue and pink packaged competitors came yellow packaging with gradated blue lettering on a white background").

88.     Both Ahold (Giant, Stop & Shop and Tops) and Safeway[16] have used similar package design across its no-calorie sweetener store brands and has color-coded them: red for

---

[16]     McNeil has attempted to suggest that the Safeway Sucralose design is an aberration from Safeway's typical store brand design and different from its saccharin and aspartame products.

saccharin; blue for aspartame; and yellow for sucralose.  Canaan, 1/26/07 Tr. 172:6-15 (Ahold);

Kessler Decl. ¶¶ 13-14 and Ex. B.  In fact, Ahold even uses the same product name, "Sweetener"

for its pink (saccharin), blue (aspartame) and yellow (sucralose) products.  Cannon, 1/26/07 Tr.

183: 9-17.

89.     If a grocery store used a color scheme other than red/pink for saccharin, blue for

aspartame and yellow for sucralose, "It would be very confusing . . .[c]olor coding helps

consumers know here's -- here's the basic product.  And it would be a disservice to go with

another color." *Id.* 13-21.

90.     The touchstone of food packaging is appetite appeal.  Sandler, 1/26/07 Tr. 45:10-

11; Canaan Decl. ¶ 34.  In other words, food packaging is designed so that the consumer will

believe the foods associated with the product will look and taste good.  *Id.*

91.     There are only a certain number of colors that provide such appeal.  *Id.* ¶ 35.

Yellow is one such color, which stands out well on a grocery store shelf against blue, red and

pink.  *Id.*

_____

Exs. 6A, 130, 145, 146.  The only evidence of record regarding the Safeway design, however,
demonstrates that: (a) Safeway is in the midst of unifying its branded products with a common
packaging theme; (b) the Safeway Sucralose product was the first no-calorie sweetener to employ
the chain's package redesign; (c) the package redesign has been completed for Safeway's
aspartame and saccharin products; and (d) the redesigned packages for aspartame and saccharin
employ all the same packaging elements as the Sucralose product: (i) the "S" curve; (ii) the
product information with icons and in a "poker chip" at top right; (iii) the product name and
serving suggestion photograph in the bottom left; and (iv) the Safeway brand name and logo at
the bottom, directly below the "S" curve.  Declaration of David Kessler, Director of Packaging
Development with Safeway, Inc. ("Kessler Decl.") ¶¶ 8, 13-14.  McNeil grouses that Kessler's
declaration omits a statement that Safeway did not intend to confuse consumers with its Sucralose
packaging.  McNeil Conclusions 29 n.6.  Kessler's declaration, however, was intended only to
rebut McNeil's assertion that the Sucralose package was somehow aberrational.  Moreover,
implicit in Safeway's uniform design throughout its no-calorie sweetener packaging, and indeed
all of its packaging, is a lack of intent to confuse consumers.  As Kessler stated, Safeway's intent
was to create "a common packaging theme" across products.  *Id.* ¶ 8.

92.     Applying principals of packaging design, a manufacturer of sugar substitutes would be unlikely to choose purple, green or orange for its color scheme.  *Id.* ¶ 36.  This is because purple and orange are not commonly associated with successful food products and green is generally associated with produce and health foods, instead of sweeteners.  Canaan, 1/26/07 Tr. 178:17-20; Canaan Decl. ¶ 36.

93.     Indeed, McNeil considered and rejected orange, purple and green as potential colors for its Splenda packaging.  Sandler, 1/26/07 Tr. 142:11-27.

**W.     Common Features of All Sweetener Packages**

94.     The vast majority of sugar and sugar substitute packages contain pictures of foods and/or drinks that are either made with sweetener, into which sweetener is added, or onto which sweetener is sprinkled.  Sandler, 1/26/07 Tr. 103:7-10; Gelov Decl. ¶ 36.

95.     For example, many sweetener packages depict hot and cold beverages such as coffee, tea (iced or hot) and lemonade; fruit; cereal; and baked goods, such as cake, bread, or pie.  Gelov, 2/7/07 Tr. 15:26-16:3.  *See also, e.g.,* Exs. AA (Equal), BB (NatraTaste), CC (Sugar Twin), KK (Domino confectioners' sugar).

96.     Equal, for example, depicts a cup of coffee and a glass of iced tea because consumers typically use sugar substitute in both of these beverages.  Sandler, 1/26/07 Tr. 103:7-13; Ex. AA; Gelov Decl. ¶ 37.

97.     NatraTaste's packaging contains a photograph of a coffee cup and a packet of sweetener.  Sandler, 1/26/07 Tr. 103:23-26; Gelov Decl. ¶ 37; Ex. BB.

98.     The packaging for Sugar Twin, also marketed before Splenda, includes a picture of a coffee cup and a portion of a pie.  Sandler, 1/26/07 Tr. 103:14-17; Gelov Dec. ¶ 37; Exs. CC1 and CC2; s*ee also* http://www.sugartwin.com/pi.cfm.

99.     Sweet'N Low's packaging also depicts a coffee cup.  Sandler, 1/26/07 Tr. 103:18-19; Ex. A19.

100.    As McNeil's Sandler aptly summarized: "Yeah, they all have coffee cups." Sandler, 1/26/07 Tr. 103:24.

101.    Many sweeteners also show cold beverages on their packaging.  Sandler, 1/26/07 Tr. 105:4-7, 17-28.

102.    Many sweeteners also depict baked goods, including Pure D'Lite, Sugar Twin, and Equal.  Sandler, 1/26/07 Tr. 103:27-104:3, 104:16-27-105:3; Exs. UUU, CC1, CC2, AAA.

103.    It is not surprising that sugar substitute packages would include references to foods and beverages in which the product is used.  Canaan Decl. ¶ 37.  This is because the product itself is a white powder, which, on its own, lacks appetite appeal.  Canaan, 1/26/07 Tr. 172:28-173:2; Canaan Decl. ¶ 37.

104.    Leading images that promote appetite appeal are precisely those that are found on the packaging of almost all sugar substitutes: coffee, iced tea, lemonade, and other beverages to which sweetener is typically added; cereal; fruit; and baked goods.  *Id.*

**X.    Common Features of Grocery Store Sugar Aisles**

105.    Consumers typically encounter boxes and flexible packages of no-calorie sweeteners in grocery stores, where other elements aside from packaging help them make purchasing decisions.  Gelov, 2/7/07 Tr. 31:1-9.

106.    Bulk sugar tends to be found on the bottom shelf.  Canaan, 1/26/07 Tr. 174:11. Sugar substitutes are generally found at eye level.  *Id.* 174:12-15.

107.    Before a consumer even gets to the sugar aisle, he or she is aware of the store in which he or she is shopping.  Sandler, 1/26/07 Tr. 113;4-8; Gelov, 2/7/07 Tr. 31:8-9.

108.    The consumer is aware that the store has private label brands that, in most cases, are merchandised next to the national brands.  *Id.* 31:10-13.

109.    The prices are prominently displayed, showing the cost difference between store brands and national brands.  *Id.* 31:13-15; Exs. A36, A39-A42, B1-B2.

110.    There are other visual cues of differences between store and national brand sweeteners, including shelf extenders or shelf talkers, which are tags that extend below store aisles shelves and contain promotional messages.  *Id.* 31:15-16; Sander, 1/26/07 Tr. 84:27-85:4; Exs. A39-A42.

111.    Consumers also often see circulars that promote the store's brand identity and that often promote store brands.  Gelov, 2/7/07 Tr. 31:19-32:3.  These circulars are available in stores, often are inserted into Sunday newspapers and sometimes are delivered to consumers' homes.  *Id.* 31:21-24.

112.    Ahold circulars have featured Giant and Stop & Shop store brand no-calorie sucralose sweetener.  *Id.* 51:9-52:13; Exs. GGG, HHH, ZZ.

113.    Stores spend significant sums of money to promote their brands.  Sandler, 1/26/07 Tr. 136:24-137:2, 137:23-28, 138:1-87.  They advertise in channels that include television, radio and print media.  Gelov, 2/2/07 Tr. 51:6-8.

114.    As McNeil's Debra Sandler admitted, stores like Giant and Safeway and Food Lion, spend very significant sums of money promoting that store name and identity.  Sandler, 1/26/07 Tr. 137:23-28.

115.    For example, Safeway in 2005 spent almost twice as much promoting its brand ($113 million) as McNeil spent promoting Splenda ($62 million).[17]  *Id.* 136:24-137:2, 138:1-8.

---

[17]    The $62 million McNeil spent in 2005 to promote Splenda also was less than the budget for a number of other Johnson & Johnson products, including Neutrogena ($178 million) and

**Y.**     **Attributes of Average Consumers**

116.     The average United States consumer had median household income of $46,242 as of 2005.  Income, Earnings, and Poverty Data from the 2005 American Community Survey, U.S. Census Bureau, available at http://www.census.gov/prod/2006pubs/acs-02.pdf, at 2-3.[18]

117.     The average consumer is well acquainted with the concept of brands and brand messages.  Canaan, 1/26/07 Tr. 154:18-25.  In fact, the average consumer sees 2,500 branded messages a day and has since the day he or she was born.  *Id.* 154:18-21

118.     Average consumers readily recognize the differences between brands, and are very capable of differentiating between them.  *Id.* 154:24-25, 155:2-4.  They are trained to do so by marketing and through life experience.  *Id.* 155:2-4.

119.     Consumers are "extremely sophisticated in the way they shop" and "understand color" as it relates to various products.  *Id.* 178:20-22.

120.     Consumers shop by looking for product differences.  *Id.* 182:9-10.  They expect product choice and are prepared to look for it.  *Id.* 183:20-22.

**Z.**     **Packaging Supplied By Heartland**

121.     Heartland typically does not design its own packaging.  Gelov, 2/7/07 Tr. 8:24-27; Gelov Decl. ¶ 40.  Rather, the retailer to whom Heartland sells product generally provides the design.  Gelov, 2/7/07 Tr. 8:24-27.

122.     Heartland did not design any of the packaging at issue in this matter.  Gelov, 2/7/07 Tr. 8:23-9:3; Gelov Decl. ¶ 41.

---

Tylenol ($145 million).  Sandler, 1/26/07 Tr. 136:22-23.  The $62 million also was much less than spent on a major consumer product such as Pepsi and Diet Pepsi ($263 million in 2005).  *Id.* 135:19-26.  In fact , McNeil's expenditures to promote its Splenda brand decreased by $9 million in 2006.  *Id.* 136:24-137:3.

[18]     Publications of a public authority, such as the U.S. Census Bureau, are self-authenticating and subject to a hearsay exception.  FED. R. EVID. 902(b), 803(8).

123.    Instead, Food Lion designed its Food Lion packaging; Gelov, 2/7/07 Tr. 9:8-15; Ahold designed the Giant, Stop & Shop and Tops packaging, *id.* 9:16-27; and Safeway designed the packaging for its store brand, which also is sold in Genuardi's stores. *Id.* 10:15-20.

124.    Each grocery chain, and not Heartland, selected the background color, the pictures and the color of the writing on its respective sucralose packaging. *Id.* 10:21-28.

125.    The only copy Heartland supplied on any of the packages at issue reflects the net weight, nutritional facts, the ingredient statement and, on the Ahold boxes, the sugar conversion chart. *Id.* 11:22-28 (Food Lion); *id.* 12:1-12 (Ahold); *id.* 12:16-24 (Safeway). The stores chose the rest of the copy on the packages. *Id.* 12:25-27.

126.    Heartland owns no rights in the trade dress of its private-label customers. *Id* 11:1-4. To the contrary, the customers own their packaging designs. *Id.* 11:5-7.

127.    Heartland has no ability to change the packaging of its customers. *Id.* 11:8-11.

128.    Heartland has no control over where its products appear inside stores. Instead, the stores themselves control the merchandizing and placement of products on their shelves. *Id.* 50:24-28.

129.    Similarly, Heartland does not design the flexible packaging in which Food Lion and Ahold markets its granular sucralose products. *Id.* 40:24-41:9. Safeway does not currently have a granular product; to date, it markets only boxes of sucralose packets. *Id.* 40:23.

130.    Heartland selected the pouch size it uses for the Food Lion and Ahold granulated sucralose products because: (a) it is the correct size for equivalence to five pounds of sugar; (b) it has good graphic printing ability; (c) it has light weigh for efficient and cost-effective distribution; and (d) it is the correct size to allow the product, which is light and fluffy, to settle away from the heat seal and to allow high-speed production. *Id.* 41:13-42:5.

131.    As Gelov testified: "Heartland provides products in flexible packaging because it's a popular and widely used method of packaging these products."  *Id.* 47:18-20.

132.    Likewise, Heartland does not design the packets contained in Food Lion, Ahold or Safeway sucralose boxes.  *Id.* 34:27-35:7

133.    Almost all packets in the sweetener category employ a standard packet size that is dictated by available equipment.  *Id.* 39:2-15, Exs. 9B; M; N-P; Q; MMM; NNN, OOO.

134.    Heartland supplies the paper used to make the packets.  *Id.* 35:12-13.  It uses a "standard stock yellow color" paper supplied to it by a well known supplier in the industry that "virtually everybody uses."  *Id.* 35:26-36:5, 74:10-13; Ex. T.

135.    Sugar Twin uses the same stock yellow paper for its packets.  Gelov, 2/7/07 Tr. 38:9-13.

136.    Heartland selected yellow for the packets because "the industry color codes, and yellow is an appropriate color for this product."  *Id.* 36:9-12; *see also* Sandler, 1/26/07 Tr. 77:13-15 ("Sugar packets in the industry have been identified as white, so as I mentioned -- as we discussed before, it is a color identified category").

137.    In selecting this color, Heartland did not seek to replicate the color McNeil uses for its Splenda packets.  Gelov, 2/7/07 Tr. 36:13-21.  In fact, McNeil uses a custom yellow color for its packets that is different from the stock yellow Heartland selected.  *Id.* 36:19-24; *compare* Ex. MMM, *with* Ex. N.

138.    Heartland did not have a custom yellow made for it for sucralose packets because it is costly to produce a custom color.  In addition, a minimum quantity of 80-100 tons is required for a custom order.  It would take Heartland a year to a year-and-a-half to use that quantity of paper, and Heartland lacks sufficient space to store it.  Gelov, 2/7/07 Tr. 37:23-38:8.

139.    Heartland began providing private-label sucralose products to the five retailers at issue in or around May/June 2006. Gelov Decl. ¶ 42.

140.    The 100-count boxes Heartland supplies to Food Lion, Ahold and Safeway are all the same size.  Gelov, 2/7/07 Tr. 13:5-8.

141.    Heartland's 100-count boxes also are the same size as the 100-count boxes for Equal, Sugar Twin and NutraSweet.  *Id.* 13:9-13.

142.    The Heartland boxes are the size they are because Heartland uses standard equipment available in the industry to manufacture the boxes.  *Id.* 13:22-27.  Heartland bought this equipment from Merisant Company, the maker of Equal.  *Id.* 13:28-14:6.  The machines were already tooled for Heartland's standard-size 100-count box.  *Id.* 14:1-3.

143.    McNeil's 100-count Splenda box is a different size than the Food Lion, Ahold and Safeway boxes.  *Id.* 13:18-21; *compare* Ex. KKK, *with* Exs. III, R, S, SSS.

144.    Heartland's 200-count boxes are the same size as the Equal, NutraSweet and Safeway 200-count boxes.  *Id.* 14:17-15:10.  Like the 100-count box, they are made on standard equipment in the industry that is available to make packaging.  *Id*. 15: 4-10.  These boxes are the size of the industry standard, and the tooling had been made and set up at the time Heartland bought its equipment.  *Id.* 15:4-10.

145.    Roughly six months before providing private-label sucralose products to Food Lion, Ahold and Safeway, in January 2006, Heartland began providing Wal-Mart with a private-label sucralose product named "Altern," and with its packaging.  Gelov Decl. ¶ 44.

146.    This packaging contains many of the same elements that McNeil complains about, including: yellow background; italicized font for the product name; "Tastes Like Sugar" slogan; similar package dimensions, similar photos (e.g., white coffee cup, bowl of cereal), and similar design layout.  *Id.*

147.    Altern also is marketed in packets made from the same stock yellow paper as the Safeway, Ahold and Food Lion sucralose packets.  Gelov, 2/7/07 Tr. 109:5-14; Ex. 11A.

148.    Albertsons, another grocery store chain, also sells a sucralose product with packets made from the same stock yellow paper as the Safeway, Ahold and Food Lion packets.  Gelov, 2/7/07 Tr. 109: 20-26; Ex. 132A-132B.

149.    McNeil, which sold $100 million of Splenda to Wal-Mart in 2006, has not brought suit against Wal-Mart or Albertsons based on these packaging similarities.  Sandler, 1/26/07 Tr. 40:28-41:4; Gelov Decl. ¶ 45.

**AA.    Heartland's Lack of Intent**

150.    Heartland's intent in selling its sucralose packaging is not to confuse consumers.  Gelov, 2/7/07 Tr. 46:19-22; Gelov Decl. ¶ 46.

151.    As Heartland President Teodor E. Gelov explained, Heartland does not design the packaging; the stores do.  Gelov, 2/7/07 Tr. 46:24-25.

152.    In addition, "it doesn't benefit [the stores] to create any confusion in packaging.  The stores spend significant sums of money to promote their brand and their brand strategy.  So, confusion is counterintuitive, counterproductive to their strategy.  Their strategy is to provide consumers with choice, and in some cases, private brands are the only choice to a national brand . . . There's no -- no benefit of confusion, whatsoever, for Heartland or for the stores."  *Id.* 46:25-47:8.

153.    When Heartland President Gelov was presented with the design for the Food Lion, Ahold and Safeway sucralose packet boxes, he had no concerns about potential customer confusion.  *Id.* 21:28-28:3.  He had no such concerns because:

•    the names of the products are generic: "Sweet Choice" for Food Lion, "Sweetener" for Giant,  "Sucralose" for Safeway, *id.* 22:4-7, 25:21-22, 26:20-26;

- the shades of yellow used in the Food Lion, Ahold and Safeway packaging were different from the shade Splenda used, *id.* 22:8-12;

- yellow and blue is a very common color scheme, *id.*;

- the photographs on the packages depicted uses of the products that also had been depicted before on other sweetener packages, *id.* 22:13-18;

- unlike the Splenda packaging, none of the Heartland packages depict iced tea, *id.* 23:1-3; 27:10;

- the "Sweet Choice" and "Sucralose" names on the Food Lion and Safeway packages are on the bottom, while Splenda's logo is prominently displayed in the center of the package, *id.* 22:22-25, 27:9-10;

- the Sweet Choice package contains a rectangular element on the left that is darker than the other two-thirds of the box and identifies it as a Food Lion product, *id.* 25:4-11;

- the logo of each store is prominently displayed on the Heartland packaging, *id.* 22:24-25, 25:23-24

- there is significantly more blue on the Ahold box than on the Splenda package, *id.* 25:24-25;

- the Ahold box has a white border not present on the Splenda box, *id.* 26:18-19;

- the Safeway box has a white Safeway "S" incorporated through the center of the package, bisecting the box, which leads the consumer's eye to the Safeway logo, *id.* 26:28-27:6; *see also* Sandler, 1/26/07 Tr. 116:23-26 (agreeing that the white "S" leads the eye to the Safeway name and logo); and

- the overall look and feel of the packages are "distinctively different."  Gelov, 2/7/07 Tr. 22:25-26; 25: 25-26, 26:26-27.

154.    For the same reasons, Gelov had no concerns about consumer confusion after Splenda changed its packaging last year.  *Id.* 24:17-25:3, 26:8-15; 27:28-28:8.

155.    Gelov likewise had no concerns about potential customer confusion between the Food Lion flexible pouch and the Splenda flexible pouch, or between the Ahold flexible pouches and the Splenda flexible pouch for the reasons stated above.  *Id.* 42:6-45:18.

## BB.    **Harm Created by McNeil's Requested Preliminary-Injunctive Relief**

156.    Sucralose products are currently Heartland's sole business, with one small exception.  *Id.* 52:19-23.  Accordingly, if the Court ordered Heartland to stop selling the products at issue, it would have a significantly negative financial impact on Heartland.  *Id.* 52:14-26.

157.    Moreover, if the Court were to grant the preliminary-injunctive relief requested by McNeil and order a product recall, it would be "devastating" to Heartland. *Id.* 54:4.

158.    Revenues and cash flow lost during the period before Heartland's customers could design new packaging and Heartland could produce that packaging and get it to market would be lost forever. As Gelov explained: "Generally speaking, in food sales, . . . once a customer doesn't buy your product, they don't eat twice as much the next month." *Id.* 97:8-10.

159.    As Gelov explained:  "First of all, I'm not -- I don't know the logistics of forcing the stores to send the product back once it's their product. They own the packaging, and they own the designs. But, assuming that had to occur, you are talking about a process where each store would have to put personnel into their warehouses and into their stores to pull product off the shelves, send it to a reclamation center and, to my knowledge, the stores charge the manufacturer the retail price of the product, plus . . . a reclamation fee." *Id.* 54:5-15.

160.    There would be additional costs involved in destroying the product. *Id.* 54:19-20.

161.    Moreover, as is standard in the food packaging industry, Heartland is obligated to indemnify its customers against the risk that the packages that they designed will infringe another party's trade dress. *Id.* 106:22-107:15.

162.    Any injunction would affect retail stores because of the significant costs associated with redesigning the packages, lost sales, loss of customer goodwill and the need to fill a hole in the retail shelf where the sucralose products had been merchandised. *Id.* 55:16-56:7.

163.    In addition, ordering the preliminary injunction McNeil seeks would harm consumers who choose lower-priced store brands over more expensive national-label products. As Gelov stated at the hearing: "[M]any consumers can't afford to buy national brands, so they look forward to buying the store's private brands, and they would no longer be able to purchase the product which is less -- less expensive [than] the national brands." *Id.* 56:8-12.

## PROPOSED CONCLUSIONS OF LAW

I.   **BECAUSE MCNEIL SEEKS A MANDATORY INJUNCTION,
     IT MUST BE HELD TO THE STANDARD OF PROVING
     A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.**

164.    "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (internal citation omitted).

165.    To obtain a preliminary injunction, a movant must establish all four of the following factors: (1) likelihood of success on the merits, (2) irreparable harm if the injunction is denied, (3) balancing the harms weighs in favor of the moving party, and (4) the public interest favors such relief. *Shire US Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003) (affirming denial of preliminary injunction, holding that plaintiff's tablet shape and color were functional, and therefore not protected trade dress); *Freixenet S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir. 1984) (setting forth same test, affirming denial of preliminary injunction in trade-dress infringement suit).

166.    Courts should be exceedingly hesitant to grant mandatory injunctive relief that would alter the status quo before a trial on the merits, and may do so only upon a ***substantial*** showing of likelihood on the merits. *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.")

167.    This heightened standard, requiring a "substantial showing of likelihood on the merits" when seeking a mandatory injunction, applies in trade-dress cases where a party seeks to prevent the sale of an allegedly infringing product. *See, e.g.*, *Klein-Becker USA, LLC v. Prod. Quest Mfg., Inc.*, 429 F. Supp. 2d 1248, 1251 (D. Utah 2005) (plaintiff seeking to enjoin the sale of products in a trade dress matter must meet a heightened burden); *accord Christian v. Alloy,*

*Inc.*, 2004 WL 1375274, at *2 (S.D.N.Y. Jun. 17, 2004) (applying heightened standard in trademark infringement case).

168.    A recall of products from retailers not involved in the lawsuit is relief that alters the status quo, and a plaintiff seeking such relief must meet the heightened standard for a mandatory injunction.  *See Oral Research Labs., Inc., v. L. Perrigo Co.*, 864 F.2d 149 (Fed. Cir. 1988) (applying Third Circuit law, holding that a district court's preliminary injunction order improperly included a recall that did not operate merely to preserve the status quo, as it required mandatory compliance by non-party stores carrying the infringing product).[19]

169.    In this matter, McNeil seeks to enjoin Heartland not only from packaging and distributing the sucralose products at issue but also to force Heartland to recall the products from its customers.  *See* Compl. at 16; McNeil Proposed Order ¶ 3.

170.    Heartland's customers, Food Lion, Ahold, and Safeway, are not parties to this litigation.  Yet, if this Court orders a recall, Heartland's customers must take arduous and costly measures to comply with a recall as well as lose significant sales, product placement and customer goodwill.  *See* Gelov, 2/7/07 Tr. 55:16-56:7, 58:1-8; 58:21-59:12.

---

[19]    McNeil cites three cases for the proposition that a recall preserves the status quo, and therefore the heightened standard for mandatory injunctive relief is unwarranted.  Each case, however, is distinguishable.  In *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 997 (2d Cir. 1997), the only parties affected by the recall were named defendants in the lawsuit:  In *McNeil-PPC v. Merisant Co.*, No. 04-1090, 2004 WL 3316380, at *4 (D.P.R. Jul. 29, 2004), a recall was ordered, but the district court did so under the proper heightened standard: "a party seeking a preliminary injunction must establish that . . . it is **substantially** likely to succeed on the merits . . . ." (emphasis added).  *See* Section II(D) *infra.* for additional discussion of the differences between *Merisant* and this case.  Lastly, the district court ordered a recall in *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 191 F. Supp. 2d 343, 346 (S.D.N.Y. 2001), but did so under a more-relaxed preliminary injunction standard that only requires a showing of, "either a likelihood of success on the merits or sufficient questions on the merits to make them a fair ground for litigation."  The Third Circuit does not utilize this lax standard.  *See Shire*, 329 F.3d at 352.

171.    Therefore, McNeil must be held to the higher standard of mandatory injunctive relief, requiring a *substantial* showing of likelihood on the merits.

## II.    MCNEIL'S EVIDENCE IS INSUFFICIENT TO SHOW THAT IT HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON ITS TRADE DRESS CLAIM.

172.    A plaintiff seeking mandatory injunctive relief in a trade dress case must make a substantial showing that the claimed trade dress: (1) is non-functional; (2) has acquired secondary meaning; *and* 3) is likely to be confused with the allegedly infringing product by reasonably prudent consumers.  *Freixenet,* 731 F.2d at 151; *see also Amer. Home Prods. Corp. v. Barr Labs., Inc.*, 656 F. Supp. 1058, 1061 (D.N.J.), *aff'd*, 384 F.2d 368 (3d Cir. 1987) (applying the same test when considering unfair competition claims); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06-0597, 2007 WL 30115, at *1 n.1 (E.D. Pa. Jan. 4, 2007).

173.    Trade-dress infringement claims, like McNeil's, rely on Section 43(a) of the Lanham Act, which provides a cause of action to one who is injured when a person uses "any word, term name, symbol, or device . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods."  15 U.S.C. § 1125(a)(1)(A) (2006); *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28-29 (2001).

174.    The preservation of free competition, however, remains paramount, as protected trade dress is merely an exception to the "general principle of free copying and competitive imitation."  1 McCarthy on Trademarks and Unfair Competition § 8:1.

175.    Although providing a cause of action for trade dress infringement, Section 43(a) is consumer focused, not producer focused, and exists both to promote competition and to decrease for consumers the cost of decision-making.  *TrafFix Devices, Inc.*, 532 U.S. at 29; *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 157 (1989) (observing that the "general concern" of the law of unfair competition "is with protecting consumers from confusion as to source [and

42

w]hile that concern may result in the creation of 'quasi-property rights' in communicative

symbols, the focus is on the protection of consumers, not the protection of producers as an

incentive to product innovation"); *Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, 1995 WL 550585, at

*6 (E.D. Pa. Sep. 14, 1995) ("The purpose of the Lanham Act is to protect the public from the

confusion and deception . . . .") (internal punctuation omitted).

176.    In fact, copying a competitor's product "is not *ipso facto* 'unfair competition,' . . .

it is only 'unfair competition' to trade off another's good will and in the process dupe consumers

into mistaking one's products for another's." *Duraco Prods., Inc. v. Joy Plastic Enters., Inc.*, 40

F.3d 1431, 1448 (3d Cir. 1994); *see Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 207 (3d Cir.

1995) ("It is not unfair competition for someone to trade off the good will of a product, *see*

*Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111 (1938); it is only unfair to deceive consumers as to

the origin of one's goods and thereby trade off the good will of a prior producer."); *Deere & Co.*

*v. Farmhand, Inc.*, 560 F. Supp. 85, 93 (D.C. Iowa 1982), *aff'd*, 721 F.2d 253 (8th Cir. 1983)

(stating in a trade dress case that "personal notions of what is 'fair'" must be distinguished from

"the societal objectives in the law of unfair competition.  It is not only fair to imitate nonpatented

functional products, it is necessary to our form of economy.")

177.    McNeil aptly summarized this law in its appellate briefing in *Bristol-Myers Squibb*

*Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992), in which it was defending against a

trade-dress claim:

> [A] competitor that wanted to compete with Bristol by ***intentionally***
> ***copying*** its background colors could do so, so long as the competitor has
> otherwise clearly distinguished its product.  Indeed, this is the routine
> practice of generic manufacturers.  ***So long as the generic manufacturer***
> ***does not also adopt a trade name that is confusingly similar to the name***
> ***brand's product, the use of color–the copying of color–to show***
> ***similarity to other marketed goods has routinely been upheld by the***
> ***courts.***

McNeil Brief, *Bristol-Meyers Squibb Co. v. McNeil-P.P.C., Inc.*, at 21-22 (March 2, 1992)

(emphasis added)[20]; *see also McKeon Prods. Inc. v. Flents Prods. Co.*, 2003 WL 23100262, 69

U.S.P.Q.2d 1032, 1039 & n.8 (E.D. Mich. Nov. 19, 2003) (describing the private-label practice of

matching some elements of the name-brand competitor's packaging to "direct customers to the

appropriate head-to-head comparison" and recognizing it as "common"); *Klein-Becker USA,*

*LLC*, 429 F. Supp. 2d at 1257 (finding the private-label industry's practice of "creat[ing] a

physical resemblance between a private label product and the name brand product with which it

competes . . . to alert consumers to the functional equivalence between the two" was

"common").[21]

178.    More importantly, courts that have considered the practice uniformly have held it

is lawful and in fact serves twin goals of increasing competition and educating consumers: "the

public interest is actually helped by this industry practice, because the consumer is encouraged to

decide whether he or she wants to spend additional money for a brand name." *McKeon Prods.*

*Inc.*, 69 U.S.P.Q.2d at 1041.

179.    A store-brand's use of the same color as a nationally known brand benefits

consumers and fosters competition:

> The resemblance between two products can alert consumers to the
> function of utilitarian equivalence between them, to the fact the one

---

[20]     The cited pages of McNeil's brief are attached as Exhibit B.

[21]     McNeil relies upon *Kroger Co. v. Johnson & Johnson*, 570 F. Supp. 1055 (S.D. Ohio 1983), for its position that store-brand competition contravenes the true purpose of the Lanham Act.  The products at issue in *Kroger*, however, had product names "Actenol," Supernol," and Hydenol" that admittedly mimicked Johnson & Johnson's "Tylenol" product name.  *Id.* at 1059. The store-brands in this case do not use names similar name to "Splenda," or that share any prefix or suffix in common with "Splenda."  Instead, the products have generic names that describe the product itself -- a sweetener made with sucralose.  For this reason, McNeil's complaint that the store-brands' product names start with "S" lacks merit.  Indeed, given that the products in this category are sweeteners, several product names start with this letter and even include "sweet" in their names, including, for example, Sweet'N Low, Sweet Crystals, Sweet Choice, and Sweetmate.

product may be substituted for the other in the ultimate uses for which the products are intended.  The free-flow of information regarding the substitutability of products is valuable to individual consumers and to society collectively, and by providing it a supplier engages in fair competition based on those aspects–for example, price–in which the products differ.

*Amer. Home Prods. Corp.,* 656 F. Supp. at 1068**.**

180.    As detailed below, Heartland's packaging complies with applicable trade dress law and is consistent with the main goal of the Lanham Act, which is to benefit consumers by fostering competition and easing purchasing decisions.  *See TrafFix Devices*, 532 U.S. at 29; *Bonito Boats*, 489 U.S. at 157.

### A.    McNeil Fails To Demonstrate That There Is a Substantial Likelihood That an Appreciable Number of Reasonably Prudent Consumers Will Be Confused by the Store-Brand Packaging.

181.    "A plaintiff may prevail in a trade dress infringement action only if it shows that an appreciable number of ordinarily prudent consumers of the type of product in question are likely to be confused as to the source of the goods."  *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 200 (3d Cir. 1995) ("[T]he law does not require that a competitor insure against all possible confusion or the likelihood thereof."); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d at 569 ("The court considers whether the similarities in the NatraTaste and NutraSweet [two sugar substitutes] trade dresses are likely to confuse an appreciable number of ordinarily prudent purchasers as to the source of the products.")

182.    The Third Circuit has approved the use of a ten-factor test to determine whether there is a likelihood of confusion between competing goods.  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 213 (3d Cir. 2000), which commonly are referred to as the *Lapp* factors:

- **Factor 1:**  the degree of similarity between the plaintiff's trade dress and the alleged infringing trade dress;

- **Factor 2:**  the strength of the plaintiff's trade dress;

- **Factor 3:**  the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

- **Factor 4:**  the length of time the defendant has used the allegedly infringing trade dress without evidence of actual confusion;

- **Factor 5:**  the defendant's intent in adopting its trade dress;

- **Factor 6:**  any evidence of actual confusion;

- **Factor 7:**  whether the goods are marketed through the same channels of trade and advertised through the same media;

- **Factor 8:**  the extent to which the targets of the parties' sales efforts are the same;

- **Factor 9:**  the relationship of the goods in the minds of consumers because of the similarity of function;

- **Factor 10:**  other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

183.    As discussed below, a review of the *Lapp* factors demonstrates McNeil's lack of

the factual and legal support necessary to show a substantial likelihood that customers will be

confused between Splenda and the store-brand sucralose products.

**Factor 1:  The well-known store-brand logos, along with other distinctive and unique features, safeguard against consumer confusion.**

184.    Given that the supermarkets at issue in this matter display their well-known logos

and are visually distinct from Splenda's packaging, McNeil fails to establish that the packaging

distributed by Heartland is likely to confuse an appreciable number of consumers, as discussed in

detail below.  *See* Exs. R, S, III, JJJ, SSS, TTT; Sandler, 1/26/07 Tr. 203:23-204:20.

185.    First and foremost, the store-brand packaging differs from Splenda's in that it

prominently displays the particular supermarket's trademarked name and logo on the front of the

packaging.  *See* Exs. R, S, III, JJJ, SSS, TTT.

186.    Thus, for example, the front of the packaging for Food Lion's store-brand sucralose product displays the Food Lion name in prominent black lettering together with the Food Lion trademarked logo.  *See*, *e.g.*, Exs. II, RRR.

187.    Similarly, the packaging for the Ahold stores, Stop & Shop, Tops, and Giant, all displays the respective store's distinctive name and logo.  *See, e.g.,* Ex. S (Stop & Shop name in black lettering together with the store's trademarked traffic-light logo); Ex. TTT (Giant name and familiar logo); and Ex. 5A (Tops name and familiar logo).

188.    Lastly, Safeway's Sucralose packaging contains Safeway's name in three different locations on the front of the package.  *See* Ex. SSS; Gelov, 2/7/07 Tr. 27:20-25.  Moreover, as Sandler agrees, the white "S" element on the Sucralose packaging "leads your eye down to the Safeway name and logo."  Sandler, 1/26/07 Tr. 116:23-26.

189.    Customers of the five respective supermarkets doubtless are very familiar with each store's trademarked name and logo as a result of their prominent appearance at the entrance to each store, throughout each store (e.g., on store shopping carts and employee's uniforms), on the store's shopping circulars, in newspapers and television advertisements, on the stores' Internet websites, and on other store-brand products.  *See* Exs. A20-A24, GGG, HHH; Sandler, 1/26/07 Tr. 113:4-11.

190.    Moreover, given the widespread availability of store-brand products, customers are well acquainted with these food stores' practice of selling both national brand products, like Splenda, together with similar, but less expensive, store-brand offerings.  *See* Canaan, 1/26/07 Tr. 182:25-183:11 ("[F]or 140 years supermarkets and other distribution have used private label as a way to give consumers choice. . . .  [C]onsumers are very, very, used to this type of presentation of private label and national brands.")

47

191.    Indeed, the Private Label Manufacturers Association, in a study conducted by the Gallup organization, has reported that more than 90 percent of consumers polled said they were familiar with store brands and 83 percent said they bought them regularly.  Canaan, 1/26/07 Tr. 168:15-22; Canaan Decl. ¶ 22*; cf. Warner Lambert Co. v. McCrory's Corp.,* 718 F. Supp. 389, 398-99 (D.N.J. 1989) (denying Listerine manufacturer's motion for preliminary injunction against retailer of store-brand mouthwash in a trade dress packaging case, stating, "a McCrory's shopper, as with any shopper in such a retail store chain, has likely been exposed to generic or discount house brands before, and . . . is not likely to be misled by the McCrory's mouthwash brand").

192.    Accordingly, McNeil has not demonstrated a substantial likelihood that an appreciable number of reasonably prudent consumers would be misled into mistakenly thinking that they were buying Splenda or that McNeil was the source of the stores' branded sucralose products instead of the stores themselves.  *See* Canaan, 1/26/07 Tr. 162:14-21; Canaan Decl. ¶¶ 33, 40, 41 (considering these factors and concluding that an appreciable number of ordinarily prudent consumers of low-calorie sugar substitutes would not likely be confused by the Food Lion, Safeway, Giant, Stop & Shop or Tops products, and would not think they were from the same source as Splenda).  *See also Conopco*, 46 F.3d at 1556 (reversing district court's grant of preliminary injunction and holding that prominent placement of the retailer's logo on the face of its product -- a factor the district court did not consider -- was highly probative to the "likelihood of confusion issue")[22]; *Bristol-Myers Squibb Co.,* 973 F.2d 1033, 1045-46 (holding district

---

[22]    McNeil attempts to downplay the on-point holding in *Conopco* by arguing that the *Conopco* court was focused on the products' co-existence for ten years without consumer confusion.  The District Court for the Eastern District of Michigan has rejected this very argument, and this Court does too.  *McKeon Prods. Inc.*, 69 U.S.P.Q.2d at 1035.  As the *McKeon* court correctly observed, "It is clear that the Federal Circuit decided *Conopco* in favor of the accused infringer at least in part because the Defendant seller made prominent use of its own

court's finding of strong similarity between packaging was clearly erroneous, stating "although

they share many similar elements, the prominence of the trade names on the two packages weighs

heavily against a finding of consumer confusion resulting from the overall look of the

packaging").[23]

193.    Second, the products differ in that the store brands are, on average, priced 20-25

percent less than Splenda.  *See* Ex. A42; Sandler, 1/26/07 Tr. 83:21-26; Canaan, 1/26/07 Tr.

175:27-176:2 (31 percent price differential between Splenda and Giant store brand sucralose).

194.    Giant, Stop & Shop, and Tops also differentiate their store brands with tags on

store shelves that proclaim the store name and the slogan, "Top Quality.  Lower Price."  *See, e.g.,*

Exs. A26, A39, A40; *see also* Canaan, 1/26/07 Tr. 195:42-196:9, 197:18-198:2.

195.    In addition, Food Lion displays on its store shelves bright red tags that state,

"Compare to National Brands and Save!"  *See, e.g.,* Exs. A20, A24.

196.    These practices further decrease the odds of consumer confusion.  *Cf. Warner*

*Lambert Co. v. McCrory's Corp.*, 718 F. Supp. at 398 ("[T]he price difference between the two

products is not only a product difference in itself, but also prompts McCrory to bring this price

difference to the consumers' attention through the prominent use of 'compare and save' signs on

shelves in which the products appear, further distinguishing the two products from each other in

---

trademark, and thereby avoided any likelihood of confusion . . . ."  *Id.* at 1035.  This portion of
the *Conopco* holding unambiguously supports Heartland's defense.

[23]    McNeil's efforts to distinguish *Bristol-Myers Squibb* also fail.  McNeil Conclusions ¶ 83.
McNeil misapprehends Heartland's argument, which makes the valid point that the food stores'
names and trademarked logos (not the product names) substantially distinguish the challenged
packaging from Splenda's packaging.  Conclusions ¶¶ 184-192, *supra.*  For consumers, the
names of the supermarkets that they shop in carry as much name recognition (if not more) than
"Splenda" does.  Indeed, the evidence of record demonstrates that Safeway in 2005 spent almost
twice as much promoting its brand ($113 million) as McNeil spent promoting Splenda ($62
million).  Sandler, 1/26/07 Tr. 136:24-137:2, 138:108.  Thus, the *Bristol-Myers Squibb* court's
holding that "the prominence of the trade names on the two packages weighs heavily against a
finding of consumer confusion" provides strong support for Heartland's position.

the minds of prospective consumers."); *Warner Lambert Co.*, 718 F. Supp. at 398 ("prominent use of 'compare and save' signs on shelves . . . further distinguish the two products from each other in the minds of prospective consumers"); *Klein-Becker USA,* 429 F. Supp. 2d at 1258 (considering use of "compare to" statements in denying preliminary injunction relief to manufacturer of "StriVectin-SD" in trade-dress infringement action against private-label "NuVectin" skin cream); *Pfizer, Inc.*, 988 F. Supp. at 698 ("the labels in Group C urge the consumer to 'Compare to PLAX®.'  This admonition would surely help reduce or eliminate any potential confusion as to whether the product was a Pfizer product").

197.    Third, the products at issue are named "Sucralose" (Safeway), "Sweetener" (Giant, Stop & Shop and Tops), and "Sweet Choice" (Food Lion).  These descriptive names demonstrate to customers that the sweeteners are generic counterparts to the name brand Splenda and thus are separate, lower-priced products.  *See* Canaan, 1/26/07 Tr. 203:15-19; Canaan Decl. ¶ 41. *Cf. Pfizer, Inc.*, 988 F. Supp. at 698 (holding similarity factor weighed in defendant's favor, finding there was "little doubt" that the defendant product was a private label where packaging contained the generic label "Anti-Plaque," in contrast to Pfizer's "Plax" label).

198.    Indeed, the Ahold stores, Giant, Stop & Shop, and Tops, use the same product name, "Sweetener" for all of their no-calorie sugar substitutes whether the active ingredient is saccharin, aspartame, or sucralose.  *See* Exs. A39, A40, TTT.

199.    Moreover, on Safeway's and Food Lion's packaging, the generic-sounding product name is contained at the bottom of the package, further distinguishing the products from Splenda, which places its name at the top of the packaging.  *See, e.g.*, Exs. III (Food Lion), JJJ (Safeway); Sandler, 1/26/07 Tr. 124:18-20 (Food Lion), 127:7-16 (Safeway).

200.    Fourth, there are numerous other distinctions between the store-brand packaging and Splenda's, including, to cite just a few:

- the private-label's pastel, lemon-yellow background, which is noticeably lighter in color than Splenda's golden-yellow colored background;

- Splenda's distinct "white cloud," Sandler Decl. ¶ 11, which is absent from all of the store brands;

- Splenda's fanciful sprinkling of starry white images with the appearance of cascading down from top left corner to pictured items, which are absent from all of the store brands, Sandler, 1/26/07 Tr. 132:18-22;

- Safeway's prominent thick white line that cuts from the top to bottom of the front panel, providing the package with a distinctive swirl effect; and

- Tops', Stop & Shop's, and Giant's white-line border around the perimeter of the packaging, which creates a distinctive square effect.

*See also* Findings §§ M-Q, *supra* (detailed discussion of packaging differences).


**Factor 2:  Splenda's claimed trade-dress elements are common
in the sweetener industry, and therefore fail to warrant protection.**

201.    Because Splenda has adopted color schemes and pictorial elements that are

common to many sweetener products, the second factor, strength of trade dress, favors Heartland.

202.    For example, the well-known sugar brand Domino has used yellow packaging

with blue lettering for more than half a century, long before Splenda ever entered the market.  *See*

Canaan, 1/26/07 Tr. 192:14-193:8; Exs. A32-A33.  Similarly, Sugar Twin, a sugar substitute that

competes directly with Splenda, also uses a yellow packaging color scheme with blue lettering.

*See* Canaan, 1/26/07 Tr. 173:23-28; Sandler, 1/26/07 Tr. 101:1-5; Ex. A34.

203.    Domino Pure D'Lite, a blend of sugar and sugar substitutes, also uses yellow

packaging with blue lettering.  *See* Sandler, 1/26/07 Tr. 101:17-21; Canaan, 1/26/07 Tr. 174:3-7;

Ex. A35.

204.    In fact, the New Splenda Box closely resembles the golden-yellow shade of

Domino and Sugar Twin's packaging, and is distinctive from the pastel, lemon-yellow color of

the store-brand packaging at issue.  *Compare* Exs. A38, KKK, *with* Exs. A32, DD & Exs. A34, CC1, CC2,

205.    Moreover, yellow and blue packaging is common in products other than sweeteners.  *See* Sandler, 1/26/07 Tr. 102:23-26; Gelov, 2/7/07 Tr. 16:7-16, 16:22; Canaan, 1/26/07 Tr. 179:8-17; Exs. A43, II, JJ, MM, NN, PP.

206.    The photographs on Splenda's packaging (e.g., fruit, coffee, and baked goods) also are common to other sweeteners, including products existing before Splenda was even invented. *See* Exs. A19, A34, A37, A41, BB, CC2, Q.

207.    Many sugar substitute brands, including, for example, Equal and Natrataste (as well as the private-label counterparts to these brands), also use italicized fonts for their product names.  *See* Exs. A37, AA, Q (Equal), A10, BB (Natrataste).

208.    These common features weaken Splenda's trade dress.  *See Cumberland Packing Corp.,* 32 F. Supp. 2d at 568 ("Sweeteners commonly feature on their boxes images of a coffee cup, glass of ice tea, or individually wrapped paper packets.  Viewed as discrete elements, these do not help distinguish plaintiff's products."); *cf. Gray v. Meijer, Inc.,* 295 F.3d 641, 647-48 (6th Cir. 2002) ("The problem for Gray is that its packaging is not unique. . . . The Grays have no proprietary rights to the Chicago skyline which is depicted on the packaging of many products.")

**Factor 3:  Consumers are particularly aware of the store-brand industry and thus will not be confused by the store-brands packaging.**

209.    The third *Lapp* factor assesses the price of the products and other factors that may play a role in the care and attention expected of consumers when making a purchase.

210.    Generally, consumers pay less attention when purchasing lower-priced goods.

211.    However, given the high percentage of consumers who are knowledgeable about and buy store brands, it is reasonable to expect that they are comparing those brands to the

national brands before making a purchase.  *See Warner Lambert Co.*, 718 F. Supp. at 398-99

("The Court also takes cognizance of the fact that a McCrory's shopper in such a retail store

chain has likely been exposed to generic or discount house brands before, and when walking

through a McCrory's store and observing the many 'compare and save' signs, is not likely to be

misled by the McCrory's mouthwash brand.")

212.    For instance, in *Warner Lambert*, plaintiff, the manufacturer of the mouthwash

Listerine, sought to enjoin a retailer, McCrory's, from selling a private label mouthwash.  Both

mouthwashes had similar packaging and product color.  718 F. Supp. 389, 392-393 (D.N.J.

1989).  Furthermore McCrory's placed its private-label mouthwash on its shelves next to the

Listerine product, with signs exhorting consumers to "compare and save."  *Id.*  After a review of

the *Lapp* factors, the court failed to find any consumer confusion that would support the issuance

of a preliminary injunction.  *Id.* at 398.  Specifically, the court found that the price difference

between the two products helped to differentiate the products in the eyes of the consumers:

> [The] price difference between two products is not only a product
> difference in itself, but also prompts McCrory's to bring this price
> difference to the consumers attention through the prominent uses of
> 'compare and save' signs on shelves in which the products appear, further
> distinguishing the two products from each other in the minds of
> prospective consumers.

*Id.* at 398-99; *see also Smithkline Beckman Corp. v. Pennex Prods. Co.*, 605 F. Supp. 746, 751-52

(E.D. Pa. 1985) ("Advertisements which compare 'theirs' to 'ours' are common place in the retail

field.  Placing the [house brand product] in close proximity to [the name-brand product]

highlights the house brand product, but that is not unfair, only competitive.")

213.    The relationship between Splenda and Heartland is quite similar to the relationship

between Listerine and McCrory's in *Warner-Lambert*.  Although Heartland is merely the

packager of the product, and not the retailer or designer, its products are priced lower than the name-brand product, which is prominently displayed in many grocery store shelves.

> **Factors 4 and 6:  McNeil's strike-force consumer with bad eyesight and income far in excess of the average median does not qualify as a reasonably prudent shopper.**

214.    McNeil has offered just one consumer in its attempt to overcome its burden of showing that an appreciable number of reasonably prudent consumers are confused by Heartland's packaging.

215.    Margaret Grossman alone, however, is not representative of a reasonably prudent shopper who was confused by the packaging of the Safeway Sucralose product for several reasons.

216.    First, Ms. Grossman's family income exceeds $300,000, which is at least six times the 2005 national median income of $46,242.  Grossman Tr. 22:5-12; Income, Earning, and Poverty Data From the 2005 American Community Survey, U.S. Census Bureau, August 2006 (available at http://www.census.gov/prod/2006pubs/acs-02.pdf) (The American Community Survey, a critical element of U.S. Census Data, measured the median household income in the United States in 2005 at $46,242).

217.    Second, Grossman is unaware of the common and recognized industry practice of lower-priced store-brand products.  *Id.* 24:18-21.  Indeed, the price of Splenda and other staple food products is not of concern to Grossman.  *Id.* 32:19-24.  Grossman is not interested in comparison-shopping, a necessity for many shoppers closer to the median income range.  *Id.* 20:9-11.

218.    This is atypical of the reasonably prudent consumer, who is well acquainted with the concept of brands and brand messages.  Canaan, 1/26/07 Tr. 154:18-25.  Indeed, average

consumers readily recognize the differences between brands, and are very capable of differentiating between them.  *Id.* 154:24-25, 155:2-4.

219.    Third, due to her poor eyesight, Grossman admittedly cannot read the labels on the packages she purchases.  Grossman needs glasses to read, yet was not wearing them at the time she bought the Safeway Sucralose, thus making it difficult for her to read the pricing of the products.  *Id.* 34:15-35:7, 35:15-21.[24]  In fact, during her deposition, despite being a "religious" Splenda purchaser, Grossman noticed the stars on the box for the first time.  *Id.* 34:12-14 ("I don't think I've ever noticed the stars before.  I'm nearsighted . . . .")

220.    Fourth, Grossman also exhibits other shopping characteristics that do not attune with the reasonably prudent shopper.  She describes herself as a "surgical strike" shopper, shopping at a faster rate than other shoppers.  *Id.* 20:11, 20:19.

221.    This "surgical strike" approach to shopping causes carelessness that is not exhibited by the reasonable shopper.  For instance, for purposes of her deposition, Grossman bought a 400-packet box of Splenda because she thought her usual 200-packet box was not available.  *Id.* 6:3-8, 39:14-21.  During the deposition, however, when looking at a picture she took of the shelf on which the 400-packet box she bought was located, she noticed that the 200-packet box was indeed on the shelf and available for sale.  *Id.* 39:14-21.  Of course, she needed her reading glasses during the deposition to locate the 200-packet box.  *Id.* 39:16-17.  She also admitted that, in buying the 400-packet box, she "grabbed too fast."  *Id.* 39:21; *see also id.* 11:23-

---

[24]    McNeil suggests that Grossman was wearing her contact lenses and accordingly could adequately see when she bought the Safeway Sucralose.  McNeil Conclusions ¶ 63.  McNeil omits, however, that Grossman said she "wear[s] contacts, and then when I want to read, I put on glasses."  Grossman Tr. 34:15-17.  She further said that she was not wearing her reading glasses when she bought the Safeway Sucralose, despite "need[ing] my reading glasses to see."  *Id.* 39:16-17.

24 (describing her purchase of Safeway Sucralose as "buzzing through the market and

grabb[ing]" the box).

222.     McNeil challenges the use of trade dress for 17 different packages (five 100-count

boxes, five 200-count boxes, four flexible packages, and three individual packets)[25], yet presents

only one "surgical strike" customer who bought only one of the close to a dozen-and-a-half

products at issue.  McNeil has fallen short of its burden of proof.

223.     Moreover, McNeil's presentation of Grossman does not prove actual confusion, let

alone a substantial likelihood of confusion.

224.     As McNeil argued in *Bristol-Myers*, "the law does not–and should not–protect

such undiscriminating consumers.  Ex. B, McNeil Brief, *Bristol-Myers Squibb Co. v. McNeil-

P.P.C., Inc.*, at 11 (March 30, 1992); *see also McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d

1126, 1138 (2d Cir. 1979) ("'The remote possibility of occasional confusion in those who

observe less than ordinary care under the circumstances does not concern us'"); *Universal City

Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984); *Warner Brothers, Inc. v. Amer.

Broad. Cos.*, 720 F.2d 231, 246 (2d Cir. 1983); RESTATEMENT (SECOND) OF THE LAW OF TORTS §

728, Comment (A) (1977)."

225.     McNeil offers no consumer survey to support its allegations.[26]  *Id.* 145:5-8.  The

Court is free to draw an adverse inference from McNeil's failure.  *See Eagle Snacks, Inc. v.

Nabisco Brands, Inc.*, 625 F. Supp. 571, 583-84 (D.N.J. 1985) (recognizing that the failure of the

plaintiff "to run a survey to support its claims of brand significance and/or likelihood of

---

[25]     While McNeil does not explicitly challenge the store-brand packets in its complaint or requested relief, its appears to now ask the Court to enjoin their sale.  *See, e.g.*, McNeil Conclusions ¶ 73.

[26]     Moreover, McNeil admits to having "looked at shopping behavior as a better way to understand" the no-calorie sweetener category.  But McNeil has presented so evidence of its research findings and conclusions.

confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief") (denying preliminary injunctive relief).

226.    For these reasons, McNeil fails to show actual confusion.

**Factor 5:  Heartland did not intend to confuse consumers.**

227.    McNeil has presented no evidence that Heartland intended to copy Splenda's trade dress or to confuse customers into believing that its products were actually McNeil's Splenda products.

228.    Heartland's lack of intent is best illustrated by its lack of participation in the packaging design process.  *See* Gelov, 2/7/07 Tr. 8:2-10.  Heartland's customers performed all of the design duties and own all of the rights to the designs.  *Id*. at 8:22, 9:8-9, 10:5.  *Cf. Star Indus. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 389 (2d Cir. 2005) (considering that defendant offered evidence that allegedly infringing mark was designed by a third party, not defendant, and holding plaintiff failed to meet its burden on intent factor).

229.    Furthermore, although it could have, McNeil failed to offer any evidence as to the food stores' intent in designing their packaging.  Therefore, McNeil has failed to show a substantial likelihood that its Splenda trade dress was copied.[27]  *See Star Indus.*, 412 F.3d at 389

---

[27]    McNeil emphasizes its unfounded assertion that Heartland copied its packaging.  It has not, however, brought a copyright claim, where liability would lie if the Splenda packaging were found to be an original work, Heartland had access to the work, and the Splenda and Heartland packaging were found to be substantially similar.  *See, e.g.*, *Dam Things from Denmark v. Russ Berrie & Co.,* 290 F.3d 548, 561 (3d Cir. 2002).  To bring a copyright claim, however, the author must have registered the work.  *See, e.g.*, *Tang v. Hwang*, 799 F. Supp. 499, 502 (E.D. Pa. 1992) (citing 17 U.S.C. § 411(a)).  That McNeil has not done so and has not pursued a copyright claim suggests that McNeil does not believe it has created an original work of authorship, i.e., that it has arranged the elements of its packaging in an original way that is protectable.  In the trademark arena, even if McNeil were to prove copying, which it has not, there can be no liability, and so no basis for an injunction, unless the movant establishes a likelihood of consumer confusion, which it has not, for the many reasons set forth in these conclusions of law.

(holding plaintiff failed to meet its burden on intent factor where plaintiff presented no direct

evidence of defendant's intent).

230.    At any rate, even if McNeil had presented testimony that showed that Heartland

copied portions of Splenda's trade dress, a simple showing of intent to use similar marks is not

enough; *instead, a plaintiff must demonstrate that the defendant intended to deceive or confuse*

*consumers*.  *See, e.g.*, *Cumberland Packing Corp.*, 140 F. Supp. 2d at 255 ("Even if defendant

did copy certain elements of plaintiff's trade dress, which is not at all evident, copying per se

does not prove bad faith in determining confusion.  For copying to be evidence of confusion the

defendant must have copied for the purpose of causing confusion.")  This McNeil has failed to

do.

231.    To the contrary, the evidence of record affirmatively establishes that Heartland did

not intend to confuse consumers.  Gelov, 2/7/07 Tr. 46:19-22; Gelov Decl. ¶ 46.[28]

232.    McNeil's factually unsupported inference that incorporation of certain elements of

another's trade dress equates to intent to confuse consumers is unpersuasive to this Court.  On-

point federal authority belies such a conclusion: in the private-label context, store-brand trade

dress may be made deliberately similar to the national brands "not to confuse the customer into

thinking they were buying [the national-brand product], but rather to force the customer to choose

between the more expensive brand name and the less expensive private label."  *McKeon Prods.,*

*Inc.,* 69 U.S.P.Q.2d at 1039 (finding in favor of defendant on intent factor and denying

preliminary injunction request); *see also Pfizer, Inc.*, 988 F. Supp. at 699-700 ("Perrigo . . .

send[s] a message that its products are as good as the national brand products . . . in part by using

trade dress that is similar to the trade dress of the national brand equivalents. . . . Perrigo does not

---

[28]    Nor is it the intent of retailers to confuse consumers by marketing store brands.  As
Heartland's expert David Canaan explained, confusion would conflict with the retailers' goal of
building store loyalty.  Canaan, 1/27/07 Tr. 171:18.

intend to deceive consumers or to confuse consumers into believing they are buying Pfizer's products when they are actually buying Perrigo's products."); Andrew C. Finch, *When Imitation Is the Sincerest Form of Flattery: Private Label Products and the Role of Intention in Determining Trade Dress Infringement*, 63 U. CHI. L. REV. 1243, 1255 (1996) (noting that copying may be motivated by valid reasons including a belief that trade dress is functional or generic, or by a belief that copying is the best way to inform consumers that a generic product is a lower-priced alternative to the competitor's products).[29]

### Factor 7, 8 and 9:  The food stores marketing efforts prevent confusion.

233.    The respective marketing approaches of McNeil and Heartland's retail customers differ significantly, preventing any confusion of the source of the parties' respective products.

234.    Unlike McNeil, which devotes its advertising dollars to promoting Splenda's "made from sugar, tastes like sugar" message,  ¶¶ 78-84, *supra*, retailers expend significant resources advertising and promoting their store identities and occasionally their individual store-brand products.  *See* Canaan, 1/26/07 Tr. 170:19-24.  This focus, among others, differentiates store-brand products from national brands.

235.    Furthermore, Heartland's customers, Food Lion, Giant, Stop & Shop, Tops and Safeway, target store-brand shoppers -- i.e., shoppers who are willing to buy store brands because they believe they are as good as national brands and/or to save money.  *Cf. McKeon Prods. Inc.*,

---

[29]    McNeil also intimated that Heartland's lack of advertising expenditure, compared with McNeil's large advertising budget for Splenda, illustrates Heartland's intent to copy McNeil's Splenda trade dress.  McNeil Conclusions ¶ 19.  This too is unpersuasive.  The size of a plaintiff's marketing budget does not automatically correlate with a defendant copying a mark or style created by the plaintiff.  *See J&J Snack Foods, Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 136, 157 (D.N.J. 2001).  Plus, if a discrepancy between advertising budgets is indeed determinative, the Court must consider that the retail stores spend significant amounts of money advertising their store names and brands.  *See* Gelov, 2/7/07 Tr. 46:25-47:8 ("The stores spend significant sums of money to promote their brand and their brand strategy."); Sandler, 1/26/07 Tr. 136:24-137:2; 138:108 (Safeway in 2005 spent $113 million promoting its brand, nearly twice as much as the $62 million spent by McNeil promoting Splenda).

69 U.S.P.Q. 2d at 1041 ("Often, when comparing the products at issue, the consumer realizes that the private label has identical ingredients and wants the cheaper alternative.  If the brand name is injured by this practice, it is only because the consumer is becoming better informed.")  *See* Canaan, 1/26/07 Tr. 171:28-172:5; Canaan Decl. ¶ 21.

236.    The use of "compare to" statements in many of the stores at issue increases in consumers' minds the difference between Splenda and the store brands.  *See* Exs. A20 (tag under store brand of saccharin, which states, "Food Lion.  Compare to National Brands and Save!"), A41 (same tag under store brand of aspartame), A39 (tag under store brand of saccharin, which states, "Giant.  Top Quality.  Lower Price.")  *See also Warner Lambert Co.,* 718 F. Supp. at 398 ("[T]he price difference . . . is not only a product difference in itself, but also prompts McCrory to bring this price difference to the consumers' attention through the prominent use of "compare and save" signs . . . further distinguishing the two products from each other in the minds of prospective consumers.")

237.    The placement of Splenda and the store-brand products next to or close to each other on store shelves also makes purchase confusion unlikely:  "[A] consumer shopping for [sweetener] would see the two products next to each other; it is unlikely that the consumer would be confused into believing that he or she was buying one product when she actually was buying the other."  *Pfizer, Inc.*, 988 F. Supp. at 699.

238.    The side-by-side or near-by placement also minimizes any potential source confusion.  *See Conopco, Inc.*, 46 F.3d at 1563-64 (where "national brand is being sold side-by-side with the private label brand, the assumption [that a national brand manufacturer would be the source of the competing private label brand product] is at best counter-intuitive").

**Factor 10:  The differences between the packaging and the individual packets**
**preclude source confusion, as well as initial- or post-sale confusion.**

239.    McNeil has not presented any evidence to support its assertion that it is likely that customers will be confused into thinking that the store-brand sucralose products come from the same source as Splenda.  *See Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801 (2d Cir. 1973) (denying preliminary injunction upon no showing that customers were confused into believing plaintiff was source of defendant's product).

240.    Nor has McNeil shown that consumers were actually confused into thinking that the store-brand sucralose products were manufactured or supplied by McNeil.  In fact, McNeil's lone customer-witness, Margaret Grossman, testified that at the time she purchased the Safeway Sucralose, she did not know who manufactured Splenda.  Grossman Tr. 18:11-14.

241.    Similarly, the initial-interest confusion and post-sale confusion arguments are unsupported, and therefore this factor weighs in favor of Heartland.

242.    Initial-interest confusion occurs when a consumer is initially mistakenly drawn to an allegedly infringing product, even though the consumer may, upon closer examination, realize his or her mistake before buying the product.  *See Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294-95 (3d Cir. 2001).

243.    McNeil's initial-interest confusion argument fails because of the significant distinctions between Splenda and the store-brand products detailed above.

244.    Simply put, given these significant differences, consumers are highly unlikely to be confused at any point -- initially or at the time of purchase.

245.    Moreover, with no evidence that even a single consumer suffered initial-interest confusion, McNeil has failed to demonstrate that it is likely to succeed on such claim.  *See Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376 (7th Cir. 1996) (reversing the district court and holding that the defendant failed to satisfy its burden of proof as to initial confusion, purchase confusion, or post-sale confusion where the defendant held itself out as the plaintiff's competitor

and "conspicuously marked its clamshells with its company name" and plaintiff presented no evidence of actual consumer confusion).

246.    Additionally, there is a lack of factual or legal support for the contention that Heartland's individual packets are likely to cause post-sale confusion.

247.    Post-sale confusion occurs after the product has been purchased and requires that consumers (1) mistakenly believe the allegedly infringing product is the plaintiff's product or manufactured by plaintiff; (2) find the allegedly infringing product to be inferior; and (3) as a result, refuse to deal with the plaintiff in the future.  *Gucci Am., Inc. v. Daffy's Inc.*, 354 F.3d 228, 234 (3d Cir. 2003).

248.    McNeil has failed to establish a substantial likelihood of post-sale confusion based upon the individual packets for several reasons.

249.    There has been no proof or testimony presented to the Court that the store-brand packets create confusion at either restaurants, work, or in the home.  Indeed, there is no evidence that such packets are even present at restaurants or workplaces.

250.    Second, McNeil has presented no evidence that the store-brand packets confused even a single consumer, let alone any evidence that these packets confused and disappointed consumers.

251.    A finding that the customer believed the product to be inferior is required for a finding of post-sale confusion.  Grossman, who uses Splenda "religiously," did not find Safeway Sucralose to be inferior to Splenda.  To the contrary, Grossman testified that the Safeway product tasted the same as Splenda and that she had not brought any packets to her deposition because "[her family] used them all up before I got your subpoena."  Grossman Tr. 5:13-15,18:8-10, 32:10-12.  Therefore, McNeil has failed to demonstrate that Heartland's sucralose products lead

to post-sale confusion.  Furthermore, Grossman's experience with Sucralose has not dissuaded her from continuing to purchase Splenda.  *Id.* 38:19-25.

252.    As such, McNeil's allegations of post-sale harm amount to baseless speculation, and, therefore, are insufficient for preliminary-injunctive relief.  *Cf. Dorr-Oliver, Inc.*, 94 F.3d at 384 ("[A] finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof.")

253.    Notwithstanding the lack of any testimony supporting a finding of post-sales confusion, all of Heartland's individual packages are distinctive from Splenda's individual packets, thereby avoiding any post-sale confusion.  For instance, Safeway's packets contain the Safeway name and well-known logo.  *See* Ex. MMM.  In addition, the Giant, Stop & Shop, and Tops packets are visually distinct from the Splenda packet in that they: (a) have no border (and thus, no squared off-effect), unlike Splenda; and (b) have a "CALORIE FREE" banner, absent from Splenda's packet.  *See* Ex. OOO.  Food Lion's packets, in addition to the presence of Food Lion's name and distinct lion logo and "Sweet Choice," have black lettering compared to Splenda's blue type.  *See* Ex. NNN.  Moreover, McNeil does not object to packets that are the same yellow color as the Safeway, Ahold, and Food Lion packets being sold by Wal-Mart and Albertsons.  Sandler, 1/26/07 Tr. 80:11-12, 91:17-18.

**B.    A Preliminary Injunction Cannot Issue Because McNeil Fails To Show It Is Likely To Prove That the Store-Brand Packaging Employs Any Non-Functional, Uncommon Elements.**

254.    In a trade-dress infringement action, the plaintiff bears the burden of proving that the elements it seeks to protect are non-functional.  15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this Act for trade dress not registered on the principal register, the

person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.")[30]

255. "This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix Devices, Inc.*, 532 U.S. at 29; *Warner Lambert Co.*, 718 F. Supp. at 396 ("[a] defendant cannot be enjoined from using the functional features of the combination of features comprising a plaintiff's trade dress."); *see also Deere & Co.*, 560 F. Supp. at 93 ("[N]o functional feature may be given protection under 15 U.S.C. § 1125(a)."); *see generally Bayline Partners, L.P. v. Weyerhaeuser Co.*, 1994 WL 286337, 31 U.S.P.Q.2d 1051, 1053 (N.D. Cal. Feb. 17, 1994) ("'Functionality is a potent public policy. . . . . For 'functional' items no amount of evidence of secondary meaning or actual confusion will create a right to exclude.'") (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 7.26(1) (3d ed. 1992)).

256. Despite the Lanham Act's unambiguous requirement, McNeil has failed to demonstrate that the Splenda trade dress features that the store brands have allegedly imitated are non-functional. 15 U.S.C. § 1125(a)(3); *Duraco Prods., Inc.*, 40 F.3d at 1439 ("[T]o qualify for trade dress protection, the plaintiff must show . . . that the imitated feature is non-functional.") (quoting *Merchant & Evans, Inc. v. Roosevelt Building Prods. Co.*, 963 F.2d 628, 633 (3d Cir. 1992)).[31]

---

[30] McNeil's claimed trade dress is not registered on the principal register of the United States Patent and Trademark Office.

[31] Further, in every one of the five cases McNeil cites in its functionality discussion, McNeil Conclusions at 20-22, the courts held that the plaintiff failed to meet its burden of proof, and trade-dress protection was unwarranted. *See TrafFix Devices, Inc.*, 532 U.S. at 33-35 (2001) (overturning the Sixth Circuit and holding that the plaintiff's trade dress infringement action was barred because the feature at issue was functional); *Inwood Laboratories, Inc.*, 456 U.S. 844 (discussing approvingly district court's finding that trade dress was functional); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 29, 32 (2d Cir. 1995) (affirming denial of preliminary injunction); *Duraco Prods., Inc.*, 40 F.3d at 1439 (agreeing that "no factfinder could

257.     Conversely, Heartland has proffered credible evidence -- including McNeil's president's sworn testimony and McNeil's admissions -- that demonstrates the features for which McNeil claims protection are functional and/or otherwise unworthy of trade-dress protection.

258.     Significant Supreme Court precedent and authority from this and other jurisdictions confirms that a competitor may adopt the color scheme of an existing product to demonstrate to consumers that the competing product shares the same attributes as the incumbent.

259.     This is the law, for example, in the consumer-product industry, and the sugar-substitute market in particular.  For example, in *Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 249 (E.D.N.Y. 2001), the District Court for the Eastern District of New York held that the color blue was functional in that it served as an identifier of the product's sweetening ingredient -- i.e., aspartame -- and thus was a non-protectable trade dress element. Accordingly, the defendant competitor was free also to employ blue to demonstrate that aspartame was also the sweetening ingredient in its product.  *Id.*

260.     Moreover, in *Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 392, 396 (D.N.J. 1989), the court held that the defendant retailer, McCrory's Corp., was free to manufacture and sell its store-brand mouthwash in the same amber color as the plaintiff's Listerine mouthwash because the amber color conveyed to consumers that the mouthwash was unflavored, as opposed to, for example, cinnamon flavored (signified by red) or peppermint flavored (signified by blue).

261.     More recently, the Supreme Court has recognized that the manufacturer of a generic medicine may mimic the color of the branded equivalent to demonstrate that the generic is the same type of medicine as the branded drug:  "*Competitors might be free to copy the color of*

---

reasonably conclude that Duraco has demonstrated a likelihood of success on the merits"); *Sweetzel, Inc.*, 1995 WL 550585, at *10 ("Sweetzel has failed to prove an essential element of its claim for trade dress infringement, so the claim for injunctive relief must be denied.")

*a medical pill where that color serves to identify the kind of medication (e.g., a type of blood medicine) . . . ." Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 169 (1995) (emphasis added) (citing *Inwood Labs, Inc.*, 456 U.S. at 853 (nothing unlawful in generic drug manufacturer's copying of color scheme employed by branded drug because pill color was functional in that "[s]ome patients commingle medications in a container and rely on color to differentiate one from another.")

262.    In 2003, the United States Court of Appeals for the Third Circuit affirmed the holding that the plaintiff manufacturer of the brand-name drug Adderall could not enjoin a generic competitor from adopting Adderall's blue and peach color scheme color because the color scheme was functional. *Shire US Inc. v. Barr Labs Inc.*, 329 F.3d 348 (3d Cir. 2003). According to the district court, the generic's use of Adderall's color-coding would lessen confusion for patients. *Id.* at 354-55.

263.    Notably, McNeil, as the defendant manufacturer of Tylenol PM-brand analgesic in a suit brought by the manufacturer of Excedrin PM, recognized and praised the practice of competitors adopting the same color schemes as the incumbent brand to demonstrate shared product attributes:

> *[T]he nation's commitment to free and robust competition overrides any interest that Tylenol may have in its distinctive color schemes. Generic manufacturers can, and do, attract attention and consumer interest by associating themselves with Tylenol and Excedrin through the use of color, [among other practices].*
>                                              . . .
> *Tylenol and Excedrin have long-competed with [generic] daytime extra-strength products packaged in white and yellow boxes with red lettering. No one has ever thought these products would be confused. Indeed, the yellow packages highlight the propriety of borrowing color patterns to identify a kind of product.*

Ex. B, McNeil Brief, *Bristol-Meyers Squibb Company v. McNeil-P.P.C., Inc.*, at 6 (March 30, 1992) (emphasis added).

264.    As illustrated by this authority, the color yellow in product packaging and sweetener packets is functional; it allows Heartland and the food-store retailers to convey to consumers that the store brands at issue share the same attributes as Splenda -- e.g., the same sweetness profile and baking ability -- and, conversely, are different from what McNeil itself characterizes as a "sea of blue [aspartame-based] and pink [saccharin-based] packaged competitors."  McNeil Findings ¶ 14.  *See also Cumberland Packing Corp.*, 32 F. Supp. 2d at 568 ("[I]n this industry consumers associate the color blue with aspartame sweeteners and the color pink or red with saccharin sweeteners.  Thus, the dominant coloring of the boxes serves a functional purpose . . . .")

265.    As both Sandler and Gelov agree, the industry color-coding practice of white for sugar, pink for saccharin, blue for aspartame, yellow for sucralose, and even brown for sugar in the raw "enables the consumer to find the type of sweetener that he or she is looking for."[32] Sandler, 1/26/07 Tr. 111:23-112:5; Gelov, 2/7/07 Tr. 88:17-22 ("And the trade even refers to it as pink, blue, and yellow. . . . . This is . . . how the retailers communicate with me and even how the consumers communicate -- yellow, pink, blue."); Grossman Tr. 22:19-22 ("Q. Are you familiar with any other no calorie sweeteners?  A. The pink one and the blue one.  I never can remember their names.")  *See also* Sandler, 1/26/07 Tr. 77:14-15 (describing the sweetener industry as "color identified").

266.    Not only the five retailers at issue, but also Wal-Mart and Albertsons use yellow packets to market their store-brand sucralose.  Canaan, 1/26/07 Tr. 213:8; Ex. 11A, 11B, 132A.

---

[32]    As with medicines, color-coding in the sweetener market promotes safety.  All aspartame products contain phenylalanine, which can cause serious adverse effects if ingested by individuals with a disease known as phenylketonuria (PKU).  *See McNeil-PPC, Inc. v. Merisant,* 2004 WL 3316380, at *26 (D.P.R. Jul. 29, 2004).  Packaging aspartame-containing sweeteners in blue highlights this ingredient for persons who suffer from PKU, and conversely, PKU-sufferers can safely buy the store brands and Splenda, which are packaged in yellow.  *See id.*; Gelov, 2/7/07 Tr. 88:9-16.

McNeil does not dispute the lawfulness of Altern and Albertsons' use of yellow packets.  Sandler, 1/26/07 Tr. 80:11-12, 91:17-18; Gelov, 2/7/07 Tr. 92:17-19.

267.    In light of this functionality, yellow packaging is not trade-dress protectable, and the store brands are free to employ yellow in their packaging.  *Cf. Transgro, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1029 (9th Cir. 1985) (holding coloring of springs used in transmission kits was functional and therefore not protectable because it assisted mechanics in selecting springs for installation); *Nor-Am Chem. Co. v. O. M. Scott & Sons Co.*, Civ. No. 86-3810, 1987 WL 13742, at *4 (E.D. Pa. Jul. 15, 1987) (refusing to prohibit competitor from manufacturing its nitrogen-based fertilizer in blue where consumers looked for blue color to determine if fertilizer was nitrogen-based).

268.    McNeil further cannot meet its burden of demonstrating non-functionality because not only is yellow packaging in the sweetener market functional in the traditional sense, and thus incapable of protection, but it also is aesthetically functional.  "The doctrine of aesthetic functionality defines functionality in terms of consumer acceptance."  *Deere & Co.,* 560 F. Supp. at 97 (holding competitor was free to use "John Deere green" for its tractor loaders because color was aesthetically functional in that farmers preferred it).

269.    Both Sandler and Heartland's expert witness, David Canaan, testified to the key nature of appetite appeal in consumer food product packaging.  Sandler, 1/26/07 Tr. 45:9-11; Canaan Decl. ¶ 34 ("The touchstone of food packaging is appetite appeal.  In other words, food packaging is designed so that the consumer will believe the foods associated with the product will look and taste good.").  In the sweetener industry, appetite appeal is particularly critical because the food product itself is a white powder, which lacks intrinsic appeal (unlike candy, cookies, or pretzels, for example).  Canaan Decl. ¶ 37.

270.     There are only a certain number of colors that provide such appeal, however.  *Id.*¶ 35.  Other than red or pink and blue, which are used to signify saccharin- and aspartame-based products, there is yellow, orange, green, and purple. *Id.* ¶ 37.  Yellow is superior to these other colors in its appetite appeal.  Canaan, 1/26/07 Tr. 207:20-23 (testifying that orange green, and purple have less appetite appeal than yellow).  In fact, with appetite appeal as one of its prerequisites, McNeil rejected orange, green, and purple for Splenda's packaging.  Sandler, 1/26/07 Tr. 45:9-11, 142:15-27.

271.     As such, yellow packaging also is aesthetically functional.  *See Sportvision, Inc. v. Sportsmedia Tech. Corp.*, Civ. No. 04-03155 JW, 2005 WL 1869350, at *6-8 (N.D. Cal. Aug. 4, 2005) (stating that functionality established if the "asserted product feature, which gives a product its distinctiveness, is the best, or at least one, of a few superior designs" and holding use of yellow first-down line used in football game broadcasts was functional where it was preferred by customers).

272.     That the store-brands could have used a color other than yellow does not make yellow nonfunctional, contrary to McNeil's argument at paragraph 28 of its conclusions.  Indeed, in *Keene Corp. v. Paraflex Ind., Inc.*, 653 F.2d 822, 827 (3d Cir.1981), the Third Circuit rejected a similar contention, aptly stating: "[M]erely because there are other shapes and designs which defendant could use and still produce a workable product, the design used is not thereby non-functional." (internal punctuation omitted).  *See also Deere & Co.*, 560 F. Supp. at 96 (rejecting plaintiff's argument that the defendant competitor should be forced to adopt a different design merely because function could be accomplished through that design).

273.     Moreover, the yellow coloring is but one of the functional aspects of McNeil's alleged trade dress.  The graphic elements also are functional.  The individual sweetener packets depicted on Splenda and some store brands function to inform consumers as to what product they

are buying.  *See August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 620 (7th Cir. 1995) (holding that a picture of a mound of candies was "such a common visual cue to the product inside, and so obviously functional, that it [was not] a protected trade dress").  Similarly, the food and beverage photographs instruct the consumer as to what the product can be used for and therefore also are functional.  Gelov, 2/7/07 Tr. 15:28-16:3 ("[T]hat is how these products are used so, they're used in hot -- to sweeten hot and cold beverages, so there were pictures of hot and cold beverages on those packages."); Canaan Decl. ¶¶ 30-32.

274.    Fourth, evidence establishes that packaging size and shape is functional.  As an initial matter, the packaging at issue consists of rectangular boxes for the packets, rectangular flexible bags for granular product, and rectangular packets.  Such packaging cannot be protected; the "shape[s] could hardly be less distinctive and more utilitarian, i.e. functional."  *McKeon Prods. Inc.*, 69 U.S.P.Q.2d at 1038 (holding rectangular packaging was functional and, thus, not able to be protected).

275.    Furthermore, the packaging size and shape is dictated by practical considerations.  There is a standard size and shape for sweetener packets that is dictated by the manufacturing equipment used and manufacturing efficiencies.  Gelov, 2/7/07 Tr. 13:23-14:8, 39:5-13, 41:13-42:5.

276.    McNeil's other claimed trade-dress elements are not shared by the store-brand sucralose and, accordingly, there can be no finding of infringement.  For instance, not only is packaging size and shape functional in the sweetener industry (and thus non-protectable), the store-brands 100-count boxes are shorter in height and slimmer than Splenda's 100-packet box.  Sandler, 1/26/07 Tr. 119:15-120:2; Gelov, 2/7/07 Tr. 13:5-21; *see also e.g.*, Exs. KKK, III.

277.    Moreover, as Sandler has conceded, the store brands lack the allegedly "important" Splenda feature of an oval "white cloud" surrounding the product name.  Sandler, 1/26/07 Tr. 47:15-17; 119:1-6, 127:5-6; Ex. 3A.

278.    The store brands contain no circular element similar to Splenda's "made from sguar, tastes like sugar" seal, another key element of Splenda's packaging according to McNeil.  Sandler, 1/26/07 Tr. 117:17-118:3-18, 123:7-9; Gelov, 2/7/07 Tr. 27:12-19, Exs. JJJ, III, TTT.  *See also e.g.,* Merisant Tr. 29:8-12 ("The identity of the brand is built upon this, made from sugar, tastes like sugar heritage, and this is the result of McNeil's marketing efforts.")

279.    Nor does the challenged packaging have a design layout similar to Splenda's.  For example, none of the store-brands have iced tea on their packaging.  Safeway's Sucralose boxes do not depict a cold beverage at all, and Food Lion's Sweet Choice and the Ahold Sweetener packaging depict lemonade, not iced tea.  Sandler, 1/26/07 Tr. 116:27-117:9, 126:5-16; Exs. JJJ, III, TTT.  *See also* Findings §§ M-Q, *supra* (discussing other packaging differences).

280.    After eliminating all the elements that are (1) functional and/or (2) not shared by the store-brands (and thus are non-protectable), only the product name's blue lettering and italicized font remain.  These packaging elements are incredibly common both among sweeteners and in other consumer food products.  *See, e.g.*, Sandler, 1/26/07 Tr. 102:23-26 (conceding that many other food products use a color scheme of a yellow background and blue writing); *id.* 101:13-21 & Ex. UUU (blue italicized lettering on Domino Pure D'Lite); Sandler, 1/26/07 Tr. 130:7-13 & Exs. 9A, BB (blue italicized product name for Sweet 'N Low and NatraTaste); Gelov, 2/7/07 Tr. 19:26-21:5 (sweeteners that use blue type for the product name); Ex. Z (Sweet'N Low box); Ex. LLL (Equal packet); Ex. BB (NatraTaste box).

281.    Accordingly, blue lettering and italicized font cannot serve as a means of identifying the source of the product and thus are unprotected.  *See Warner Lambert Co.*, 718 F.

Supp. at 396 ("[A] feature of a trade dress can be protected from infringement only if the trade dress or feature . . . serves as a means of *identifying the source of the product*.") (emphasis added); *August Storck K.G.*, 59 F.3d at 619-20 ("common graphic elements" are not "independently protectable").

282.    In sum, preliminary injunctive relief for McNeil's purported trade dress is inappropriate because McNeil has fallen far short of its burden of demonstrating non-functionality.  Instead the evidence -- which includes the testimony of McNeil's own witness -- demonstrates that every claimed element of such dress is functional, not present in the store brand packaging or so common as to be unworthy of protection.  *See Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC,* 259 F.3d 25, 41-43 (1st Cir. 2001) (affirming district court's denial of trade dress protection for product labels that were a "combination of functional and common features"); *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1579-80 (Fed. Cir. 1995) (denying trade dress protection stating, "To our knowledge, the Eleventh Circuit has not held protectable a trade dress that encompassed only useful product features.")

**C.    Preliminary Injunctive Relief Is Further Unwarranted Because McNeil Has Not Demonstrate That It Is Substantially Likely to Prove that Splenda's Trade Dress Is Inherently Distinctive or Has Acquired Secondary Meaning.**

283.    Trade dress, like trademarks, are divided into five categories: gries, it is deemed to be inherently distinctive." *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 41 (1st Cir. 2001).  Conversely, if trade dress is generic or descriptive, trade dress protection is inappropriate.  *Id.*

284.    McNeil does not specify which of the categories its relies on in arguing that its Splenda packaging is inherently distinctive.  Presumably, however, it contends that the packaging is arbitrary and/or fanciful in that it relies on *Paddington Corp. v. Attiki Importers & Distributors,*

*Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) ("[T]ypically a trade dress will be arbitrary or fanciful and thus inherently distinctive.")[33]  *See* McNeil Conclusions ¶ 14.

285.    Thus, McNeil must demonstrate that it is substantially likely to succeed in showing that Splenda's packaging is arbitrary or fanciful.  This McNeil has failed to do.

286.    To the contrary, the evidence of record establishes that Splenda's packaging amounts to no more than a combination of elements already prevalent in the sweetener market, and thus is not inherently distinctive.  *See Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1320-21 (N.D. Ill. 1991); *see also Paddington Corp.*, 996 F.2d at 583 ("Where it is the custom of an industry to package products in a particular manner, a trade dress in that style would be generic and therefore not inherently distinctive.")

287.    For example, several other sweeteners share Splenda's packaging color scheme. Before Splenda entered the market, Domino sugar, a dominant sugar brand,[34] already used yellow packaging with blue lettering on a white background, as McNeil concedes it was aware.  *See* Sandler, 1/26/07 Tr. 98:13-24, Canaan, 1/26/07 Tr. 172:19-24, 173:8-10; Gelov, 2/7/07 Tr. 18:19-

---

[33]    *Paddington* is factually distinguishable, however, and therefore does not support McNeil's inherent distinctiveness arguments.  In *Paddington,* the Second Circuit's holding of inherent distinctiveness was focused on the lack of industry standard and that the packaging at issue was in no way descriptive.  In contrast, Splenda's packaging mimics packaging elements that are customary in the sweetener market.  Moreover, Splenda's packaging is replete with descriptive elements.  For instance, the photographs of beverages and food products describe what the sweetener inside can be used for and the photographs of Splenda packets inform consumers of the package's contents.  Even the much-emphasized "made from sugar, tastes like sugar," seal is descriptive in nature.

[34]    Domino is a national sugar brand that is widely available not only in the Northeast but also in, for example, Arizona, California, Illinois, Indiana, North Dakota, Ohio and Texas. Gelov, 2/7/07 Tr. 19:4.

22; Canaan Decl. ¶ 27; Exs. DD, KK.  Sugar Twin, a saccharin-based sweetener, also employed

yellow packaging with blue letter before Splenda came to market.[35]  Exs. CC1, CC2.

288.    Moreover, virtually every no-calorie sweetener on the market, including Sweet'N

Low, Sweetmate, Equal, and NatraTaste, employs blue italicized lettering on its packaging, as do

various sugar and sugar-blend products including Domino Pure D'Light.  Exs. Z, BB, LLL,

UUU; Gelov, 2/7/07 Tr. 19:26-21:5.

289.    Furthermore, it is industry custom in the sweetener market to depict pictures of hot

and cold beverages (particularly coffee and iced tea) and fruit or baked goods on packaging

because consumers use sweetener on or in baking these products.  *See, e.g.*, Sandler, 1/26/07 Tr.

103:11-10, 103:27-104:3, 104:16-105:28; Gelov, 2/7/07 Tr. 15:26-16:3, Gelov Decl. ¶ 27; Exs.

AA, BB, CC , UUU.  *See also* Sandler, 1/26/07 Tr. 103:24 ("Yeah, they all have coffee cups.")

290.    Finally, as discussed above, no-calorie sweetener packaging size and shape is also

standard and dictated by the available manufacturing equipment and manufacturing efficiencies.

*See* Gelov, 2/7/07 Tr. 13:23-14:8, 39:5-13, 41:13-42:5

291.    As such, Splenda's claimed trade dress "is composed entirely of commonly used

or functional elements" and thus "should be regarded as unprotectible . . . ."  *Yurman Design, Inc.

v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001) (internal punctuation omitted).  Indeed, given that

virtually every no-calorie sweetener product, as well as some sugar products, share the very

combination of features that McNeil claims as its trade dress, it would be unreasonable to believe

that Splenda's packaging (as opposed to its name or "made from sugar, tastes like sugar" seal)

would indicate to consumers the product's source.  *See Mana Prods., Inc. v. Columbia Cosmetics

Mfg., Inc.*, 65 F.3d 1063, 1070 (2d Cir. 1995) ("As a whole, the compacts' size and shape-with

---

[35]    Sugar Twin is available in every one of Safeway's 1,545 food stores.  Kessler Decl. ¶¶ 15-16.

their rectangular and square designs-are common characteristics of the entire genre of makeup compacts. . . . Consequently, [plaintiff's] makeup compacts are not inherently distinctive."); *see generally Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000) ("[W]here it is not reasonable to assume consumer predisposition to take . . . packaging as indication of source . . . inherent distinctiveness will not be found.")

292.    The findings of the District Court for the District of Puerto in the unpublished and non-controlling decision, *McNeil-PPC, Inc. v. Merisant Co.*, Civ. No. 04-109-0JAG, 2004 WL 3316380 (D.P.R. Jul. 29, 2004) ("*Merisant*"), do not support a different conclusion.

293.    Although the district court in *Merisant* recognized the industry standard of depicting beverages on sweetener package, apparently it did realize that the other claimed features of Splenda's trade dress also are no more than a reflection of the industry standard.  *Id.* at *6.  For instance, the *Merisant* court did not recognize that the size and shape of Splenda's packaging merely conforms to the industry standards or that virtually every no-calorie sweetener on the market employs blue italicized lettering like Splenda does.

294.    Furthermore, in *Merisant*, McNeil offered a consumer survey that, according to the court, showed that consumers in Puerto Rico identified the alleged Splenda trade dress with a particular source. *Id.* at *9.  McNeil has offered no consumer survey of any kind in this case. Sandler, 1/26/07 Tr. 145:5-8.

295.    *Merisant* also is factually distinguishable from this case in several important aspects.  First, the product at issue in *Merisant,* Same, was an aspartame-based sugar substitute, not a sucralose product.  2004 WL 3316380, at *3.  Thus, the consumer benefits that inure when a competing product with similar attributes uses similar packaging -- i.e., increased decision-making efficiency -- were not present.  To the contrary, the *Merisant* court was concerned that

consumers might confuse the aspartame-based Same for the sucralose-based Splenda and suffer adverse health consequences if the consumer was allergic to aspartame.  *Id.* at 26.

296.    Second, the record from *Merisant* demonstrates that the Same packaging shared many more similarities with Splenda's packaging than the store-brand products do in this matter. For example, Same's packaging used a nearly identical shade of yellow as Splenda and contained an oval-shaped white cloud surrounding the brand name.  *See id.* at *1.  In contrast, the store-brand products at issue in this matter are a lighter shade than Splenda's new golden-yellow packaging, and contain no white cloud.  *See* Findings §§ M-T, *supra*; Exs. JJJ, III, TTT. Furthermore, while Splenda and Same contained a photograph of a cold beverage, iced tea, on the left-hand side of the packaging, *Merisant*, 2004 WL 331638, at *16, the store-brand products that contain a photograph of a cold beverage depict lemonade, not iced tea, and the lemonade picture is located on the right-hand side of the packaging, Sandler, 1/26/07 Tr. 122:23-28; 126:5-16; Gelov, 2/7/07 Tr. 26:14-15; Exs. 2A, 2B, KKK, III.

297.    Finally, in *Merisant*, McNeil was seeking far narrower relief than it seeks in this matter.  In this case, McNeil apparently seeks a full recall of the entire line of sucralose products supplied by Heartland to Food Lion, Ahold, and Safeway: individual packets, boxes, and bags. Compl., *passim*.  In *Merisant*, as the court stated, "McNeil does not seek to protect . . . the labels or packaging for an entire line of products."  2004 WL 331638, at *8; *see also Yankee Candle Co., Inc.*, 259 F.3d at 42 ("[T]rade dress claims across a line of products present special concerns in their ability to artificially limit competition, as such claims are generally broader in scope than claims relating to an individual item.") (affirming judgment for defendant manufacturer on plaintiff's trade-dress claim).  As with any equitable remedy, the more onerous the relief requested, the larger a burden the movant bears.  *See generally Acierno*, 40 F.3d at 653.

76

298.   A preliminary injunction cannot issue because McNeil not only has failed to demonstrate inherent distinctiveness, but it also has failed to demonstrate that it is substantially likely to succeed on its claim that the purported Splenda trade dress has acquired secondary meaning.

299.   "To establish secondary meaning, a manufacturer must show that, in the minds of the public, *the primary significance* of a product feature or term *is to identify the source of the product rather than the product itself.*"  *Inwood Labs., Inc.*, 456 U.S. at 851 n. 11 (citation omitted) (emphasis added); *Bristol-Myers Squibb Co.*, 973 F.2d at 1041 ("The fundamental question, however, is whether the *primary* significance of the term in the minds of the consuming public is not the product but the producer.") (internal punctuation omitted) (emphasis in original).

300.   "Secondary meaning is an essentially factual determination, proof of which entails vigorous evidentiary requirements." *Bristol-Myers Squibb Co.*, 973 F.2d at 1041 (internal punctuation omitted).

301.   In this and other circuits, the preferred method of establishing secondary meaning is through direct evidence -- specifically, through a consumer survey.  *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir. 1990).  In fact, failure of the plaintiff "to run a survey to support its claims of brand significance and/or likelihood of confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief." *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985) (holding plaintiff that failed to produce consumer survey failed to meet its burden of proving secondary meaning and denying preliminary injunctive relief).  *See also World Wrestling Fed'n Entm'tt Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 438 n.16 (W.D. Pa. 2003) ("Such a failure [to conduct a consumer

survey], particularly when the trademark owner is financially able, justifies an inference 'that the plaintiff believes the results of the survey will be unfavorable.'")

302.     McNeil cannot claim that it lacks adequate financial means to conduct a secondary-meaning survey in that it conducted just such a survey in *Merisant*.  Furthermore, considering that McNeil, a wholly owned subsidiary of Johnson & Johnson, garnered roughly $213 million in Splenda sales last year alone, any claim of inadequate financial means would be simply incredible.  Sandler, 1/26/07 Tr. 32:14-15, 141:26-28.

303.     Accordingly, denial of McNeil's burdensome injunctive relief is warranted.

304.     This is particularly true in that McNeil has presented no direct evidence of secondary meaning.  McNeil's attempt to rely on Grossman's testimony fails.  At best, Grossman's testimony might establish that Splenda's packaging permits her to identify the product Splenda.  This, however, is not the standard for secondary meaning, as the Supreme Court has made clear.  *See Inwood Labs., Inc.*, 456 U.S. at 851 n. 11.

305.     At any rate, testimony from a single customer is insufficient to show that a "specific trade dress for a particular product connects [the plaintiff] as the source of the product." *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995).

306.     Finally, Grossman's testimony is unworthy of credence as a general matter. Grossman admits that, at the time of her purchase, she was not wearing her glasses, which she needs to read.  In addition, in every aspect, Grossman is atypical of a reasonably prudent shopper, as discussed above.  *See*  ¶¶ 222-228, *supra.*  For instance, and contrary to McNeil's characterization, Grossman did not "walk[]" away with the incorrect product, McNeil Conclusions ¶ 19; instead, in one of her "surgical strike" shopping missions, Grossman "buzz[ed]" past the sweetener aisle, "grabbed" the Safeway product and "ran."  Grossman Tr. 11:23-12:5, 20:7-11.

307.    McNeil also cannot rely on its advertising expenditures to establish secondary meaning.  There is no evidence that any Splenda ads have emphasized the trade-dress features for which McNeil seeks protection from the store-brands' alleged imitation.  Quite the opposite, the evidence of record demonstrates that McNeil's advertising efforts have focused primarily on its "core marketing message" that Splenda is "made from sugar so it tastes like sugar."  Merisant Tr. 16:4-6 ("And again, very prominently, it's made from sugar so it tastes like sugar, but it's calorie free.  No deviation ever from that core marketing message."), 29:8-12 ("The identity of the brand is built upon this, made from sugar, tastes like sugar heritage, and this is the result of McNeil's marketing efforts."); 15:20-22 (McNeil "was going to launch a high profile T.V. campaign introducing Splenda and its properties as being related to and derived from sugar.")

308.    As such, McNeil's advertising expenditures, however large, do not establish secondary meaning.  *See First Brands v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) (holding advertising "failed to establish a secondary meaning" where it did not direct consumers to look for any particular distinguishing feature of the packaging"); *Euro Pro Corp. v. Tristar Prods., Inc.*, 172 F. Supp. 2d 567, 572-73 (D.N.J. 2001) (injunctive relief denied where plaintiff's promotions and advertisements did not focus or "highlight" the supposedly distinctive features which plaintiff sought to protect); *Warner Lambert Co.*, 718 F. Supp. at 398 (denying injunctive relief stating, "There is also no evidence that any Listerine ads have ever sought to stress the shape of the bottle as a way of fostering consumer identification.")

309.    McNeil's length of use of the claimed trade dress similarly does not demonstrate secondary meaning.  Splenda's new packaging -- in which virtually every one of McNeil's claimed trade dress features was altered -- was introduced in September/October 2006.

310.    Thus, McNeil's length of use has been approximately only five months, not five years.  This is far too short of time to establish secondary meaning.  *See Duraco Prods., Inc.*, 40

79

F.3d at 1453-54 (affirming district court's finding of no secondary meaning, noting that plaintiff's exclusive sale of Grecian style plastic planter for *five years* was "not so long a time as to raise a strong inference of consumer association with a single source"); *see also Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. at 1345 ("[T]he exact trade dress which Turtle Wax seeks to protect was not in existence until [approximately one year ago]. . . . This is a very short period of time in which to establish secondary meaning."); *Euro Pro Corp.*, 172 F. Supp. 2d at 573 ("One year [of exclusive use], however, is not long enough to create an inference that consumers associate [plaintiff's] trade dress with a single source . . . .")

311.    Finally, despite its repeated unsupported claims to the contrary, McNeil has offered no evidence of copying in this case.  *See, e.g.,* McNeil Conclusions ¶¶ 17, 18.  The only testimony presented from any of the defendant parties was that of Ted Gelov, Heartland's president.  Contrary to testifying that Heartland copied Splenda's packaging, Gelov made clear that Heartland did not design or select a single significant feature on any of the store brand packaging.  Gelov, 2/7/07 Tr. 9:15, 9:25-27, 10:20-28.  Rather, the respective stores' marketing teams designed the packaging.  *Id.*  Furthermore, Gelov's declaration regarding "reference points" adds no support for McNeil's arguments.  Even a cursory read makes clear that Gelov is talking about general private-label practices, and not what may or may not have occurred in this case.

312.    For these reasons, McNeil has not met its burden of proof in establishing that its claimed trade dress is inherently distinctive or has acquired secondary meaning; therefore, preliminary injunctive relief cannot be granted.

**D.      McNeil Has Not Met Its Burden on Its Anti-Dilution Claim; It Has Presented No Evidence That Actual Dilution Has Occurred or That Splenda's Packaging is Famous in Pennsylvania.**

313.    McNeil claims that it is likely to succeed on the merits of its claim under

Pennsylvania's anti-dilution statute.  McNeil COL 92-107.  This Court holds otherwise.

314.    The Pennsylvania anti-dilution statute provides in pertinent part:

> The owner of a mark **which is famous in this Commonwealth** shall be
> entitled, subject to the principles of equity and upon such terms as the
> court deems reasonable, to an injunction against another person's
> commercial use of a mark or trade name if such use begins **after the
> mark has become famous and causes dilution of the distinctive quality
> of the mark** and to obtain such other relief as is provided in this section.

54 PA. CONS. STAT. ANN. § 1124 (2007) (emphasis added).

315.    Where the trade dress is not identical, as in this matter, the movant must offer

evidence of actual reduction of the capacity of the movant's trade dress to identify its goods.

*Moseley*, 537 U.S. at 419 ("[W]here the marks at issue are not identical, the mere fact that

consumers mentally associate the junior user's mark with a famous mark is not sufficient to

establish actionable dilution.")

316.    McNeil simply offers no such evidence, and, accordingly, cannot meet its

preliminary-injunction burden of showing that it is substantially likely to succeed on its anti-

dilution claim.

317.    Instead, McNeil argues that the lower burden of the Trademark Dilution Revision

Act of 2006 ("TDRA of 2006"), Pub. L. No. 109-312, 120 Stat. Ann. 1730, codified at 15 U.S.C.

§1125(c), should apply.  McNeil Conclusions ¶ 104.  Because the Pennsylvania General

Assembly has not adopted the lower "likelihood of dilution" standard of the TDRA of 2006, the

Court rejects McNeil's argument.

318.    The Federal Trademark Dilution Act ("FTDA of 1996"), which the Pennsylvania

statute tracks verbatim, provides that the owner of a famous mark is entitled to injunctive relief

against another person's commercial use of a mark or trade name if that use "*causes dilution* of

the distinctive quality" of the famous mark.  15 U.S.C. § 1125(c)(1) (enacted November 29, 1999,

effective through October 5, 2006) (emphasis added); also 54 PA. CONS. STAT. ANN. § 1124

(emphasis added).  The United States Supreme Court in *Moseley v. V Secret Catalogue, Inc.*, 537

U.S. at 432-33, held that the statutory language "causes dilution" means that "[t]his text

unambiguously requires a showing of actual dilution, rather than a likelihood of dilution."

319.    Since *Moseley*, the FTDA of 1996 was amended on October 6, 2006 under the

TDRA of 2006.  The language now provides that a trademark owner of a famous mark must show

that another's use "is likely to cause dilution."  15 U.S.C. § 1125(c)(1) (2007).

320.    The Pennsylvania statute has not been amended, however.  Although the

Pennsylvania legislature certainly could have changed the statute after *Moseley*, or after the

TDRA of 2006, it did not.  Therefore, a trademark owner must still show actual dilution to

succeed on its state dilution claim, a showing McNeil has failed to make.  *See Scott Fetzer Co. v.

Gehring*, 288 F. Supp. 2d 696, 702 (E.D. Pa. 2003).

321.    Similarly, McNeil fails to show it is likely to succeed on the merits in its claim

that the Splenda packaging is famous.

322.    In determining whether a mark is distinctive and famous, a court may consider

factors such as: (1) the degree of inherent or acquired distinctiveness of the mark in this

Commonwealth; (2) the duration and extent of advertising and publicity of the mark in this

Commonwealth; and (3) whether the mark is the subject of a registration in this Commonwealth

or a Federal registration.  54 PA. CONS. STAT. ANN. § 1124.

323.    As discussed above, McNeil has made no showing that the packaging it seeks to

protect (as distinct from the Splenda name, logo, or "made from, taste like sugar" seal) possesses

inherent or acquired distinctiveness.  *See Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500

(M.D. Pa. 1998) (in a federal and state dilution case, overall trade dress found not sufficiently

famous where other trade dress in the food industry was similar to plaintiff's color combination and lettering).

324.    Furthermore, McNeil has entered no evidence into the record of advertising or publicity in the Commonwealth of Pennsylvania or that Splenda's purported trade dress is registered in either Pennsylvania or on the federal register.

325.    For these reasons, McNeil fails to demonstrate it is substantially likely to succeed on its anti-dilution claim and accordingly its preliminary-injunction request is denied.

**E.      Having Failed to Show Likelihood of Success on the Merits, McNeil's Claim of Irreparable Harm Also Fails.**

326.    Because McNeil fails to meet its burden of proof as to likelihood of confusion, there can be no irreparable harm, and the Court should deny McNeil's preliminary-injunction request. *See McKeon*, 69 U.S.P.Q.2d at 1041 ("Because Plaintiff cannot establish likelihood of confusion, there correspondingly is no irreparable harm to Plaintiff.")

327.    McNeil's failure to bring any trade dress action against Wal-Mart or Albertsons relating to their private-label sucralose brands further contravenes McNeil's claims of irreparable harm.

328.    In January 2006, more than a year ago, Heartland began selling a sucralose product to Wal-Mart under its "Altern" brand.  Gelov Decl. ¶ 44.  The Altern packaging contains many of the same elements that McNeil complains about, including: yellow background; italicized font for the product name; similar package dimensions, similar photos (e.g., white coffee cup, bowl of cereal), and similar design layout.

329.    Furthermore, as the largest food retailer in America, Wal-Mart's house-brand sucralose sales are greater than Food Lion's, Safeway's, and the Ahold companies' combined. Gelov, 2/7/07 Tr. 91:23-92:8.

330.    Heartland also sells a sucralose product to Albertsons.  *Id.* 85:4-9

331.    It is undisputed that both Wal-Mart and Albertsons sell their store-brand sucralose products in yellow packets that use the same stock paper Heartland employs for Safeway, Ahold and Food Lion.  *Id.* 109:5-28.

332.    Accordingly, McNeil's "conscious inattention" toward the packaging and packets of Wal-Mart and the packets of Albertsons "severely undercuts plaintiff's claim that it faces irreparable damage" from Heartland.  *Warner Lambert Co.*, 718 F. Supp. at 394.

333.    The Court therefore finds that McNeil has failed to sustain its burden of establishing irreparable harm.

**F.    McNeil Fails to Show That Its Potential Harm Outweighs the Harm Heartland and the Non-Party Supermarkets Will Suffer if an Injunction Is Issued.**

334.    If the Court were to order Heartland to stop selling the products at issue, it would have a significantly negative financial impact.  Gelov, 2/7/07 Tr. 52:24-26.  Moreover, if the Court were to order the preliminary injunction requested by McNeil, and order a product recall, its would be "devastating" to Heartland.  *Id.* 54:4.  Revenues and cash flow lost during the pendency of any injunction would be lost forever because, as Heartland President Gelov explained: "Once a customer doesn't buy your product, they don't eat twice as much the next month."  *Id.* 97:8-10.

335.    In addition, Heartland would bear the cost of any recall and product destruction, just as it alone is bearing the cost of defending against this action.  *Id.* 54:1-15, 19-20; 106:22-107:15.

336.    In contrast, while McNeil's Sandler testified to some negative sales impact purportedly from the store-brand sucralose sales, she stated: "[T]here is really no way for me to say definitively what percentage of the sales were from confusion, what percentage were

consumers who were aware and chose something willingly because it was a lower price."
Sandler, 1/26/07 Tr. 74:1-15; *see also id.* 69:15-23.

337.    Moreover, while Sandler testified to a potential loss of goodwill, she claimed that
this would occur only if "someone purchases one of these products by accident or thinks that it's
affiliated with us in any way and has a negative experience."  *Id.* 70:14-17.

338.    McNeil presents no evidence, however, that the quality of Heartland's products is
lacking or that any consumer has had a negative experience.  To the contrary, Grossman testified
that she thought Splenda and Safeway Sucralose taste the same.  Grossman Tr. 18:8-10.  She
further said she brought no Safeway Sucralose packets to her deposition because "we used them
all up before I got your subpoena."  *Id.*  32:10-12.  Moreover, Heartland President Ted Gelov
testified that the manufacturer of the store-brand sucralose products meets applicable guidelines
for sucralose as far as purity, and that the manufacturer has "Good Manufacturing Practices" in
place.  Gelov, 2/7/07 Tr. 62:17-63:6.

339.    In this case, injunctive relief is particularly inappropriate in that Heartland did not
design any of the packaging at issue and has no right to implement package redesigns.

340.    Indeed, in remarkably analogous circumstances, the United States District Court
for the Eastern District of Michigan declined to enter a preliminary injunction in favor of the
national-brand manufacturer where the retailers themselves, Walgreens and Albertsons -- "the
entities that purportedly selected the trade dress at issue" -- were not parties to the litigation.
*McKeon Prods. Inc.*, 69 U.S.P.Q.2d at 1042 n.2.  As the court pertinently observed: "There is
something unsettling about granting a preliminary injunction -- an extraordinary remedy -- for the
conduct of third parties that [the store-brand manufacturer] might not be able to control fully."
*Id.*

341.    McNeil's requested relief would require a recall of all store-brand sucralose at Food Lion, Giant, Stop & Shop, Tops, and Safeway, *see* Proposed Order ¶ 3, without any opportunity for those grocery chains to be heard.

342.    At a minimum, if a preliminary injunction were granted, these food stores would need to expend time and resources redesigning the challenged packaging since re-design decisions are within their sole control.  Retail stores also would suffer lost sales, loss of customer goodwill and the need to fill a hole in the retail shelf where the sucralose products had been merchandised.  *Id.* 55:16-56:7.[36]

343.    The Court declines to impose such a burden on these non-parties.  *See McKeon Prods. Inc.*, 69 U.S.P.Q.2d at 1041 (denying preliminary injunction stating, "[T]he Court is concerned with the third party retailers who supposedly control the trade dress at issue but are not parties in this litigation.  There could be harm to them by granting preliminary injunctive relief at this stage.")

344.    Thus, in light of Heartland's and the non-party retailers' potential harm, which would outweigh the minimal, if any, harm to McNeil, McNeil's request for a preliminary injunction is denied.

---

[36]    McNeil's decision to employ a so-called "soft conversion" with its new packaging, where products are not recalled, but instead retailers are simply supplied with new packaging when refills are needed, evidences the onerous nature of a product recall.  The retailers' practices further confirm the burdensomeness of a true product recall.  For instance, when Ahold changed over from the packaging that said, "Tastes like sugar because it's made from sugar," it did not pull finished goods but rather let them run through the distribution system.  Gelov, 2/7/07 Tr. 70:12-15.

G.   **Permitting the Lower-Priced Store-Brands to Remain on the Market Pending Final Disposition Best Serves the Public Interest.**

345.   "When deciding whether to grant or withhold equitable relief a court must give high regard to the interest of the general public, which is a great beneficiary from competition." *August Storck K.G.*, 59 F.3d at 619.

346.   Moreover, as discussed above, this Court has serious doubts as to whether McNeil will prevail on the merits on likelihood of confusion, non-functionality, secondary meaning, inherent distinctiveness, or dilution.

347.   Under these circumstances, the Court will put the public interest first, by continuing to permit them access to lower-priced sucralose alternatives -- a particular benefit to consumers on fixed incomes or without substantial financial means. *See also Warner Lambert Co.*, 718 F. Supp. at 399 ("Given the . . . uncertainty as to the merits of plaintiff's position, the Court finds the public interest is best served by allowing McCrory to sell its lower priced antiseptic mouthwash pending the outcome of this action."); *Farberware, Inc. v. Mr. Coffee, Inc.*, 740 F. Supp. 291, 304 (D. Del. 1990) (reaching same conclusion); *see also August Storck K.G.*, 59 F.3d at 619 (overturning district court's grant of preliminary injunction stating, "[W]hen the plaintiff's showing is as thin as Storck's the interests of the public carry the day.") (internal citation omitted).

III.   **IF INJUNCTIVE RELIEF WERE AWARDED, A $1 MILLION BOND WOULD B WARRANTED TO ADEQUATELY PROTECT HEARTLAND'S INTERESTS.**

348.   Rule 65(c) of the Federal Rules of Civil Procedure requires a bond to be posted when a court issues a preliminary injunction, "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

349.     In determining the appropriate bond amount, courts should consider the defendant's "potential lost profits, lost market share, and [the] associated costs of relaunch." *Sanofi-Synthelabo v. Apotex Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006); *see also Site Microsurgical Sys., Inc. v. Surgin Surgical Instrumentation, Inc.*, 855 F. Supp. 1450 (E.D. Pa. 1994).

350.     The time frame for calculation is from when the restraints are issued through the end of trial. *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 254 F. Supp. 2d 527, 577 (E.D. Pa. 2003), *rev'd on other grounds*, 357 F.3d 1319 (3d Cir. 2004).

351.     Importantly, "[w]hen setting the amount of security, district courts should err on the high side." *Scanvec Amiable Ltd. v. Chang*, 2002 WL 32341772 at *3 (E.D. Pa. Nov. 1, 2002) (quoting *Mead Johnson & Cc. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000)).

352.     Indeed, "[a]n error in setting the bond too high [] is not serious. . . . Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co.*, 201 F.3d at 888.

353.     If McNeil were awarded the mandatory injunctive relief it seeks, Heartland would have to take numerous expensive steps to comply with the Court's order.  For example, Heartland would have to inform its retail customers of the need to redesign their packaging, reconfigure and replace the printing plates, printing materials, and packaging, and "go into production and sell the product." Gelov, 2/7/07 Tr. 58:1-8.

354.     Furthermore, if a recall is issued, Heartland likely would have to buy back the store-brand products at a price significantly higher than what Heartland sold to the stores, because "the stores have a policy that, in the reclamation, they charge you the retail price, what the consumer pays at the store, for the product." *Id.* 59:16-18.

355.    The food stores would suffer additional costs associated with packaging redesign, lost sales, lost customer goodwill, and man-hours needed to effectuate any recall.  *Id.* 60:14-19.

356.    McNeil estimates that a $100,000 bond is sufficient to protect Heartland's interests should injunctive relief be issued erroneously.  McNeil Conclusions ¶ 127.  But McNeil improperly limits its estimate to the costs associated with the need to prepare to print replacement packages.  McNeil Conclusions ¶ 126.

357.    Gelov testified that Heartland will suffer additional damages above and beyond the costs to print replacement packages, including purchasing its entire product on store shelves at a rate higher than the retail price.  Gelov, 2/7/07 Tr. 58:21-59:12.  "Further, Heartland will lose irreplaceable sales."  *Id.* 97:8-13.

358.    Accordingly, a $1,000,000 bond would be needed to adequately protect Heartland's interests in that Heartland's recovery would be limited to such amount, if injunctive relief were issued in error.  *Mead Johnson & Co.*, 201 F.3d at 888.

359.    At the very least, a separate hearing should be held so that Heartland may have the opportunity to present testimony, upon proper notice, regarding the full extent of its damages should the injunctive relief be issued in error.

## CONCLUSION

360.    For all of the above reasons, the Court denies McNeil's motion for preliminary injunction.

Dated:  March 6, 2007

                                        Respectfully submitted,

                                        s/*Lizanne V. Hackett*
                                        Abbe F. Fletman (PA 52896)
                                        Lizanne V. Hackett (PA 89751)
                                        FLASTER/GREENBERG P.C.
                                        Eight Penn Center

89

1628 JFK Blvd., 15th Floor
Philadelphia, PA 19103
Tel: 215-279-9393
Fax: 215-279-9394

Of Counsel:
William L. O'Connor
George A. Dremonas
DANN PECAR NEWMAN
  & KLEIMAN
One American Square
Suite 2300
Indianapolis, IN 46282