IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MCNEIL NUTRITIONALS, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HEARTLAND SWEETENERS LLC, and | : | |
| HEARTLAND PACKAGING CORP. | : | NO. 06-5336 |

## MEMORANDUM

Padova, J.                                                          May 21, 2007

Plaintiff McNeil Nutritionals ("McNeil") has brought this action against Defendants
Heartland Sweeteners LLC and Heartland Packaging Corp. (collectively "Heartland") alleging
violations of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125; dilution of trade dress and
trademark under Pennsylvania state law, 54 Pa. Cons. Stat. Ann. § 1124; unfair competition under
Pennsylvania common law; and misappropriation of an advertising idea under Pennsylvania common
law.  Currently before the  Court is McNeil's Motion for a Preliminary Injunction pursuant to Federal
Rule of Civil Procedure 65.  For the reasons detailed below, McNeil's motion is denied.

## I.    BACKGROUND

McNeil markets Splenda®, the leading artificial sweetener in the United States in terms of
dollar sales.  Heartland packages, sells, and distributes to a number of retail chains store-brand
artificial sweetener products that compete with Splenda.  McNeil filed a Complaint against Heartland
on December 5, 2006, alleging that Heartland's packaging of the store-brand products is confusingly
similar to the Splenda trade dress.[1]  Shortly after filing its Complaint, McNeil filed a Motion for

---

[1] Trade dress is defined as "the total image or overall appearance of a product, and includes,
but is not limited to, such features as size, shape, color, or color combinations, texture, graphics, or
even a particular sales technique." Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 171 (3d Cir.

Preliminary Injunction seeking an order enjoining Heartland from selling or distributing store-brand products in packaging that is confusingly similar to the Splenda trade dress, using or distributing any advertising or sales material depicting such packaging, and directing Heartland to recall from distribution and destroy all such packaging and sales material depicting such packaging. An evidentiary hearing was held on January 26, 2007 and February 7, 2007. At the conclusion of the hearing, the Court directed the parties to file proposed findings of fact and conclusions of law. Oral argument was heard on the motion on March 13, 2007.

## II.    LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits of its claim, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief. Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (citing Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)). Preliminary injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (quotation omitted). Only if the movant produces evidence sufficient to demonstrate that all four factors favor preliminary relief should the injunction issue. Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990).[2]

_____

2000).

[2]The parties disagree as to whether the relief requested by McNeil constitutes a mandatory or a prohibitory injunction. Heartland contends that McNeil seeks a mandatory injunction and, therefore, must satisfy a heightened standard, i.e., it must demonstrate that it is _substantially_ likely to succeed on the merits. See Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly

## III.   FINDINGS OF FACT

We make the following findings of fact:

**Sugar Substitutes**

1.    American consumers spend between $600 to $700 million yearly on sugar substitutes, also known as artificial sweeteners.  No-calorie sweeteners are a subset of artificial sweeteners that do not have any calories.  (Sandler, 1/26/07 Tr. at 38-39, Gelov Decl. ¶ 17.)

2.    Sugar substitutes are purchased by consumers for a variety of reasons including: blood-sugar disorders, including diabetes; obesity; weight loss; fitness; and tooth decay.  (Canaan Decl. ¶ 24, Gelov Decl. ¶ 18.)

3.    The market for no-calorie sweeteners is dominated by products that contain one of three sweetening ingredients: saccharin, aspartame, and sucralose.  (Sandler, 1/26/07 Tr. at 38-39.)

4.    Saccharin was first marketed in the United States in 1957 and was the first artificial sweetener to be introduced in the United States.  The leading artificial sweetener containing saccharin is Sweet'N Low®.  (Id. at 39.)

5.    Aspartame was approved by the U.S. Food and Drug Administration for sale in the United States in 1982.  The leading artificial sweetener containing aspartame is Equal®.  (Id. at 38-39.)

6.    Sucralose was approved by the U.S. Food and Drug Administration in 1998 for use as a food additive, and in 1999 for use as a general purpose sweetener.  Sucralose is an artificial sweetener that is manufactured through a process in which the molecular structure of sugar

---

heavy burden in demonstrating its necessity." (citing Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980))).  Given our finding that McNeil has not satisfied the non-heightened "likelihood of success" standard, we need not address the issue of whether a heightened standard is applicable in this case.

is modified by replacing three of eight hydroxyl (i.e. hydrogen and oxygen) groupings on the sucrose molecule with three chlorine atoms. Therefore, sucralose is essentially a chlorinated sucrose molecule. Sucralose has no calories because it is passed through the body without being metabolized. Because sucralose is more heat-resistant than saccharin and aspartame, it is often marketed not only in individual packets, but also in loose or granular form to be used in cooking and baking. (Sandler Decl. ¶¶ 5-6, Sandler, 1/26/07 Tr. at 39-40.)

7.      In September 2000, McNeil introduced Splenda, the first artificial sweetener in the United States made from sucralose. Sales of Splenda have grown more than tenfold in just six years, from approximately $32 million in 2001 to approximately $410 million in 2006. Within a year of its introduction, Splenda captured 14% of the total U.S. market for low-calorie sweeteners (based on dollar volume). Splenda's market share has increased over the last five years, and in 2006, Splenda captured approximately 60% of the no-calorie sweetener market, compared to approximately 15% for Equal and 14% for Sweet'N Low. (Id. at 39-40, 42:12-45:10, Sandler Decl. ¶ 23-27.)

**Color Coding in the Sugar Industry**

8.      As the number of sugar and sugar substitutes has increased, color-coding in packaging has developed as a means of differentiating products and quickly identifying the active ingredient in a given product. The leading artificial sweeteners are each sold in distinctive packaging that helps consumers identify and distinguish them from other products in the market. (Sandler, 1/26/07 Tr. at 85:23-25; Gelov, 2/7/07 Tr. at 51:7-9.)

9.      Sweet'N Low, the leading saccharin brand, is marketed in predominately red and pink packaging. Individual packets of Sweet'N Low are pink. The recognized industry standard

4

for saccharine-based products is for the product to be sold in red and/or pink packaging.  This practice informs consumers that the particular product is made primarily with saccharin and, in the case of store-brand products, that the item competes with Sweet'N Low.  (Gelov Decl. ¶¶ 23, 25.)

10.    Equal, the leading aspartame brand, is marketed in packaging that is primarily blue. Individual packets of Equal are blue.   Aspartame-based sweeteners are primarily sold in blue packaging.  (Id. ¶¶ 28, 30, Sandler, 1/26/07 Tr. at 91:16-17.)

11.    The primary color used in the packaging of Splenda, the leading sucralose brand, is yellow, and the individual packets of Splenda are primarily yellow.  (Id. at 51., Pl. Exs. 1(a), 1(b), 1(c), 2(a) and 2(b).)

**Private-Label and Store-Brand Products**

12.    Private-label products are typically products manufactured or provided by one company for offer under another company's name.  Such products are generally made with the same active ingredient as, or otherwise are similar to, the particular name-brand or national-brand product with which the private-label product competes.  (Canaan, 1/26/07 Tr. at 182:12-14,  Gelov Decl. ¶ 7.)

13.    Private-label products are available in a wide range of industries and are often positioned as lower cost alternatives to national-brand products.  Private-label products generally are about 25 percent less expensive than national-brand products.  (Canaan Decl. ¶¶ 13, 15.)

14.    As of 2005, private-label sales represented 20 percent of all U.S. supermarket, drug chain, and mass merchandiser sales and totaled $50 billion. (Id. ¶ 14.)

15.    Store-brand products are a type of private-label products, in which the store name, such as

Giant, Safeway, or Food Lion, is the brand name. Store-brand products have been used by retailers since 1883, when they were first introduced by the supermarket pioneer, Barney Kroger. (Canaan, 1/26/07 Tr. at 190:8-9, Canaan Decl. ¶ 22.)

16. Consumers have become highly aware of store-brand products. The Private Label Manufacturers Association (PLMA), in a study conducted by the Gallup organization, reported that in 2005, more than 90 percent of consumers polled were familiar with store-brands and 83 percent bought them regularly. (Id. ¶ 22.)

17. Store-brands are typically found on store shelves next to the analogous national-brand product. The packaging of store-brand products often includes reference points to invite the consumer to compare the store-brand product to the national-brand product. These reference points often include similar product packaging and "compare to" statements on the packaging. Stores also employ tags on store shelves that explicitly invite consumers to compare the store-brand product with a national-brand product. (Def. Exs. A19-A30, Gelov Decl. ¶¶ 14-16.)

18. Stores develop private-label products for several reasons, including, enhancing the retailer's image, strengthening its relationship with consumers, and inspiring consumer loyalty. (Canaan Decl. ¶ 19.)

19. In the artificial sweetener market, there are a number of private label products that compete with Sweet'N Low and Equal. Nearly all grocery store chains sell private-label saccharin and aspartame sweeteners that compare to the national-brand products. (Gelov Decl. ¶¶ 31, 37.)

**Splenda Trade Dress**[3]

20.    McNeil has devoted substantial resources to market and promote Splenda products.  McNeil

has spent nearly $250 million to promote and publicize the brand to consumers.  Through its

branding campaign, McNeil has highlighted the yellow Splenda packaging which includes

the Splenda trademark in gradated blue italicized lettering on a white cloud.  A Splenda

package has been featured in nearly every Splenda television commercial and print

advertisement since its launch.  (Sandler, 1/26/07 Tr. at 54:18-56:24.)

21.    McNeil began selling boxes of individual Splenda packets in 2000.  The boxes come in 100

and 200 count sizes and are identical except for the size of the box.  The box is oriented

horizontally.  The background is yellow with a mottled effect, while the lettering on the box

is primarily blue.  The trade name "Splenda" appears at the top-center of the front of the box

in italicized blue lettering that increases in intensity from light to dark blue.  The trade name

is also surrounded by a white, oval-shaped cloud, and is underlined by a blue half-circle and

the words "No Calorie Sweetener."  On the front, lower-right side of the box, there is a

photograph of a white cup of coffee and saucer, with an individual Splenda packet resting

on the saucer.  On the front, left side of the box, there is a photograph of a glass and pitcher

of iced tea with slices of lemon.  In the bottom-left corner is a circular element that contains

the words, "Made From Sugar, Tastes Like Sugar."  (Def. Ex. K, Pl. Ex 1(a).)

22.    The individual Splenda packets are also primarily yellow.  The packets contain the trade

name "Splenda" in blue, italicized font, underlined by a blue half-circle and the words "No

---

[3] For reference, images of the packages at issue in this case are reproduced in the Appendix
to this Memorandum.

Calorie Sweetener."   The following words appear in red on the packet: "Made From Sugar So It Tastes Like Sugar."  A border, either in gold or blue, frames the packet.  (Pl. Ex. 1(b); Def. Ex. N.)

23.     McNeil also sells Splenda in its granular form packaged in bags.   The bag has a mottled yellow background.   The trade name "Splenda" appears in the top-center of the bag in italicized blue lettering that increases in intensity from light to dark blue.   The trade name is also surrounded by a white, oval-shaped cloud, and is underlined by a blue half-circle and the words "No Calorie Sweetener." On the lower half of the bag, there is a photograph of a piece of pie on a white plate, a bowl of cereal with raspberries, and a white scoop containing the Splenda product in its granular form.  (Pl. Ex. 1(c).)

**Heartland Products**

24.     In mid-2006, private-label or store-brand sucralose products began to appear in the market. Heartland manufactures a number of store-brand artificial sweetener products for retailers including Giant, Stop & Shop, Tops, Food Lion, Safeway, Albertson's, and Wal-Mart.[4] (Gelov Decl. ¶¶ 43-44.)

25.     Giant, Stop & Shop, and Tops are all owned by Ahold,[5] and the packaging of the store-brand sucralose products sold by each of these stores is identical except that the packaging contains the respective store's name or logo.  (Sandler, 1/26/07 Tr. at 60:17-21.)

26.     The Ahold store-brand box of individual sucralose packets is oriented horizontally.  The box

---

[4]This lawsuit is only concerned with the Heartland sucralose products that are packaged and distributed to Giant, Stop & Shop, Tops, Food Lion, and Safeway.

[5]These stores, and the store-brand products from these three stores, are referred to generally as "Ahold.".

has a yellow background color that is more intense at the top than at the bottom. The lettering on the box is either blue or white. The product name, "Sweetener," appears at the top center, in italicized blue font that increases in intensity from light blue to dark blue. The product name is outlined in white. There is a banner below the product name that contains the text, "Calorie Free." The store logo appears at the top-center above the product name. On the lower-right corner there is a photograph of a white cup of coffee and saucer, a glass of an iced beverage (possibly lemonade) with a lemon slice, and several lemons. There is a white rectangular border on the front of the box. The 100 and 200 count boxes are identical except for their size. (Pl. Ex. 3(a), Def. Ex. TTT.)

27. The Food Lion store-brand box of individual sucralose packets is oriented horizontally. The box has a yellow background with a mottled effected. The lettering on the box is blue. The product name, "Sweet Choice," appears on the bottom center, in italicized font that increases in intensity from light blue to dark blue. The product name is underlined in blue with the words "No Calorie Sweetener" in the underline. The front of the box contains a vertical design element that divides the front into two portions. The left portion is darker than the right, and includes the Food Lion logo and store name at the top. Food Lion uses this vertical element design feature in its other store-brand packaging. The right portion contains a photograph of a white cup of coffee, saucer, and teaspoon, and a photograph of a pitcher of lemonade, two glasses containing lemonade, and sliced lemons. (Pl. Ex. 7(a), Gelov, 2/7/07 Tr. at 26:9-16.)

28. The Safeway store-brand box of individual sucralose packets is oriented horizontally with a yellow background. The lettering on the box is blue. The product name, "Sucralose,"

appears on the bottom-left, in italicized font with a shadow effect.   Each individual letter in the  product name is also surrounded by a white cloud.  The words "No Calorie Sweetener" appear just below the product name.  The front of the box contains a white "S"-shaped design element that divides the front of the packaging.   This "S"-shaped element is found in other packaging for Safeway store-brand products.  The Safeway box displays the Safeway name and logo on the bottom-right.  On the left side of the box there is a photograph of a white cup of coffee, a white bowl of strawberries, a white packet caddy containing individual packages of "Sucralose," and an individual package of "Sucralose" leaning against  the  packet caddy.  The 100 and 200 count boxes are identical except for their size.  (Pl. Ex. 6(a), Def. Exs. JJJ, U., V.)

29.     The individual packets contained in the Ahold "Sweetener" boxes are yellow.   The packets are oriented horizontally, with blue lettering.  The product name "Sweetener" appears in the center of the packet, with the words "Calorie Free" in a blue banner and the words "contains Sucralose" below the product name. (Pl. Exs. 3(b), 4(b), and 5(b).)

30.     The individual packets contained in the Food Lion "Sweet Choice" boxes are yellow.  The packets are oriented horizontally, with black lettering.   The Food Lion name/logo is printed on the top-center of the packet in black.  The product name  "Sweet Choice" appears at the bottom-center, and  is underlined in black.   The underline contains the words "No Calorie Sweetener."  (Def. Ex. NNN.)

31.     The individual packets contained in the Safeway "Sucralose" boxes are yellow.  The packets are oriented horizontally, with blue lettering.  The Safeway name/logo appears in the  bottom-left.  The product name "Sucralose" appears in the upper-center.  Below the product name

10

are the words "No Calorie Sweetener."  A blue border frames the entire packet.  (Pl. Ex. 6(b).)

32.     The Ahold stores also sell a store-brand granular sucralose product packaged in bags.  The bag has a yellow background that increases in intensity from light yellow on the top, to a darker yellow on the bottom.  Lettering on the bag is primarily blue and white.  The product name "Sweetener" appears on the front of the bag at the top-center in a blue italicized font that increases in intensity from light to dark.  The product name is also outlined in white.  The store name/logo appears at the top-center of the bag, above the product name.  Below the product name is a blue banner containing the words "Calorie Free."  The front of the bag displays a photograph of a slice of cheesecake on a white plate, a bowl of cereal with raspberries, and cup of coffee and saucer, and also includes a white rectangular frame.  (Pl. Exs. 3(c), and 4(c).)

33.     Food Lion also sells a store-brand granular sucralose product packaged in bags.  The bag has a yellow background.  Lettering on the packaging is blue.  The product name "Sweet Choice" appears on the front of the bag at the bottom-center in blue italicized font that increases in intensity from light to dark.  The product name is underlined in blue with the words "No Calorie Sweetener" in the underline.  The front of the bag contains a vertical design element that divides the front into two portions.  The left portion is darker than the rest of the bag, and includes the Food Lion logo and store name at the top.  Food Lion uses this vertical element design feature in its other store-brand packaging.  The front of the bag includes a photograph of a loaf of banana nut bread, a container of granular sucralose with a scoop, and a bowl of mixed fruit. (Pl. Ex. 7(c), Gelov, 2/7/07 Tr. at 26:9-16.)

11

34.     Safeway does not sell a store-brand granular sucralose product.  (Id. at 43:23.)

**Refreshed Splenda Trade Dress**

35.     Manufacturers occasionally refresh their trade dress to make their product look more contemporary.   This refreshing of a trade dress tends not to consist of major changes, but rather includes evolutionary changes in order to keep the good will of the product's consumer base.  (Sandler, 1/26/07 Tr. at 46:23-47:16.)

36.     McNeil refreshed the Splenda trade dress in late-2006.  Changes were made to the packaging for the 100 and 200 count boxes, the individual packets, and the packaging of the granular sucralose product.  (Id. at 53:3-4, 121:22-24.)

37.     The refreshed Splenda 100 and 200 count box is still yellow, but the yellow is brighter, and does not have the mottled effect that appeared on the original Splenda packaging.   The product name "Splenda" is now outlined in white.   Stars appear above the product name and on the left side of the box.  The photograph of the white coffee cup and saucer has been moved to the bottom center, and a teaspoon has been added.  The photograph of a pitcher and glass of iced tea was replaced with a photograph of a glass of iced tea with a lemon wedge, and several raspberries.   The refreshed package also depicts two individual packets of Splenda to the right of the coffee cup and saucer.  (Pl. Ex. 2(a).)

38.     The refreshed Splenda bag of granular sucralose is still yellow, but the yellow is brighter, and does not have the mottled effect that appeared on the original Splenda packaging.   The product name "Splenda" is now outlined in white and stars appear above the product name and on the front, left side of the bag.  The photographic elements have been altered.   In the refreshed packaging, it now contains a photograph of a slice of mixed berry pie, a bowl of

mixed fruit, and a cup of coffee.  (Pl. Ex. H.)

**Common Features of Sugar and Sugar Substitute Packages**

39.    The majority of sugar and sugar substitute packages contain pictures of foods and/or drinks that are made with sweetener, into which sweetener is added, or onto which sweetener is sprinkled.  For example, packages depict hot and cold beverages, such as coffee, tea, iced tea, or lemonade; fruit; cereal; and baked goods, such as cake, bread, or pie.  (Gelov Decl. ¶ 36; Def. Exs. AA, BB, KK, CC1, CC2, and UUU; Gelov Decl. Ex. A8-9; Fletman Decl. Ex. B9; Hubbs Decl. Ex. D7-9.)

**Other Findings of Fact**

40.    Consumers are generally aware of the name of the store in which they are shopping.  (Gelov, 2/7/07 Tr. at 33:6-7.)

41.    Consumers are aware that stores have private-label brands that in most cases are merchandised next to the national-brand products.  The Heartland store-brand products are merchandised next to the Splenda products.   (Id. at 33:8-11, Pl. Exs. 140(e), 140(f).)

42.    Prices for products are typically prominently displayed.  Consumers can, therefore, see the cost difference between store-brands and national-brands.  (Gelov, 2/7/07 Tr. at 33:12-14.)

43.    Stores use shelf-extenders or shelf-talkers, tags that extend below store aisle shelves and contain promotional messages, to indicate differences between store-brand products and national-brand products.  (Id. at 33:13-15.)

44.    Heartland did not design any of the packaging at issue in this matter.  Food Lion designed its own packaging, Ahold designed the Giant, Stop & Shop, and Tops packaging, and Safeway designed its own packaging.  Heartland supplied only the net weight, nutritional

facts, ingredient statement, and, on the Ahold boxes, the sugar conversion chart.  (Id. at 8:9-12:12.)

45.  A 100 count box of Splenda cost approximately $5.00, while the comparable store-brand sucralose products vary in price and can range from approximately $4.00 to $4.60.  (Sandler Decl. ¶ 36, Sandler, 1/26/07 Tr. at 68:5-8.)

46.  Margaret Grossman, a consumer from Pasadena, California, mistakenly purchased Safeway's "Sucralose" product during a shopping trip in December 2006 during which she intended to purchase Splenda.   When Mrs. Grossman purchased the Safeway "Sucralose" product, she was "just buzzing through the market . . . ."  She did not look at pricing, but rather, she just grabbed the box of "Sucralose" and ran.  Mrs. Grossman is a self-described "surgical strike" shopper, intending to shop at a faster rate than other shoppers.  She is aware that store-brand products exists; however, she is not aware that they are less expensive than national brand products, and she is not a comparison shopper.   Her yearly household income exceeds $300,000, far above the national median income.  She was not wearing her reading glasses during the shopping trip in which she inadvertently purchased the Safeway "Sucralose" product.  (Grossman Dep. Tr. at 6:16-22, 7:17-22, 11:23-24, 12:3-5, 13:4-6, 20:8-19, 22:5-21, 34:18-24.)

## IV.   CONCLUSIONS OF LAW

### A.   Lanham Act Claim

McNeil seeks a preliminary injunction against Heartland pursuant, in part, to its claim brought under Section 43(a)(1)(A) of the Lanham Act.  McNeil, therefore, must demonstrate that it is likely to succeed on the merits of this claim.  Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C.

§ 1125(a)(1)(A), provides a private right of action against any person who:

> uses in commerce any word, term, name, symbol, or device . . . [that] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).  The Lanham Act protects not only words and symbols, but also trade dress.  Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 171 (3d Cir. 2000) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 765 n.1 (1992)).  To prove a claim of trade dress infringement, a plaintiff must establish the following elements:  "'[1] the trade dress is distinctive, either because it is inherently distinctive or because it has acquired secondary meaning; [2] the trade dress is nonfunctional; and [3] the defendant's use of plaintiff's trade dress is likely to cause consumer confusion.'"  Id. at 172 (quoting Duraco Prods. v. Joy Plastic Enters., 40 F.3d 1431, 1439 (3d Cir. 1994)).  Based on the analysis below, we find that McNeil has failed to demonstrate that Heartland's packaging is likely to cause consumer confusion, and consequently, it has failed to establish a likelihood of success on the merits on its Lanham Act claim.

The United States Court of Appeals for the Third Circuit has instructed that "a plaintiff may prevail in a trade dress infringement action only if it shows that an appreciable number of ordinarily prudent consumers of the type of product in question are likely to be confused as to the source of the goods."  Versa Prods. Co., Inc.  v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 200 (3d. Cir. 1995).  The Third Circuit has adopted a non-exhaustive test consisting of ten factors, commonly referred to as the Lapp factors, to determine the likelihood of consumer confusion between two competing products.  Freedom Card, Inc. v. JP Morgan Chase & Co., 432 F.3d 463, 470-71 (3d. Cir. 2005)

15

(referring to <u>Interpace Corp. v. Lapp, Inc.</u>, 721 F.2d 460 (3d Cir. 1983)).[6]  The <u>Lapp</u> factors to be

used in a trade dress infringement case are:

> (1) the degree of similarity between the owner's [trade dress] and the
> alleged infringing [trade dress];
> (2) the strength of the owner's [trade dress];
> (3) the price of goods and other factors indicative of the care and
> attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the [trade dress] without
> evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the [trade dress];
> (6) the evidence of actual confusion;
> (7) whether the goods are marketed through the same channels of
> trade and advertised through the same media;
> (8) the extent to which the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because
> of the similarity of function;
> (10) other factors suggesting that the consuming public might expect
> the prior owner to manufacture a product in the defendant's market,
> or that he is likely to expand into that market.

<u>Id.</u> at 171(quoting <u>Lapp, Inc.</u>, 721 F.2d at 463); <u>see also</u>, <u>A&H Sportswear, Inc.</u>, 237 F.3d at 211.

The Third Circuit has recognized that all <u>Lapp</u> factors may not be relevant in all cases; consequently,

the district courts are expected to use the factors that seem appropriate to a given situation.  <u>Freedom</u>

<u>Card, Inc.</u>, 432 F.3d at 471 (quoting <u>A&H Sportswear</u>, 237 F.3d at 215).

###### 1.    Factor 1: Similarity of trade Dress

The similarity of a trade dress is the paramount consideration in product packaging trade

---

[6]The <u>Lapp</u> test was developed for "cases of alleged trademark infringement and unfair
competition by a producer of a non-competing product." <u>Fisons Horticulture, Inc. v. Vigoro Indus.</u>
<u>Inc.</u>, 30 F.3d 466, 473 (3d Cir. 1994).  The Third Circuit subsequently held that the <u>Lapp</u> test "is to
be employed when examining both competing and non-competing goods." <u>A&H Sportswear Inc.</u>
<u>v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 213 (3d Cir. 2000).  The Third Circuit has also
employed the <u>Lapp</u> factors in trade dress infringement actions. <u>Versa Prods. Co.</u>, 50 F.3d at 202-
209; <u>see also</u> <u>Warner Lambert Co. v. McCrory's Corp</u>, 718 F. Supp. 389, 398 (D.N.J. 1989)
(applying the <u>Lapp</u> factors in a trade dress infringement case involving allegations that a private-label
product's packaging infringed upon the trade dress of a national-brand product).

dress infringement cases, and "unless the allegedly infringing [trade dress] is substantially similar to the [plaintiff's trade dress], it is highly unlikely that consumers will confuse the product sources . . . ." Versa Prods. Co., 50 F.3d at 202.  In the trade dress context, "it is the overall physical appearance of the defendant's trade dress which is critical." Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc., 747 F.2d 844, 851 (3d Cir. 1984) (quotation omitted).  The likelihood of confusion cannot be assessed by a side-by-side comparison of the competing product unless that is the way the products are encountered in the marketplace.  A&H Sportswear Inc., 237 F.3d at 216 (holding that in trade mark cases "side-by-side comparison of the two marks is not the proper method of analysis when the products are not usually sold in such a fashion"); Ciba-Geigy Corp, 747 F.2d at 851 (affirming the district court's reasoning that "[r]ealistically the likelihood of confusion cannot be assessed by a side-by-side comparison of the plaintiff's and defendant's products" (quotation omitted)).  In this case, consumers encounter Splenda and the Heartland products next to one another on grocery store shelves, and thus, a side-by-side comparison is appropriate.   Additionally, in analyzing whether the overall impression of the allegedly infringing trade dress is similar, the court must put itself into the mind of the consumer.  A&H Sportswear Inc., 747 F.2d at 851.

a.   *Individual sucralose packets*[7]

We find that each of the Heartland individual packets and the Splenda individual packets are not similar.  The individual packets supplied by Heartland to Food Lion, Safeway, and the Ahold stores are yellow like the Splenda individual packets.  However, the lettering on the Food Lion package is black, not blue and red like the Splenda packet.  Furthermore, the Food Lion packet

---

[7]   (Pl. Exs. 1(b), 2(b), 3(b), 6(b); Def. Exs. N, NNN.)  See also Appendix to this Memorandum.

includes the Food Lion name/logo and has no border, and the product name "Sweet Choice" is in a location different from where the trade name "Splenda" appears on its packets.  The Safeway packet does contain blue lettering and a blue border like the Splenda packet; however, the packet also prominently displays the product name "Sucralose" and contains the Safeway store name and logo.  Finally, the Ahold packet does contain blue lettering like the Splenda packet; however, the packet prominently displays the product name "Sweetener," does not include a border like the Splenda packet, and includes a banner with the words "Calorie Free."  In addition to the differences just described, none of the store-brand individual packets supplied by Heartland include the slogan "Made From Sugar So It Tastes Like Sugar" that appears on the individual Splenda packets. Because the overall impression of these Heartland products is that they are not similar to the Splenda individual packet, this factor weighs in favor of finding that they are not likely to cause consumer confusion.

> b.    *100 and 200 count boxes of individual sucralose packets*[8]

As an initial matter, the 200 count box for each of the Heartland products is indistinguishable in size and shape from the 200 count Splenda box, while the 100 count Heartland box is slightly shorter and less deep than the 100 count Splenda box.  Additionally, the trade dresses of each store-brand's 100 and 200 count boxes are identical with the exception that the 200 count box is larger in size than the 100 count box.

Both the original Splenda box and the Food Lion box have a yellow background in a mottled effect, contain text in a blue font that increases in intensity from light to dark, include the words "No

---

[8](Pl. Exs. 1(a), 2(a), 3(a), 6(a), 7(a); Def. Exs. K, L, JJJ, TTT.)  <u>See also</u> Appendix to this Memorandum.

Calorie Sweetener" beneath the product name, and depict a cup of coffee, pitcher, and glasses of an iced beverage. However, the Food Lion product name "Sweet Choice" is significantly different from the name Splenda, and it is positioned at the bottom of the front panel of the Food Lion box, whereas on the Splenda box, the trade name "Splenda" appears at the top. The positioning of the graphical elements is different on the two boxes. The Food Lion box also contains a vertical element that divides the front of the box into two portions. The left portion is darker than the right portion, and includes the Food Lion logo and store name at the top. Finally, unlike the Splenda box, the Food Lion box does not depict its product name surrounded by a large white cloud, nor does it contain a circular element with the words "Made From Sugar, Tastes Like Sugar." Due to these significant differences, we find that both the 100 and 200 count Food Lion "Sweet Choice" boxes are not similar to the comparable Splenda boxes, and therefore, this factor weighs in favor of finding that they are not likely to cause consumer confusion.

The Safeway box, like the Food Lion box, is significantly different from the Splenda box. The background color on the Safeway box is yellow, but there is significantly less yellow on the front of the Safeway box than the Splenda box, and the yellow on the Safeway box is not mottled as it is on the original Splenda box. Like the Splenda box, the Safeway box has lettering primarily printed in blue, contains the words "No Calorie Sweetener" beneath the product name, and depicts a cup of coffee and some individual packets. However, the Safeway product name "Sucralose" is significantly different from the name Splenda, and is positioned at the bottom of the front panel of the Safeway box, whereas on the Splenda box, the trade name "Splenda" appears at the top. Unlike the Splenda box, the Safeway box depicts a bowl of strawberries and a packet caddy containing individual "Sucralose" packets and does not depict an iced beverage of any kind. Additionally,

unlike the Splenda box, the Safeway box contains a "S"-shaped element that divides the front of the box, and includes the Safeway name and logo at the bottom of this graphical element. Finally, unlike the Splenda box, the Safeway box does not depict its product name surrounded by a large white cloud, nor does it contain a circular element with the words "Made From Sugar, Tastes Like Sugar." Due to these significant differences, we find that both the 100 and 200 count Safeway "Sucralose" boxes are not similar to the comparable Splenda boxes, and therefore, this factor weighs in favor of finding that they are not likely to cause consumer confusion.

The Ahold box, like the original Splenda box, has a yellow background, but does not have a mottled effect. The Ahold box also contains lettering primarily printed in blue, and depicts a white coffee cup and saucer, and an iced beverage with slices of lemon, like the Splenda box. Moreover, like the Splenda box, the product name on the Ahold box is located at the top-center, in a blue italicized font that increases in intensity from light to dark. However, unlike the Splenda box, the product name on the Ahold box is "Sweetener," and the store name/logo appears directly above the product name at the top-center. In addition, the store names/logos of the three Ahold stores contain the color red, and stand out among the otherwise yellow and blue color scheme. The placement of the graphical elements is also different on the Ahold box. Finally, unlike the Splenda box, the Ahold box does not depict its product's name surrounded by a large white cloud, nor does it contain a circular element with the words "Made From Sugar, Tastes Like Sugar." Though there are several differences between the Ahold and the Splenda boxes, we find that the overall impression of these boxes is that they are similar. We find, therefore, that this factor weighs in favor of finding that they are likely to cause consumer confusion.

c.      *Bags of granular sucralose*[9]

The Food Lion bag of granular sucralose, like the original Splenda bag, has a yellow background, contains text in blue font that increases in intensity from light to dark, and includes the words "No Calorie Sweetener" beneath the product name.  The front of the Food Lion bag includes a photograph of a bowl of mixed fruit, similar to the refreshed Splenda bag; however, the Food Lion bag depicted a bowl of fruit prior to the launch of the refreshed Splenda bag.  The Splenda bag and the Food Lion bag are virtually identical is terms of size and shape; the Food Lion bag is only slightly taller.  The Food Lion product name "Sweet Choice" is significantly different from the trade name "Splenda," and it is positioned at the bottom of the front of the Food Lion bag, whereas the trade name "Splenda" appears at the top of the Splenda bag.  Moreover, the Food Lion bag depicts a loaf of banana nut bread, whereas the original Splenda bag depicts a slice of peach pie, and the refreshed Splenda bag contains a slice of mixed berry pie.  In addition, unlike the Splenda original bag, the Food Lion bag does not depict a bowl of cereal.  The Food Lion bag also contains a vertical design element that divides the front of the bag into two portions.  The left portion is darker than the right portion, and includes the Food Lion logo and store name at the top.  Finally, unlike the Splenda bag, the Food Lion bag does not depict its product name surrounded by a large white cloud, nor does it contain a circular element with the words "Made From Sugar, Tastes Like Sugar."  Due to the significant differences between the Food Lion bag of granular sucralose and the Splenda bag of granular sucralose, we find that the overall impression of these bags is that they are not similar, and therefore, this factor weighs in favor of finding that the Food Lion bag is not likely to cause consumer confusion.

_____

[9](Pl. Exs. 1(c), 3(c), 7(c); Def. Ex. H.)  See also Appendix to this Memorandum.

The Ahold bag of granular sucralose, like the Splenda bag, has a yellow background, contains text in blue font that increases in intensity from light to dark, and depicts a dessert, and a bowl of cereal with raspberries.  The Ahold bag also depicts a cup of coffee similar to that depicted on the refreshed Splenda bag; however, the Ahold bag depicted a cup of coffee prior to the launch of the refreshed Splenda bag.  In addition, the Ahold bag, like the Splenda bag, contains a blue banner or flag element that extends from the left edge of the package and contains text in white.  The Splenda bag and the Ahold bag are virtually identical is terms of size and shape; the Ahold package is only slightly taller.  The product name on the Ahold bag appears at the top-center, like the product name on the Splenda bag; however, the Ahold product name "Sweetener" is significantly different from the trade name "Splenda" and the Ahold store name/logo appears directly above the product name at the top-center.  Finally, unlike the Splenda bag, the Ahold bag does not depict its product's name surrounded by a large white cloud and the Ahold bag does not contain a circular element with the words "Made From Sugar, Tastes Like Sugar."  Although there are several differences between the Ahold and Splenda bags of granular sucralose, we find that the overall impression of these two products is that they are similar, and we conclude that this factor weighs in favor of finding that the Ahold bag is likely to cause consumer confusion.

In summary, we find that the similarity of trade dress factor weighs in favor of finding that there is no likelihood of consumer confusion for all of Heartland's products except the Ahold 100 and 200 count boxes of individual packets, and the Ahold bag of granular sucralose.

   2.    Factor 2: Strength of the Splenda trade dress

The stronger the trade dress, the greater the likelihood there will be consumer confusion when a second comer adopts a substantially similar trade dress.  Versa Prods. Co., 50 F.3d at 203.

"Strength includes both 'distinctiveness on the scale of [trade dresses]' and 'commercial strength, or marketplace recognition.'" Id. (quoting Fisons Horticulture, Inc. v. Vigoro Indus. Inc., 30 F.3d 466, 479 (3d Cir. 1994)).  We find that this factor weighs in favor of McNeil.  Splenda has been a remarkable commercial success.   In just six years, it has become the leading no-calorie sweetener with approximately 60% of the market and 2006 sales totaling approximately $410 million. (Sandler, 1/26/07 Tr. at 42:12-45:10.)   McNeil has invested $250 million in promoting and advertising its product in both print and television advertising campaigns.   (Id. at 54:18-56:24.) McNeil has also provided testimony that the Splenda trade dress appears in all of its television and print advertisements.   Contrary to Heartland's argument, we find that the fact that McNeil has also focused in its advertising campaigns on the slogan "Made From Sugar, Tastes Like Sugar" does not diminish the strength of the Splenda trade dress.  Additionally, we find that the strength of Splenda's trade dress is not diminished by the fact that other sugar and sugar-substitute products in the marketplace use a yellow and blue color scheme, like the color scheme used by Splenda, or that the Splenda trade dress uses certain elements that are common to the trade dress of other sweetener products, such as a cup of coffee, fruit, or baked goods.

        3.      Factor 3: The price of goods and other factors indicative of the care and attention expected of consumers in making a purchase

The likelihood of consumer confusion decreases as the care and attention expected of consumers when making a purchase increases.  Fisons Horticulture, Inc. v. Vigoro Indus. Inc., 30 F.3d 466, 476 n.12 (3d Cir. 1994).  When items are generally inexpensive, consumers are less likely to devote much time to the purchasing decision.  See Versa Prods. Co., 50 F.3d at 204 ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones."); Century 21

23

Real Estate Corp. v. Lendingtree, Inc., 425 F.3d 211, 248 (3d Cir. 2005) (Fisher, J., dissenting) ("The cheaper the goods or the less sophisticated the consumers, the more likely that a use may confuse."); see also McCarthy on Trademarks and Unfair Competition § 23:95 (same). In this case, the price of a 100 count Splenda box is approximately $5.00 dollars, and the price of the store-brand 100 count boxes ranges from $4.00 to $4.60. McNeil relies solely on the relatively low cost of the Splenda and Heartland products to argue that this factor weighs in its favor. However, when considering this factor, we utilize other indicators of the care and attention that consumers use when making a purchase in addition to price. For example, the Third Circuit has instructed that "[t]he more important the use of the product, the more care that must be exercised in its selection." Versa Prods. Co., 50 F.3d at 204. Sugar substitutes are purchased by consumers for a variety of reasons including: blood-sugar disorders, including diabetes; obesity; weight loss; fitness; and tooth decay. (Canaan Decl. ¶ 24, Gelov Decl. ¶ 18.) Because consumers choose to purchase no calorie sweeteners for health, fitness, and dietary considerations, we find that the level of care and attention a consumer would use when making a purchase of the products at issue in this case is heightened. Consequently we find that McNeil has failed to demonstrate that this factor weighs in its favor even though these items are relatively inexpensive.

       4.      Factors 4 & 6:  The length of time without evidence of actual confusion; and evidence of actual confusion

The fourth and sixth factors are related and are often examined together. See Kos Pharms., Inc. v. Andrx Corporation, 369 F.3d 700, 717 (3d Cir. 2004); Versa Prods. Co. 50 F.3d at 205. When considering the fourth factor, we examine whether the allegedly infringing product has been in the marketplace "for a sufficient period of time without evidence of consumer confusion about

24

the source of the product." Kos Pharms., Inc., 369 F.3d at 717.  When considering the sixth factor,

we examine "evidence of actual confusion." Id.  "[P]roof of actual confusion is not required for a

successful claim of trade dress infringement under the Lanham Act.  Versa Prods. Co., 50 F.3d at

205 (citing Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 292 (1991)).  "If a

defendant's product has been sold for an appreciable period of time without evidence of actual

confusion, one can infer that continued marketing will not lead to consumer confusion in the future.

The longer the challenged product has been in use, the stronger this inference will be." Id.

Conversely, "lack of evidence of actual confusion (at least where the time period that the two

products have been in competition is short . . .) does not raise the inference that there is no likelihood

of confusion." Id. (internal citation omitted).  In cases where the products at issue are relatively

inexpensive, consumers may not be willing to take the time to report incidents of actual confusion.

See Fisons, 30 F.3d at 476 n.12 ("Because the products at issue represent a small investment for the

consumer, this may not be a case in which actual confusion would readily manifest itself to a

manufacturer."); Beer Nuts v. Clover Club Foods Co., 805 F.2d 920, 928 (10th Cir. 1986)

("Purchasers are unlikely to bother to inform the trademark owner when they are confused about an

inexpensive product.").  A plaintiff seeking to protect its trade dress does not need to wait for there

to be evidence of actual confusion before seeking to protect its rights under the Lanham Act.  See

Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986) (explaining

that, in cases where an infringing product has been on the market for only a short period of time, and

there has been little chance for actual confusion, "[i]t would be unfair to penalize [a plaintiff] for

acting to protect its trademark rights before serious damage has occurred"); see also DeCosta v. CBS,

Inc., 520 F.2d 499, 514 (1st Cir. 1975) (holding that, in a trademark infringement case, "plaintiff

should not be expected to stand by and await the dismal proof").

    In this case, McNeil asserts that it has produced evidence of actual consumer confusion. McNeil presented the testimony of Margaret Grossman, a consumer from Pasadena, California.  Mrs. Grossman testified that, in December 2006, during a shopping trip in which she intended to purchase Splenda, she mistakenly purchased Safeway's "Sucralose." (Grossman Dep. Tr. at 6:16-22.)  She continued to use the product for three weeks before noticing that the product was Safeway's "Sucralose." (Id. at 7:17-21.)  We find that Mrs. Grossman's testimony fails to demonstrate that the ordinarily prudent consumer would be confused by Heartland's packaging.  Mrs. Grossman testified that when she mistakenly purchased the Safeway "Sucralose" product she was "just buzzing through the market . . . ," and further stated, "I bought what I thought was a Splenda box . . . . I did not look at pricing.  I just grabbed the box and ran." (Id. at 11:23-24, 12:3-5.)  She described herself as a "surgical strike" shopper, intending to shop at a faster rate than other shoppers.  (Id. at 20:8-19.)  While Mrs. Grossman is aware that the store-brand products exists, she is not aware that they are less expensive than national brand products, and she is not a comparison shopper.  (Id. at 13:4-6; 22:18-21; 20:9-10.)  Mrs. Grossman's yearly household income exceeds $300,000, far above the national median income.  (Id. at 22:5:12.)  Finally, it is unclear from the record how good Mrs. Grossman's eyesight is without her reading glasses, which she was not wearing during the shopping trip in which she inadvertently purchased the Safeway "Sucralose" product.  (Id. at 34:18-24.)[10]   McNeil has

_____

    [10]Mrs. Grossman testified that it would have been difficult in the supermarket for her to read the pricing information on the store shelf without her reading glasses.  (Grossman Dep. Tr. at 35:7-7-8.)  Additionally, in preparation for her deposition, Mrs. Grossman purchased a 400 count box of Splenda because she thought her usual 200 count box was not available.  However, during a deposition, when looking at a picture she herself took of the shelf on which the 400 count box was located, she noticed for the first time that the 200 count box was on the shelf and available for purchase.  (Id. at 39:14-21.)

produced no evidence of actual consumer confusion, other than Mrs. Grossman's testimony.  Thus, factor six weighs in favor of finding that the Heartland products are not likely to cause consumer confusion.

Heartland's allegedly infringing products were introduced in mid-2006.  This relatively short period of time and the fact that the products at issue are inexpensive, may explain why McNeil has not been able to produce credible evidence of actual consumer confusion.  Therefore, even though McNeil has not produced any evidence of actual consumer confusion, we find it inappropriate to draw an inference that it is unlikely to be able to do so.  Consequently, we find that factor four does not favor Heartland or McNeil.

         5.    Factor 5: Intent of the defendant in adopting the trade dress

"A defendant's intent to confuse or deceive consumers as to the product's source may be highly probative of likelihood of confusion."  Versa Prods. Co., 50 F.3d at 205 (citing cases). McNeil argues that Heartland's intent to mimic the Splenda trade dress can be inferred from the "striking similarity" between Heartland's packaging and the Splenda trade dress.  However, courts do not focus on the defendant's intent to mimic, but rather on whether the defendant had an intent to confuse.  Id.  While it is obvious that the trade dress of the store-brand sucralose products is intended to suggest the Splenda trade dress, McNeil presents no evidence that Heartland intended to confuse consumers into buying the store-brand products because they thought it was Splenda. Heartland notes that, in the private-label industry, manufacturers of private-label products use reference points (i.e. tools for making comparisons such as similar color, shapes, and sizes to the comparable national-brand product, and "compare to" statements) on their private-label products in order to inform consumers about the existence of the alternative store-brand products.  Heartland

argues that this was the intent behind the packaging of the store-brand sucralose products, and that it did not intend to confuse consumers. (Gelov Decl. ¶¶ 14, 46.) Heartland also presented testimony that the intention of the stores in developing store-brand products is not to confuse consumers, but rather is to enhance the retailer's image, to strengthen its relationship with consumers, and to build consumer loyalty to a particular store. (Canaan Decl. ¶ 19, Canaan, 1/27/07 Tr. at 205:10-14.)   In light of this evidence, we are not persuaded that we should infer an intent to confuse from the fact that the store-brand's trade dress suggests the Splenda trade dress.   Consequently, we find that this factor weighs in favor of finding that there is no likelihood of consumer confusion.

      6.     Factors 7, 8 & 9: Channels of trade and advertising; targets of the parties' sales efforts; similarity of the function of the goods

Under the seventh factor, we examine "whether the goods . . . are marketed through the same channels of trade and advertised through the same media." Versa Prods. Co., 50 F.3d at 208.   Under the eighth factor, we examine "[t]he extent to which the targets of the parties' sales efforts are the same." Id.   Under the ninth factor, we examine "the relationship of the goods in the minds of the public because of the similarity of function." Id.   We find that these factors weigh in favor of finding a likelihood of confusion.   Splenda and the comparable store-brand sucralose products are marketed through the same channels.   They appear next to each other on grocery store shelves, and are even sometimes interspersed.   (Pl. Exs. 140(e), 140(f).)   Considering that the products appear side-by-side, we find that McNeil and the relevant stores are targeting the same consumers, namely consumers seeking a sugar substitute.   We find unpersuasive Heartland's claim that the store-brand sales efforts target only consumers who are willing to buy store-brand products because they believe they are as good as national-brand products and/or they wish to save money.   Finally, the two products are

functionally equivalent.  We find, therefore, that these factors weigh in favor of finding that the Heartland products are likely to cause consumer confusion.

       7.      **Factor 10: Other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that <u>he is likely to expand into that market</u>**

This factor is "highly context-dependant," <u>Kos Pharms., Inc.</u>, 369 F.3d at 724, and in assessing this factor, we look at "the nature of the products or the relevant market, the practices of other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source." <u>Id.</u> (citing cases).

McNeil contends that, because of the similarities between the Heartland packaging and the Splenda trade dress, there is likely to be confusion as to affiliation or sponsorship.  McNeil contends that there are numerous examples of partnerships and cross-promotions in today's marketplace, and a consumer seeing the Heartland's store-brand sucralose products may believe that Splenda is making a store-brand sucralose product on behalf of the retailer, or that McNeil is sponsoring or is in some way associated with the Heartland products.  McNeil has presented no evidence that consumers, when they see the Heartland products, actually believe that the product is associated through some sort of affiliation or sponsorship with McNeil's Splenda product.  For this reason, we believe that this contention is speculative, and fails to support McNeil's argument that there is a likelihood of consumer confusion.

McNeil also maintains that consumers encountering Heartland's store-brand sucralose products are likely to experience initial interest confusion.  Initial interest confusion occurs "'when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating the purchase.'" <u>Checkpoint</u>

Sys. Inc. v. Check Point Software, 269 F.3d 270, 294 (3d Cir. 2001) (quoting Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 464 (7th Cir. 2000)). The Third Circuit has stated that "initial interest confusion is probative of a Lanham Act violation." Id. As discussed above, even though there are some Heartland products that have a similar appearance to a comparable Splenda product, there are significant distinctions between the Heartland products and the Splenda products. There are also other factors that dispel the likelihood of initial interest confusion between Splenda and the store-brand products in this case. Consumers are highly aware of the existence of store-brand products; when they are shopping in a particular store they are aware of the store's name; each of the Heartland products on sale in grocery stores displays the store name/logo; the Heartland and Splenda products typically appear next to each other; and there are other signals to the consumer on grocery store shelves, such as price differentials and shelf-talkers inviting consumer to compare and save, that indicate to the consumer that the Heartland and Splenda products are not the same.[11] Additionally, McNeil has failed to produce any evidence of a consumer who experienced initial interest confusion or any other evidence from which we can infer that initial interest confusion is likely to occur. For these reasons, we find that McNeil has failed to demonstrate that the Heartland

---

[11]McNeil argues that the Lanham Act provides no exception for private-label products. We agree that there is no exception for private-label products in the Lanham Act or in cases interpreting it. Makers of private-label products are subject to the same standard as makers of generally available products. This standard is that the defendant's trade dress, among other requirements, must not be likely to cause consumer confusion. Rose Art Indus, 235 F.3d at 171. However, although there is no exception for the private-label industry, consumers' awareness and experiences with the private-label industry influences whether they are likely to be confused when they encounter a private-label product in the marketplace. See Warner Lambert Co. v. McCrory's Corp, 718 F. Supp. 389, 398-99 (D.N.J. 1989) (stating in its analysis of the likelihood of consumer confusion that "[t]he Court takes cognizance of the fact that a McCrory's shopper, as with any shopper in such a retail store chain, has likely been exposed to generic and discount house brands before, and when walking through a McCrory's store and observing the many 'compare and save' signs, is not likely to be misled by the McCrory's mouthwash brand.").

products are likely to cause initial interest confusion.

Finally, McNeil argues that Heartland's individual packets are likely to cause post-sale confusion.  The post-sale confusion theory "presumes that 'the senior users potential purchasers or ongoing customers might mistakenly associate the inferior quality work of the junior user with the senior user and, therefore, refuse to deal with the senior user in the future.'"  Gucci Am. Inc. v. Daffy's, Inc., 354 F.3d 228, 234 (3d Cir. 2003) (quoting Acxiom Corp. v. Axiom, Inc., 27 F. Supp. 2d 478, 497 (D. Del. 1998)).  Therefore, the post-sale confusion theory requires consumers (1) to mistakenly believe that the allegedly infringing product is the plaintiff's product, (2) to find the allegedly infringing product to be inferior, and (3) to refuse to deal with the plaintiff in the future, as a result of the inferiority of the allegedly infringing product.  As discussed above, we find that the store-brand individual packets are not similar to the individual Splenda packets.  McNeil has not presented any other evidence that the Heartland packets have confused consumers, nor has it offered evidence that consumers have found Heartland's products to be inferior to Splenda.  Therefore, we find that McNeil has failed to present evidence demonstrating that it is likely to succeed on the merits under this theory.

### 8.   Conclusion

Even though some of the packaging of the Heartland products is similar to the comparable Splenda product, after carefully considering the various factors discussed above, we find that McNeil has failed to demonstrate that the Heartland packaging of any of the products at issue in this case is likely to cause consumer confusion in an appreciable number of ordinarily prudent consumers.  Because McNeil has not demonstrated the likelihood of consumer confusion, we need not address the remaining elements of a Lanham Act violation.   We conclude that McNeil has failed to satisfy

its burden of demonstrating that it is likely to be successful on the merits of its Lanham Act claim, and therefore, we deny McNeil's Motion for a Preliminary Injunction with respect to this claim.

      B.     <u>Pennsylvania Anti-Dilution Claim</u>

McNeil also seeks a preliminary injunction pursuant to its claim brought under the Pennsylvania anti-dilution statute, 54 Pa. Cons. Stat. Ann. § 1124.   The Pennsylvania anti-dilution statute provides in pertinent part:

> The owner of a mark which is famous in this Commonwealth shall be entitled, subject to the principles of equity . . . to an injunction against another person's commercial use of a mark or trade name if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark and to obtain such other relief as is provided in this section . . . .

54 Pa. Cons. Stat. Ann. § 1124.   The wording of the Pennsylvania anti-dilution statute is taken almost verbatim from the federal anti-dilution statute.  <u>Strick Corp. v. Strickland</u>, 162 F. Supp. 2d 372, 378 n.10 (E.D. Pa. 2001).  The United States Supreme Court has interpreted the federal anti-dilution statute as requiring evidence of actual dilution.  <u>Moseley v. V Secret Catalogue, Inc.</u>, 537 U.S. 418, 433 (2003).  Following the Supreme Court decision in <u>Moseley</u>, Congress amended the Federal Trademark Dilution Act (FDTA), effective October 6, 2006, (the "amendment") so that an owner of a famous mark can obtain an injunction against the user of a mark that is "likely to cause dilution" of the famous mark.  15 U.S.C. § 1125(c)(1); <u>see also</u> <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 477 F.3d 765, 766 (2d Cir. 2007).

McNeil argues that because the federal law has been modified to require only a showing that the infringing mark is *likely* to cause dilution, we should interpret the Pennsylvania anti-dilution statute as similarly requiring only a showing of a likelihood of dilution and not actual dilution. We

find this argument to be without merit.  While the Pennsylvania Supreme Court has not ruled on whether actual dilution must occur in order to establish a claim under the Pennsylvania anti-dilution statute, numerous courts have found the requirements for establishing a dilution claim under the Pennsylvania and federal law (prior to the amendment) to be identical, <u>Scott Fetzer Co. v. Gehring</u>, 288 F. Supp 2d 696, 702 n.9 (E.D. Pa. 2003); <u>Strick Corp.</u>, 162 F. Supp. 2d at 378; <u>World Wrestling Fed'n Entm't, Inc. v. Big Dog Holdings</u>, 280 F. Supp. 2d 413, 443 (W.D. Pa. 2003), and that the Pennsylvania anti-dilution law, like the federal law (prior to the amendment) requires a showing of actual dilution.  <u>Scott Fetzer Co.</u>, 288 F. Supp. 2d at 702 n.9.  No amendment to the Pennsylvania anti-dilution statute corresponding to the federal amendment to the FDTA has been enacted.  Consequently, to succeed on a claim under the Pennsylvania anti-dilution statute, a plaintiff must still demonstrate actual dilution.   In this case, McNeil has not presented any evidence of actual dilution.  Consequently, we find that McNeil has failed to demonstrate that it is likely to succeed on the merits of this claim and its request for a preliminary injunction with respect to this claim is also denied.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MCNEIL NUTRITIONALS, LLC            :            CIVIL ACTION
                                    :
        v.                          :
                                    :
HEARTLAND SWEETENERS LLC, and       :
HEARTLAND PACKAGING CORP.           :            NO. 06-5336

**ORDER**

**AND NOW**, this 21st day of May 2007, upon consideration of Plaintiff's Motion for Preliminary Injunction (Docket No. 5), Defendants' response thereto, the evidentiary hearing held on January 26, 2007 and February 7, 2007, oral argument held on March 13, 2007, and all papers filed in connection therewith, **IT IS HEREBY ORDERED** that Plaintiff's Motion is **DENIED**. **IT IS FURTHER ORDERED** that Defendants' Motion for Leave to File Supplementation to the Record (Docket No. 49) is **DISMISSED AS MOOT**.

BY THE COURT:

s/ John R. Padova, J.
John R. Padova, J.