UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA
————————————————————X

McNEIL NUTRITIONALS, LLC,  :
                                 :
           Plaintiff,       :
                                 :       Civil Action No. 06-CV-5336
         v.               :
                                 :       The Honorable John R. Padova
HEARTLAND SWEETENERS LLC and   :
HEARTLAND PACKAGING CORP.,   :
                                 :
         Defendants.     :
————————————————————X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RENEWED APPLICATION FOR A PRELIMINARY INJUNCTION

Steven A. Zalesin
Karla G. Sanchez
David G. Sewell
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

Alfred W. Putnam, Jr.
Andrea L. D'Ambra
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, Pennsylvania 19103-6996
(215) 988-2700

Of Counsel:
Donna Malin, Esq.
Eric Schwartz, Esq.
Johnson & Johnson

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ...........................................................................................2

ARGUMENT ..................................................................................................3

I.    MCNEIL IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADE
    DRESS INFRINGEMENT CLAIM ...........................................................4

      A.    The Splenda Trade Dress is Entitled to Protection ...................................5

          1.    The Splenda Trade Dress Is Inherently Distinctive ......................5

          2.    The Splenda Trade Dress Has Acquired Secondary Meaning....................6

              a.    The Extent of Splenda Sales and Advertising Leading to
                    Buyer Association (Factors 1, 7 and 9)..............................7

              b.    Length and Exclusivity of Use of the Splenda Trade
                    Dress (Factors 2 and 3) ..................................................8

              c.    Competitor Copying of the Splenda Trade Dress
                    (Factor 4)........................................................................9

              d.    Limited Use by Others of Yellow, Blue and White
                    Packaging Does Not Preclude a Finding of Secondary
                    Meaning ........................................................................10

      B.    The Splenda Trade Dress Is Not Functional.........................................11

II.    MCNEIL WILL CONTINUE TO SUFFER IRREPARABLE INJURY
    ABSENT PRELIMINARY INJUNCTIVE RELIEF ........................................14

III.    THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF
    PRELIMINARY RELIEF.......................................................................16

IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION .............................19

V.    SCOPE OF RELIEF .............................................................................20

      A.    McNeil is Prepared to Post a Bond in an Appropriate Amount.............................20

CONCLUSION.................................................................................................23

<u>TABLE OF AUTHORITIES</u>

CASES                                                                                    Page(s)

<u>A&H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.</u>,
    167 F. Supp. 2d 770 (E.D. Pa. 2001) ............................................................8

<u>Am. Greetings Corp. v. Dan-Dee Imports, Inc.</u>,
    619 F. Supp. 1204 (D.N.J. 1985) ...................................................................7

<u>Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.</u>,
    909 F. Supp. 896 ..........................................................................................20

<u>Bebe Stores, Inc. v. May Dep't Stores Int'l, Inc.</u>,
    230 F. Supp. 2d 980 (E.D. Mo.), aff'd in part, remanded in part,
    313 F.3d 1056 (8th Cir. 2002) .....................................................................16

<u>Checkpoint Sys. v. Check Point Software Techs., Inc.</u>,
    269 F.3d 270 (3d Cir. 2001)...........................................................................8

<u>Ciba-Geigy Corp. v. Bolar Pharm. Co.</u>,
    747 F.2d 844 (3d Cir. 1984)...................................................................8, 9, 10

<u>Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.</u>,
    214 F.3d 432 (3d Cir. 2000)...........................................................................7

<u>Dranoff-Perlstein Associates v. Sklar</u>,
    967 F.2d 852 (3d Cir. 1992)..........................................................................11

<u>Duraco Prods. v. Joy Plastic Enters.</u>,
    40 F.3d 1431 (3d Cir. 1994)..........................................................................12

<u>General Motors Corp. v. Lanard Toys, Inc.</u>,
    468 F.3d 405 (6th Cir. 2006) .........................................................................9

<u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>,
    456 U.S. 844 (1982)...............................................................................11, 18

<u>Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.</u>,
    58 F.3d 27 (2d Cir. 1995)..............................................................................12

<u>Kos Pharms., Inc. v. Andrx Corp.</u>,
    369 F.3d 700 (3d Cir. 2004)..............................................................18, 19, 21

<u>McNeil Nutritionals, LLC v. Heartland Sweeteners et al.</u>,
    512 F. Supp. 2d 217 (E.D. Pa. 2007)...............................................2, 6, 7, 9, 10

## TABLE OF AUTHORITIES

McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC et al.,
   No. 07-2644, ___ F.3d ___ (3d Cir. Dec. 24, 2007).............................................. *passim*

McNeil-PPC, Inc. v. Merisant Co.,
   No. 04-1090, 2004 WL 3316380 (D.P.R. Jul. 29, 2004)......................................6, 8, 10

Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharm.
   Co.,
   290 F.3d 578 (3d Cir. 2002)................................................................................18, 19

Opticians Ass'n of Am. v. Indep. Opticians of Am.,
   920 F.2d 187 (3d Cir. 1990)...........................................................................14, 15, 19

Paddington Corp. v. Attiki Imps. & Distribs., Inc.,
   996 F.2d 577 (2d Cir. 1993)....................................................................................5, 6

Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,
   143 F.3d 800 (3d Cir. 1998).......................................................................................14

Qualitex Co. v. Jacobson Prod. Co.,
   514 U.S. 159 (1995)......................................................................................................5

Rose Art Indus. v. Swanson,
   235 F.3d 165 (3d Cir. 2000).........................................................................................4

S & R Corp., v. Jiffy Lube Int'l., Inc.,
   968 F.2d 371 (3d Cir. 1992)..................................................................................19, 20

Scott Paper Co. v. Scott's Liquid Gold,
   589 F.2d 1225 (3d Cir. 1978).......................................................................................7

Shire U.S., Inc. v. Barr Labs.,
   329 F.3d 348 (3d Cir. 2003).........................................................................................3

Sprint Communications Co. L.P. v. Cat Communications Intern., Inc.,
   335 F.3d 235 (3rd Cir. 2003) .....................................................................................20

Sweetzel, Inc., v. Hawk Hill Cookies,
   No. 95-2632, 1995 U.S. Dist. LEXIS 13495 (E.D. Pa. Sept. 14, 1995) ..............5, 6, 12

Times Mirror Magazines Inc. v. Las Vegas Sports News,
   212 F.3d 157 (3d Cir. 2000).........................................................................................8

Traffix Devices v. Mktg. Displays,
   532 U.S. 23 (2001)......................................................................................................11

## TABLE OF AUTHORITIES

Two Pesos, Inc. v. Taco Cabana, Inc.,
      505 U.S. 763 (1992)..............................................................................5

Union Carbide Corp. v. Ever-Ready, Inc.,
      531 F.2d 366 (7th Cir. 1976) ..........................................................11

Wal-Mart Stores, Inc. v. Samara Bros., Inc.,
      529 U.S. 205 (2000)............................................................................5

## STATUTES

Fed. R. Civ. P. 65(c) ..........................................................................20

Lanham Act, 15 U.S.C. § 1125(a)(1)(A) ................................................2, 4, 18

1428815v.3

Plaintiff McNeil Nutritionals, LLC ("McNeil") respectfully submits this Renewed Application for a Preliminary Injunction preventing Defendants Heartland Sweeteners, LLC and Heartland Packaging Corporation ("Heartland") from continuing to manufacture and distribute certain private-label sucralose products that infringe the trade dress of McNeil's Splenda® no-calorie sweetener.

## INTRODUCTION

Heartland continues to manufacture and distribute Splenda knock-off products in packaging that the United States Court of Appeals for the Third Circuit has held is likely to cause consumer confusion. *See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC et al.*, No. 07-2644, ___ F.3d ___, slip op. at 40 (Dec. 24, 2007) (hereinafter "Third Cir. Op."). These products, sold under various trade names in the Giant®, Stop & Shop®, and Tops® grocery store chains (collectively, the "Ahold products" or "Ahold packages"), infringe the Splenda trade dress, and cause irreparable harm to McNeil. This cannot continue.

On December 5, 2006, McNeil filed this action for, *inter alia*, trade dress infringement and false designation of origin of goods in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125. On December 14, 2006, McNeil sought to enjoin Heartland from continuing to manufacture, distribute, and sell private-label sucralose products to some of the nation's largest grocery store chains in packaging that infringes the Splenda trade dress.[1] After hearings held on January 26, February 7, and March 13, 2007, the Court denied McNeil's Motion. *See McNeil Nutritionals, LLC v. Heartland Sweeteners et al.*, 512 F. Supp. 2d 217 (E.D. Pa. 2007). In a Mandate that issued January 17, 2008, the Third Circuit affirmed in part, reversed in part, and remanded the case for further proceedings. *See* Dkt. No. 66.

---

[1] McNeil initially challenged five Heartland products: the three Ahold products that remain at issue as well as Food Lion® "Sweet Choice" and Safeway® "Sucralose."

Addressing itself only to the issue that this Court decided – whether the Heartland products are likely to cause consumer confusion – the Third Circuit held that this Court's finding that Food Lion "Sweet Choice" and Safeway "Sucralose" are unlikely to have such an effect in the marketplace was not clearly erroneous. It therefore affirmed the denial of preliminary injunctive relief as to those products. *See* Third Cir. Op. at 25. However, with respect to the Ahold products – Giant, Stop & Shop, and Tops – the Court of Appeals found that McNeil had established a likelihood of consumer confusion and thus remanded the case for consideration of "whether McNeil establishes a likelihood of success on the remaining elements of trade dress infringement under the Lanham Act as well as the remaining factors for preliminary injunctive relief" as to those products. *Id.* at 40.

The following questions are now before the Court: (1) whether McNeil is likely to succeed on the merits of its claim that the Splenda trade dress is protectable and non-functional; (2) whether McNeil will be irreparably harmed by the continued manufacture and distribution of the Ahold products; (3) whether the balance of hardships favors McNeil; and (4) whether preliminary injunctive relief is in the public interest. As described in detail below, the Court should answer each question in the affirmative and grant a preliminary injunction prohibiting the continued manufacture and distribution of Heartland's Ahold products.

## **ARGUMENT**

A party seeking a preliminary injunction must demonstrate that:  it is likely to succeed on the merits of its claim, there is a significant risk of irreparable harm absent preliminary injunctive relief, the balance of hardships weighs in its favor, and the requested injunction is in the public interest. *Shire U.S., Inc. v. Barr Labs.*, 329 F.3d 348, 352 (3d Cir.

3

2003).  With respect to the Ahold products that remain at issue, McNeil easily satisfies each

prong of this test, and is therefore entitled to preliminary injunctive relief.

**I.    MCNEIL IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADE DRESS INFRINGEMENT CLAIM[2]**

To prevail on a claim of trade dress infringement in violation of Section

43(a)(1)(A) of the Lanham Act, the plaintiff must establish that:

    (1)    the trade dress is used in commerce;

    (2)    the trade dress in question is protectable, *i.e.* it is "inherently distinctive" or has acquired "secondary meaning" among consumers;

    (3)    the trade dress is non-functional; and

    (4)    the products at issue are sufficiently similar in appearance that consumers are likely to confuse them in the marketplace.

*See* 15 U.S.C. § 1125(a)(1)(A); *see also Rose Art Indus. v. Swanson*, 235 F.3d 165, 172 (3d Cir.

2000).

The first and fourth elements require little discussion.  McNeil has sold Splenda

throughout the United States since 2000.  Accordingly, the Splenda trade dress has been "in

commerce" for more than seven years.  Furthermore, as to the Ahold products now at issue, the

Court of Appeals held that "McNeil has demonstrated . . . [that] there is a likelihood of confusion

between these products' trade dresses and the analogous Splenda trade dress."  Third Cir. Op. at

41.  The remaining two elements – whether the Splenda trade dress is (1) protectable because it

---

[2]  Throughout these proceedings, Heartland has argued that because McNeil requested a product recall, it sought "mandatory relief that would alter the *status quo* before a trial on the merits," and must therefore meet a heightened burden of persuasion. *See* Defs.' Opp'n to Mtn. for a Prelim. Inj. [Dkt. No. 25] at 17. McNeil has already briefed its response to this flawed argument at length and it will not repeat it here. *See* Reply in Support of Mtn. for Prelim. Inj. [Dkt. No. 32] at 3-4.  This dispute is now moot, however, because, given the passage of time, McNeil no longer seeks a recall of the infringing Ahold products. Rather, it simply requests an injunction prohibiting the continued manufacture and distribution of the offending packages (including the destruction of any such packages that have been manufactured but not yet shipped from Heartland's warehouse).  As the basis for Heartland's attempt to impose a heightened standard on McNeil is no longer valid, there should be no dispute that the default "likelihood of success" standard applies.

is inherently distinctive or has acquired secondary meaning and (2) non-functional – are addressed *seriatim* below.

### A.     The Splenda Trade Dress is Entitled to Protection

Trade dress is protectable under the Lanham Act if it is either inherently distinctive or has acquired secondary meaning.  The Splenda trade dress is entitled to protection under both theories.

### 1.     The Splenda Trade Dress Is Inherently Distinctive

Trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  The "predominant function [of a product's package is] source identification.  Consumers are therefore predisposed to regard [packaging] as [an] indication of the producer, which is why such symbols 'almost automatically tell a customer that they refer to a brand,' and 'immediately signal a brand or a product 'source.'" *Id.* at 212-13 (emphasis in the original) (citing *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 162-63 (1995)).

In other words, when it comes to product packaging, trade dress is almost always inherently distinctive. *See, e.g., Paddington Corp. v. Attiki Imps. & Distribs., Inc.,* 996 F.2d 577, 583 (2d Cir. 1993) ("Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive."); *Sweetzel, Inc., v. Hawk Hill Cookies*, No. 95-2632, 1995 U.S. Dist. LEXIS 13495 at *19 (E.D. Pa. Sept. 14, 1995) (same) (citing *Paddington Corp.*, 996 F.2d at 583).  McNeil's packaging for Splenda is no exception to this rule.

This Court has already found that McNeil purposefully created the Splenda trade dress to distinguish it from the market leaders at the time: Sweet'N Low and Equal. *Heartland*, 512 F. Supp. 2d at 222; *accord* Third Cir. Op. at 6; *see also* Sandler, 1/26/07 Tr. at 45; Sandler Decl. ¶ 10; Canaan, 1/26/07 Tr. at 191. The color scheme, pictorial elements, labeling, and layout all contribute to an overall appearance that is unique and easily-recognizable as Splenda packaging. And while certain graphical elements of the Splenda trade dress may appear on other sweetener packages (such as a cup of coffee or a piece of pie), the overall look and feel is original to Splenda. *See Paddington Corp.*, 996 F.2d at 584 ("If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements."); *Sweetzel, Inc.*, 1995 U.S. Dist. LEXIS 13495 at *20 (same). Indeed, this Court has already ruled that the use of "certain elements that are common to the trade dress of other sweetener products, such as a cup of coffee, fruit, or baked goods" and even a "yellow and blue color scheme" does not weaken the Splenda trade dress. *Heartland*, 512 F. Supp. 2d at 232.

In sum, there can be no question that the Splenda trade dress is inherently distinctive. *Accord McNeil-PPC, Inc. v. Merisant* Co., No. 04-1090, 2004 WL 3316380 *8 (D.P.R. Jul. 29, 2004) ("[T]he overall appearance of the Splenda package is unique and identifiable, and is thus entitled to protection as inherently distinctive. . . .").

### 2.    The Splenda Trade Dress Has Acquired Secondary Meaning

Even if it were not inherently distinctive, the Splenda trade dress is protectable because it has acquired secondary meaning, *i.e.* widespread recognition in the marketplace. In determining whether a trade dress has acquired secondary meaning, courts in the Third Circuit consider the following factors: (1) the extent of sales and advertising leading to buyer association, (2) length of use, (3) exclusivity of use, (4) the fact of copying, (5) customer

6

surveys, (6) customer testimony, (7) the use of the mark in trade journals, (8) the size of the

company, (9) the number of sales, (10) the number of customers, and (11) actual confusion.

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir.

2000). This list is non-exhaustive and not every factor will be relevant in every case. *Id.*

   Here, the analysis is straightforward given that Splenda is a blockbuster consumer

product. As this Court has noted, "Splenda's market share has increased over the last five years,

and in 2006 Splenda captured approximately 60% of the no-calorie sweetener market."

*Heartland*, 512 F. Supp. 2d at 221; *see also* Third Cir. Op. at 5 (explaining that "sales of Splenda

increased more than tenfold in just six years"). Such phenomenal success "creates, in legal

terms, 'secondary meaning.'" *Am. Greetings Corp. v. Dan-Dee Imports, Inc.*, 619 F. Supp.

1204, 1222 (D.N.J. 1985).

### a. The Extent of Splenda Sales and Advertising Leading to Buyer Association (Factors 1, 7 and 9)

   "Secondary meaning is generally 'established through extensive advertising

which creates in the minds of consumers an association between the mark and the provider of the

services advertised under the mark.'" *Commerce Nat'l*, 214 F.3d at 438 (citing *Scott Paper Co.*

*v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978)). As detailed above, and as this

Court has recognized, McNeil has devoted "substantial resources to market and promote Splenda

products." *Heartland*, 512 F. Supp. 2d at 223. Indeed, the undisputed proof shows that McNeil

has poured more than a quarter-billion dollars into Splenda advertising and promotion, and that

nearly every ad has featured the Splenda trade dress to at least some extent. Sandler, 1/26/07 Tr.

at 49-52; PX 15-20. That extraordinary investment was calculated to create an association

between the Splenda brand and its packaging. Sandler, 1/26/07 Tr. at 49-51; Sandler Decl. ¶ 9.

McNeil's promotional efforts have yielded phenomenal sales and secured a dominant share of the no-calorie sweetener market. Sandler, 1/26/07 Tr. at 37-41; Sandler Decl. ¶¶ 23, 27; PX 12.

McNeil's substantial investment in Splenda, and the product's ensuing success in the marketplace, support a finding of secondary meaning. *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 283 (3d Cir. 2001) (recognizing secondary meaning where "millions of dollars" had been spent on advertising); *Times Mirror Magazines Inc. v. Las Vegas Sports News*, 212 F.3d 157, 166 (3d Cir. 2000) (finding secondary meaning where plaintiff had "expended millions of dollars in advertising and promoting their mark through various media outlets"); *A&H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 167 F. Supp. 2d 770, 776 (E.D. Pa. 2001) (recognizing secondary meaning where plaintiff had "extensively advertised and promoted its goods" and where there had "been substantial sales").

### b. Length and Exclusivity of Use of the Splenda Trade Dress (Factors 2 and 3)

McNeil has prominently used and marketed the Splenda trade dress from the moment the brand was introduced to the U.S. market more than seven years ago. *See Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 852 (3d Cir. 1984) (secondary meaning found where product was marketed in trade dress for more than five years). As described above, McNeil intentionally positioned the Splenda brand to stand out: into a sea of competitors packaged in blue and pink came yellow packaging with gradated blue lettering on a white background. Moreover, McNeil has zealously protected its rights when necessary, as here, to prevent others from encroaching on the Splenda trade dress. *See Merisant*, 2004 WL 3316380 at *25.

8

Apart from Heartland's sweeteners, consumers encounter only one sucralose-based sweetener that utilizes yellow packaging and blue lettering on a white background. That product is, and for over seven years has been, Splenda.

### c.   Competitor Copying of the Splenda Trade Dress (Factor 4)

There is no incentive to copy a package design that has no recognition value with consumers. For this reason, intentional copying by competitors is additional persuasive evidence that a plaintiff's package has acquired secondary meaning. See *Ciba-Geigy Corp.*, 747 F.2d at 852 ("[A] product is generally considered to have acquired distinctiveness and secondary meaning when its trade dress has been copied.") (internal citation and quotation marks omitted); *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006) ("Intentional copying may be used to show secondary meaning . . .").

This Court found that "it is obvious that the trade dress of the store-brand sucralose products is intended to suggest the Splenda trade dress" and Heartland has conceded that this was no coincidence. See *Heartland*, 512 F. Supp. 2d at 234. Heartland's President readily admitted that its packaging incorporates "reference points" that enable consumers to recognize its brands as alternatives to "the name brand products against which they compete[,]" *i.e.* Splenda. Gelov Decl. ¶ 14. Among the "reference points" intentionally copied are the "colors, shapes, and size[]" of the Splenda packaging. *Id.* In addition, the evidence shows that other design elements of the Splenda trade dress were also copied. PX 1-7. Moreover, given the Third Circuit's holding that the Ahold packages are likely to cause consumer confusion, the Court can readily conclude that Heartland's customer intentionally copied the Splenda trade dress.

Additional evidence of copying can be found in the decision from an earlier litigation in which Merisant, the maker of Equal®, was enjoined from the continued manufacture, distribution and sale of one of its no-calorie sweeteners, in part because of "Merisant's evident copying of the Splenda package design." *Merisant*, 2004 WL 3316380 at *13. Such copying is compelling proof that the Splenda trade dress has achieved secondary meaning.

### d.   Limited Use by Others of Yellow, Blue and White Packaging Does Not Preclude a Finding of Secondary Meaning

Throughout these proceedings, Heartland has repeatedly argued that the use of yellow and blue themed packaging by other sweeteners – including Domino Sugar® and Sugar Twin® – preclude McNeil from protecting the Splenda trade dress. This Court has rejected that argument, as has the only other district court to consider the issue.[3] *See Heartland*, 512 F. Supp. 2d at 232 ("[W]e find that the strength of Splenda's trade dress is not diminished by the fact that other sugar and sugar substitute products in the marketplace use a yellow and blue color scheme, like the color scheme used by Splenda . . ."); *see also Merisant*, 2004 WL 3316380 at *22.

** ** **

Accordingly, it is no surprise that the only court to have ruled on the issue found that the Splenda trade dress is protectable. In *Merisant*, the U.S. District Court for Puerto Rico concluded that the Splenda packaging not only was inherently distinctive, but had acquired secondary meaning. *See Merisant*, 2004 WL 3316380 at *8-*9. In the years since that decision, the secondary meaning that has accrued to the Splenda trade dress has only increased. *See Ciba-Geigy Corp.*, 747 F.2d at 852. The evidence of confusion presented to this Court only

---

[3]  This finding compels denial of Heartland's untimely Second Motion for Leave to Supplement the Record [Dkt. No. 57], which remains pending. Through that Motion, Heartland seeks to introduce trial testimony from a former McNeil executive in an unrelated proceeding as evidence that McNeil designed its packaging to emphasize the product's sugar origins (a point that is disputed in any event). Given the Court's ruling, this evidence is wholly irrelevant to any outstanding issues in this case.

10

strengthens the conclusion that consumers have come to recognize and rely on the Splenda trade dress as an indicator of the product's origin.[4]

In sum, McNeil's trade dress is both inherently distinctive and has acquired secondary meaning among consumers.

### B.   The Splenda Trade Dress Is Not Functional

A Lanham Act plaintiff must establish not only that its trade dress is protectable, but also that it is non-functional. A product feature "is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Traffix Devices v. Mktg. Displays,* 532 U.S. 23, 32 (2001) (internal quotation marks and citations omitted); *see also Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982) (same).

There is nothing about the combination of yellow-and-blue themed packaging, a trade name presented in cursive lettering at the top of a horizontally-aligned box, or any of the other distinctive design elements that comprise the Splenda packaging that can be fairly described as "essential to the use and purpose" of a no-calorie sweetener made from sucralose. *Traffix Devices*, 532 U.S. at 32. Nor do such packaging features affect "the cost or quality" of sucralose. *Id.* As such, the Splenda trade dress is not functional.

Heartland has used the depiction of common graphical elements – including cups of coffee and pieces of pie – and the history of color coding in the sweetener category as grounds

---

[4] The Court should reject out of hand any argument by Heartland that Splenda cannot acquire secondary meaning because consumers may be unaware that McNeil is its source. The Third Circuit has held that "[i]n order for secondary meaning to exist, 'it is not necessary for the public to be aware of the name of the [source] . . . It is sufficient if the public is aware that the product [or service] comes from a single, though anonymous, source.'" *Dranoff-Perlstein Associates v. Sklar*, 967 F.2d 852, 858 (3d Cir. 1992) (quoting *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 380 (7th Cir. 1976)). Furthermore, as Heartland's expert testified, the majority of consumer products do not bear the name of the company that produces them, and he conceded that sellers know the trade dress and associate it with a brand, even though they cannot name the source. *See* Canaan, 1/26/07 Tr. at 188:10-190:19.

for arguing that the Splenda trade dress is functional. According to Heartland, photographs of

food and beverages are required to "inform consumers as to what . . . they are buying" and how it

"can be used," and a yellow background is necessary to indicate that a sweetener "is made with

sucralose as opposed to saccharin or aspartame." *See* Heartland Br. at 41. This is just wrong.

First and foremost, even assuming that certain elements contained in the Splenda

trade dress are descriptive or functional, the trade dress must be evaluated as a whole to

determine whether it is worthy of protection. *See* Third Cir. Op. at 19-20 (explaining that, in

trade dress cases, the district court's analysis must focus on the "overall impression" created);

*see also Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)

("Although each element of a trade dress individually might not be inherently distinctive, it is the

combination of elements that should be the focus of the distinctiveness inquiry. Thus, if the

overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of

generic elements."); *Duraco Prods. v. Joy Plastic Enters.*, 40 F.3d 1431, 1439 (3d Cir. 1994)

(same); *see also Sweetzel* 1995 U.S. Dist. LEXIS 13495 *20 (E.D. Pa. Sep. 14, 1995) (evaluating

trade dress not by incorporation of generic or descriptive elements, but "when viewed in

totality"). There are no arguments advanced that support the notion that the trade dress as a

whole is functional.

Thus, even if yellow were functional for sucralose, which it is not, the trade dress

as a whole is not functional and therefore protectable. Heartland's expert conceded as much –

the "only reason why consumers would have a particularly strong association between yellow

and sucralose is because of the amazing popularity of Splenda." Canaan, 1/26/07 Tr. at 218.

This admission destroys the core of what remains of Heartland's functionality argument. In

point of fact, the function of yellow is not to indicate sucralose – it is to signify Splenda.

12

Further, prior to 2000 there was not a single sucralose product available in the United States in yellow and blue themed trade dress; indeed, there was no sucralose product on the market at all. Canaan, 1/26/07 Tr. at 178. Until the appearance of Heartland's infringing products in mid-2006, Splenda was the only sucralose product marketed in yellow and blue packaging. Gelov, 2/7/07 Tr. at 89; Canaan, 1/26/07 Tr. at 178. Heartland's president conceded that if a consumer encounters sucralose in yellow and blue themed trade dress, it could only have originated from one of two sources: McNeil or Heartland. Gelov, 2/7/07 Tr. at 89. Heartland cannot credibly claim that the Splenda trade dress is "functional" because it, *and only it*, distributes competing sucralose products in similar trade dress. Where precisely two competitors – the parties to this case – sell yellow-themed sucralose packages, the argument that yellow signifies sucralose generically rather than Splenda brand sweetener is pure sophistry. Furthermore, it is belied by the fact that Heartland produces sucralose packages for itself as well as its largest customer in *different colors*. Gelov, 2/7/07 Tr. at 76-78, 82-83; http://nevella.com (attached as Exhibit A to Pl.'s Mtn. for Leave to Supp. or Reopen the Record).

Finally, the proof shows that sucralose products are currently sold (and Heartland's expert admitted that such products can be successfully marketed) in packaging that is not yellow and blue. Wal-Mart's Altern (PX 11A) and Albertson's sucralose product (PX 132), both manufactured by Heartland, use different colored packaging. Altern is packaged in a red and yellow box while Albertson's is packaged in a purple and blue box. In fact, Mr. Canaan testified that consumers would not be confused by the Albertson brand's use of purple and blue to promote its sucralose product. Canaan, 1/26/07 Tr. at 213. In addition, Mr. Canaan testified that a party could develop a sucralose-based sweetener in packaging other than yellow.

> Q.   And if the Court were to conclude that the usage by Heartland of yellow and blue and white in the accused products in this case was

treading too closely on McNeil's trade-dress rights, it would not be [precluding] competition in the no-calorie sweetener category, would it?

A.      No.

Canaan, 1/26/07 Tr. at 209-12; PX 11, 132. Indeed, Heartland itself has launched its own

sucralose package using orange, gold, brown and white. Exhibit A to Pl.'s Mtn. for Leave to

Supp. or Reopen the Record.

In sum, when viewed in its entirety, the overall look and feel of the Splenda trade

dress is indisputably non-functional and protectable.

## II.     MCNEIL WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT PRELIMINARY INJUNCTIVE RELIEF

McNeil has established as a matter of law that the Ahold products are likely to

cause consumer confusion. Third Cir. Op. at 41. "Irreparable injury follows as a matter of

course." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196 (3d Cir. 1990)

(where, as here, the plaintiff makes a "a strong showing of likely confusion, irreparable injury

follows as a matter of course"). As a result, there can be no serious dispute that the continued

distribution of those products will irreparably harm McNeil. But even were this presumption of

injury inapplicable, the record clearly demonstrates that McNeil's "injur[ies] include loss of

control of reputation, loss of trade, and loss of goodwill" – harm that, by its nature, is irreparable.

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998).

Accordingly, Heartland's infringement has irreparably harmed McNeil and will continue to do so

if left unchecked.

First, when customers are initially confused by the Ahold packaging, and are

brought to the shelf by the popularity and advertising of the Splenda brand but buy a Heartland

product instead, McNeil is damaged. Although McNeil developed the product, sought and

14

received FDA approval for its sale, developed a marketing campaign and then informed consumers about that campaign, at great expense, Heartland simply enjoys the rewards without any investment. That type of harm is difficult to quantify and is thus irreparable.

Second, when customers are confused by the Ahold packaging, and mistakenly purchase a Heartland product, McNeil loses sales. Sandler, 1/26/07 Tr. at 69; Sandler Decl. ¶ 39. Because there is no way to measure whether those sales are due to confusion or any other factor, those losses are irreparable. Sandler, 1/26/07 Tr. at 69-70.

Third, Heartland's infringing use of the Splenda trade dress is causing steady erosion of the Splenda brand identity and goodwill. McNeil has honed these assets at great expense over nearly eight years. Sandler, 1/26/07 Tr. at 70. Heartland's copying of the Splenda trade dress dilutes its uniqueness, undercuts McNeil's efforts to link its trade dress to the Splenda brand and, consequently, weakens the strength of that brand. Because such injuries cannot be precisely quantified or fully compensated in money damages, they are by definition the types of harm that injunctive relief is designed to prevent.

Finally, because McNeil cannot control the quality of Heartland's sucralose, the continued manufacture and distribution of the Ahold products threatens to erode the reputation and goodwill McNeil has so carefully cultivated for Splenda. Sandler, 1/26/07 Tr. at 70, 143; Sandler Decl. ¶ 42. If a consumer "purchases one of these products by accident or thinks that it's affiliated with us in any way and has a negative experience, that impacts my goodwill with the consumer," thereby causing serious and irreparable injury to McNeil. Sandler, 1/26/07 Tr. at 70; *Opticians Ass'n of Am.*, 920 F.2d at 196 (3d Cir. 1990) (The mere risk of this "[p]otential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary

15

injunction in a trademark case."). Again, such harm is impossible to quantify and, as such, McNeil is entitled to injunctive relief.

## III.   THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF PRELIMINARY RELIEF

McNeil has now invested over a quarter-billion dollars to advertise and promote Splenda, and has featured the Splenda trade dress prominently in such communications. Sandler, 1/26/07 Tr. at 55-56; PX 15-20. McNeil's efforts have resulted in unprecedented success in the no-calorie sweetener category and have positioned Splenda as the undisputed leader of that market. Damage to the Splenda trade dress and McNeil's goodwill simply cannot be measured. It is therefore irreparable.

By contrast, Heartland has made virtually no investment in its products, choosing instead to poach market share and sales from McNeil by mimicking the Splenda trade dress.[5] This "free riding" on the popularity of Splenda injures McNeil. As McNeil's Worldwide President Debra Sandler testified:

> [T]he majority of that [advertising] money is to drive awareness and to bring consumers to the shelf. That's the expenditure we are making. So, most of that traffic that's coming to our area is coming based on that expenditure. If [Heartland is] benefiting from that, then that is a loss of a return on my investment.

Sandler, 1/26/07 Tr. at 71. *See Bebe Stores, Inc. v. May Dep't Stores Int'l, Inc.*, 230 F. Supp. 2d 980, 996 (E.D. Mo.), *aff'd in part, remanded in part,* 313 F.3d 1056 (8th Cir. 2002) (explaining that the balance of hardships tips in the plaintiff's favor because it devoted substantial resources

---

[5] Although Heartland admits it expends no funds to promote its products (Gelov, 2/7/07 Tr. at 50; Gelov Supp. Decl. ¶ 8), it claims the stores to which it sells sucralose – including the Ahold stores – engage in advertising. Gelov, 2/7/07 Tr. at 51. The only evidence Heartland offers for this proposition is a handful of store circulars, which by definition highlight price savings on a multitude of products, not solely sweeteners. Heartland cannot plausibly suggest that this type of advertising is akin to the television commercials and print ads that McNeil runs.

to building and advertising its brand of clothing while the defendant merely mimicked it with confusingly similar designs).

   While the denial of a preliminary injunction would impose a severe hardship on McNeil, the entry of such relief will impose a far lighter burden on Heartland.  Heartland's president testified that all of the products originally at issue in this case account for less than half of Heartland's sales.  Fully 50-60% derives from two products that McNeil has never challenged: Wal-Mart's Altern and Albertson's "Sugar Substitute."  Gelov, 2/7/07 Tr. at 92.  Moreover, two of the five packages McNeil originally challenged – Food Lion's "Sweet Choice" and Safeway's "Sucralose" – are no longer at issue in this motion.  Subsequent to the filing of this case, Heartland began producing private-label sucralose products for the Kroger® chain of supermarkets and Sysco®, the nation's largest food service distributor.  Additionally, Heartland began selling its own brand of tabletop sucralose under the trade name Nevella®.  Thus, the Ahold products that remain in dispute likely constitute an even smaller portion of Heartland's business.  Given these developments, an injunction against the further manufacture and distribution of the Ahold products would have an even more modest impact on Heartland's bottom line than might have been the case even six months ago.

   To the extent Heartland may be damaged by an injunction, its injury is entirely self-inflicted.  Heartland has manufactured the infringing sweeteners with full knowledge that the packages were designed to mimic the Splenda trade dress.  In addition, Heartland continued to manufacture and distribute these products even after McNeil warned it of its infringement.[6]

---

[6] Heartland has previously tried to disclaim liability on the ground that its customers – in this case, Ahold – design the packaging it sells and it plays no role in creating the products' trade dress.  Gelov Decl. ¶ 46. On this theory, Heartland contends, it should not be held responsible for any such packaging that infringes the Splenda trade dress.  But this argument is plainly inconsistent with the Lanham Act. Liability under the statute attaches to "*any person* who . . . uses *in commerce* any word, term, name, symbol, or device, or any combination thereof . . ." that "is likely to cause consumer confusion."  15

At least since August 2006, Heartland has been on notice that McNeil intended to enforce its intellectual property rights in the Splenda trade dress. Nevertheless, its president testified that it took no steps either to develop a contingency plan in the event an injunction issues or to design alternative, non-infringing packaging for its products. Gelov, 2/7/07 Tr. at 98-99.

Assuming Heartland will suffer a supply interruption in a small part of its business, that interruption might have been considerably shorter had Heartland taken steps to mitigate its damages. In no small measure, Heartland has brought upon itself any consequences of a preliminary injunction. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 729 (3d Cir. 2004) ("[Defendant] took a deliberate risk by proceeding despite being warned that its mark was dangerously close to that of a competing product, and is thus not in position to urge its original blamelessness as a consideration which should be persuasive to a court of equity.") (quotation marks and citation omitted); *see also Novartis Consumer Health Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596-97 (3d Cir. 2002) (holding that because any financial harm defendant might suffer is self-imposed, the district court properly enjoined its use of a trade name).

Further, even if the entry of a preliminary injunction in McNeil's favor causes a temporary loss of some business for Heartland – as the infringing Ahold packages are taken off the market and redesigned – an accompanying increase in business would likely result once that customer places orders for new, non-infringing packages. *Id.* The net result for Heartland would be close to neutral.

---

U.S.C. §1125(a)(1) (emphasis added). Whether such person designs the offending item or simply manufactures and distributes it is of no consequence. *See Inwood Lab., Inc.*, 456 U.S. at 854 ("[I]f a manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily liable for any harm done as a result of the deceit.").

18

At most, the entry of a preliminary injunction would cause Heartland a four-month interruption in less than half of its business and between $50,000 and $100,000 to change its printing plates and reset its presses.[7] *Id.* Whatever the exact cost an injunction would entail, which Heartland has not even attempted to estimate, the company's president admitted that any losses it might suffer are quantifiable and compensable. *Id.; see Kos Pharms.*, 369 F.3d at 728 (concluding that the "time and expense in obtaining trademark clearance services, changing the labeling and product inserts, product re-launch advertising and the re-establishment of goodwill, and perhaps in destroying inventory or recalling the products already distributed" are "compensable by money damages and thus do not constitute irreparable harm") (internal quotation omitted).

On the other hand, denial of injunctive relief would impose hardships on McNeil that are far more serious: the erosion of the invaluable brand identity and consumer goodwill it has spent over seven years and substantial sums of money to cultivate. By their nature, such losses cannot be quantified or compensated by money. Thus, unlike the harm to McNeil, which is irreparable, any harm to Heartland is not.

## IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION

The "public interest can be defined in [any] number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n of Am.*, 920 F.2d at 197. By definition, "[w]here a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." *S & R Corp., v. Jiffy Lube Int'l., Inc.*, 968 F.2d 371, 379(3d Cir. 1992). Heartland's assertion that the

---

[7] Without any evidence, Heartland speculates that competitors could swoop in and steal its business. Not only has Heartland failed to demonstrate that there is even *a single* producer of private-label sucralose with which it might have to compete, it cannot credibly deny that any such competitor would face the same design and ramp-up time as Heartland would if an injunction issues.

public interest is served by allowing "competition" from its infringing brands is premised upon a faulty legal theory and highly questionably economic policy. Intentional copying of protectable trade dress – even when done by a private label producer – does not serve the public interest. *See* Third Cir. Op. at 37 (the Lanham Act does not support a "*per se* rule" immunizing producers of private label brands for infringing behavior). Whether the infringer happens to be a private label, as opposed to a branded competitor, the use of trade dress that is likely to cause consumer confusion does not serve the public interest. *S & R Corp.*, 968 F.2d 371.

Without question, the public interest favors entry of a preliminary injunction in this case.

## V.    SCOPE OF RELIEF

### A.    McNeil is Prepared to Post a Bond in an Appropriate Amount

Pursuant to Federal Rule of Civil Procedure 65, a preliminary injunction will issue only if the prevailing party posts a bond "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c); *see also Sprint Communications Co. L.P. v. Cat Communications Intern., Inc.*, 335 F.3d 235, 239-40 (3rd Cir. 2003) (entry of a preliminary injunction requires the prevailing party to post a bond in an amount that will "compensate incorrectly enjoined defendants") (internal citation and quotation marks omitted). The amount of the bond is committed to the district court's discretion.

Defendants have the burden of demonstrating, with "credible evidence," the harm they realistically would be expected to sustain in the event of a wrongfully-issued injunction. *See Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 910 and n.25 (S.D.N.Y. 1995). On cross examination, Heartland's president testified that there are three

discrete categories of injury that Heartland would suffer in the event injunctive relief is entered, and that a dollar value could be assigned to each form of harm:

> Q.   . . . In any event, the various injuries that you've identified -- the loss of revenue during the four months when you're not able to sell to these customers, the costs of retooling your printing operations, and the costs of inventory, which I want to come back to in a moment, those are all items that you can quantify within some reasonable degree of estimation, correct?
>
> A.   Within a reasonable degree, we can quantify them.
>
> Q.   You can assign a dollar value to them.
>
> A.   Within some reason, yes.

Gelov, 2/7/07 Tr. at 98. But despite the ability to quantify its injury, Heartland made absolutely no effort to do so. *See* Gelov, 2/7/07 Tr. at 93, 95-96, 98. Rather, it has offered only the conclusory statements that an injunction would "have a severely detrimental effect on the . . . business" and would be "devastating." Gelov Supp. Decl. ¶ 47; Gelov, 2/7/07 Tr. at 54. In short, Heartland has completely failed to meet its burden.

Moreover, where, as here, the evidence shows that a party failed to mitigate its damages, courts in this jurisdiction are required to reduce the bond appropriately. *See Kos Pharms.*, 369 F.3d at 732 n.28 (instructing district court to "take into account [the defendant's] ability to minimize the potential for [its] damages" when calculating bond). Heartland's president testified that, despite learning in August 2006 of McNeil's claims of trade dress infringement, Heartland took absolutely no steps to mitigate its damages – *e.g.*, reduce its inventory, develop alternative package designs, etc. On these facts, the Court should reduce the amount McNeil would otherwise be required to post as a bond.

In the end, the only hard evidence in the record of Heartland's potential harm was elicited on cross-examination by McNeil:

Q.      [L]et's explore the elements of the harm that you've described.  I think you described that on your direct examination that if the existing Ahold and Safeway and the other challenged packages were enjoined, that you would have to incur some costs to prepare to print replacement packages, or different packages, is that correct?

A.      There would be costs for that, yes.

Q.      Okay.  And those costs relate to a new -- setting up of new printing apparatus and the like, correct?

A.      Yes.

Q.      Would it be fair to say that the total cost for that activity would be less than $100,000?

A.      For that activity?  I think it would be safe to say that's less than 100,000.

Q.      Less than 50,000?

A.      I don't think so.

Q.      Okay.

A.      I think it might be more than that.

Q.      Okay.  Somewhere between 50 and 100?

A.      I would say that's a fair range.

Gelov, 2/7/07 Tr. at 93.

Accordingly, McNeil proposes that the bond be set in the amount of $100,000 – the upper range of Mr. Gelov's estimate of the maximum out-of-pocket expense Heartland could incur.  This is more than adequate under the circumstances.

1428815v.3

## CONCLUSION

For the foregoing reasons, McNeil's Motion for Preliminary Injunction should be granted and Heartland should be enjoined from the further manufacture and distribution of its Ahold packages.


Dated:          February *13*, 2008

PATTERSON BELKNAP WEBB & TYLER LLP

By:    *Karla G. Sanchez*

Steven A. Zalesin
Karla G. Sanchez
David G. Sewell
1133 Avenue of the Americas
New York, NY 10036-6710
Tel: (212) 336-2000

DRINKER BIDDLE & REATH LLP
Alfred W. Putnam, Jr.
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996


Of Counsel:   Donna Malin, Esq.
              Eric Schwartz, Esq.
              Johnson & Johnson