IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MCNEIL NUTRITIONALS, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HEARTLAND SWEETENERS LLC, and | : | |
| HEARTLAND PACKAGING CORP. | : | NO. 06-5336 |

### MEMORANDUM

**Padova, J.**                                                   **June 26, 2008**

Plaintiff McNeil Nutritionals, LLC ("McNeil") brought this action against Defendants Heartland Sweeteners LLC and Heartland Packaging Corp. (collectively "Heartland") alleging, inter alia, violations of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).  Currently before us is McNeil's Renewed Application for Preliminary Injunction, in which it asks that we enjoin Heartland from manufacturing and distributing certain store-brand products in packaging that is confusingly similar to the trade dress of McNeil's no-calorie sweetener Splenda®.  For the reasons that follow, we grant McNeil's renewed application for injunctive relief.

## I.    PROCEDURAL BACKGROUND

McNeil filed the instant lawsuit on December 5, 2006, alleging that Heartland violated Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); the Pennsylvania Anti-Dilution Act, 54 Pa. Cons. Stat. Ann. § 1124; and Pennsylvania common law regarding unfair competition and misappropriation of an advertising idea.  On December 14, 2006, McNeil filed its initial motion for a preliminary injunction seeking an order enjoining Heartland from, among other things, manufacturing and distributing a no-calorie sweetener in packaging that is confusingly similar in appearance to any packaging used by McNeil for its Splenda® product ("Splenda").  McNeil also

requested that the preliminary injunction require Heartland to recall from distribution all of the infringing packages, and remove or cause to be removed all of the infringing packages from store shelves.  The initial motion for a preliminary injunction concerned the 100 and 200-count boxes of individual packets, the individual packets themselves, and the bags of granular sucralose that Heartland packages and distributes to Ahold, U.S.A., Inc.'s stores, i.e., Giant, Stop & Shop, and Tops (collectively "Ahold"), as well as Food Lion, and Safeway.

On May 21, 2007, following an evidentiary hearing on January 26, 2007, receipt of proposed findings of fact and conclusions of law from the parties, and oral argument on March 13, 2007, we issued a Memorandum and Order, McNeil Nutrionals, LLC v. Heartland Sweeteners LLC, 512 F. Supp. 2d 217 (E.D. Pa. 2007) ("McNeil I"), denying the motion for a preliminary injunction in its entirety.  In that Memorandum, we addressed the issue of whether McNeil was likely to succeed on the merits of its Lanham Act claim and we concluded that it was not.  We noted that to be successful on a Lanham Act claim based on trade dress infringement, a plaintiff must establish the following elements:  (1) that the trade dress is distinctive, either because it is inherently distinctive or because it has acquired secondary meaning; (2) that the trade dress is nonfunctional; and (3) that the defendant's use of the plaintiff's trade dress is likely to cause consumer confusion.  We then applied the ten factor analysis articulated by the United States Court of Appeals for the Third Circuit in Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3d Cir. 1983), commonly known as the Lapp factors, to the various products at issue to determine whether McNeil had established a likelihood of success on the third element of a Lanham Act claim, i.e., that the Heartland packaging was likely to cause consumer confusion.  With respect to the first Lapp factor, we found that only the packaging of the Ahold 100 and 200-count boxes of individual packets and the Ahold bag of granular sucralose were

2

similar to the analogous Splenda trade dress.  We found that the packaging of the Food Lion and Safeway products, as well as the Ahold individual packets, were not similar to the analogous Splenda trade dress.  Nevertheless, after considering all of the Lapp factors, we concluded that McNeil had failed to demonstrate that the packaging of any of the products at issue was likely to cause consumer confusion.  Accordingly, we denied McNeil's motion for a preliminary injunction.

McNeil appealed and in an opinion filed December 24, 2007, McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350 (3d Cir. 2007) ("McNeil II"), the Third Circuit affirmed our denial of McNeil's preliminary injunction motion as to the Food Lion and Safeway products. Id. at 369.  However, it reversed the denial as to the Ahold 100 and 200-count boxes and the Ahold bag of granular sucralose, and held that McNeil had demonstrated a likelihood of success on the merits with respect to the third element of trade dress infringement, i.e., likelihood of consumer confusion between these products' trade dresses and the analogous Splenda trade dress. Id.[1]  The Third Circuit remanded the matter to us to consider whether, with respect to these Ahold products, McNeil has established a likelihood of success on the remaining elements of trade dress infringement, as well as the remaining factors for preliminary injunctive relief.  Id.

On February 13, 2008, McNeil renewed its application for a preliminary injunction.  On March 12, 2008 and March 31, 2008, the parties submitted joint stipulations to stay further proceedings pending settlement discussions.  That stay expired on April 8, 2008.  On April 17, 2008, McNeil filed a motion for an extension of time in which to file a reply brief and for an order permitting it to conduct limited discovery.  We granted that motion on April 24, 2008, and allowed

---

[1]McNeil did not appeal our decision as it related to the individual packets of sucralose. See McNeil II, 511 F.3d at 369 (reversing only as to the Ahold boxes and bags of granular sucralose).

the parties to conduct limited discovery until May 7, 2008. On May 14, 2008, McNeil filed a motion

for leave to file a reply, which we granted on May 16, 2008. The parties also separately submitted

motions to supplement the record. Both of these motions were granted as unopposed on April 24,

2008 and May 21, 2008, respectively.

## II.    FACTUAL BACKGROUND

American consumers spend between $600 to $700 million yearly on sugar substitutes, also

known as artificial sweeteners. No-calorie sweeteners are a subset of artificial sweeteners that do

not have any calories. (N.T. 1/26/07 at 37:23-25; Declaration of Teodor Gelov, 1/12/2007, "Gelov

Decl." ¶ 17.) The market for no-calorie sweeteners is dominated by products that contain one of

three sweetening ingredients: saccharin, aspartame, and sucralose. (N.T. 1/26/07 at 38:15-23.) The

leading artificial sweetener containing saccharin is Sweet'N Low®, which was first marketed in the

United States in 1957. (Id. at 38:25-39:2.) Aspartame was approved by the U.S. Food and Drug

Administration for sale in the United States in 1982. The leading artificial sweetener containing

aspartame is Equal®. (Id. at 38:15-23.)

Sucralose was approved by the U.S. Food and Drug Administration in 1998 for use as a food

additive, and in 1999 for use as a general purpose sweetener. (Declaration of Debra Sandler,

12/12/206, "Sandler Decl." ¶ 5.) Sucralose is an artificial sweetener that is manufactured through

a process in which the molecular structure of sugar is modified by replacing three of eight hydroxyl

(i.e., hydrogen and oxygen) groupings on the sucrose molecule with three chlorine atoms. (Sandler

Decl. ¶ 5.) Therefore, sucralose is essentially a chlorinated sucrose molecule. (Id.) Sucralose has

no calories because it is passed through the body without being metabolized. Because sucralose is

more heat-resistant than saccharin and aspartame, it is often marketed not only in individual packets,

4

but also in loose or granular form to be used in cooking and baking. (N.T. 1/26/07 at 40:1-10.)

In September 2000, McNeil introduced Splenda, the first artificial sweetener in the United States made with sucralose. (Id. at 37:5-6; Sandler Decl. ¶ 7.) Sales of Splenda have grown more than tenfold in just six years, from approximately $32 million in 2001 to approximately $410 million in 2006. Within a year of its introduction, Splenda captured 14% of the total U.S. market for low-calorie sweeteners (based on dollar volume). Splenda's market share has increased greatly since its introduction, and in 2006, Splenda captured approximately 60% of the no-calorie sweetener market, compared to approximately 15% for Equal and 14% for Sweet'N Low. (N.T. 1/26/07 at 42:12-45:10; Sandler Decl. ¶¶ 23-27.)

As the number of sugar and sugar substitutes has increased, color-coding in packaging has developed as a means of differentiating products and quickly identifying the active ingredient in a given product. The leading artificial sweeteners are each sold in distinctive packaging that helps consumers identify and distinguish them from other products in the market. (N.T. 1/26/07 at 85:23-25; N.T. 2/7/07 at 51:7-9.) Sweet'N Low, the leading saccharin brand, is marketed in predominately red and pink packaging. Individual packets of Sweet'N Low are pink. The recognized industry standard for saccharine-based products is for the product to be sold in red and/or pink packaging. This practice informs consumers that the particular product is made primarily with saccharin and, in the case of store-brand products, that the item competes with Sweet'N Low. (Gelov Decl. ¶¶ 23, 25.) Equal, the leading aspartame brand, is marketed in packaging that is primarily blue. Individual packets of Equal are blue. Aspartame-based sweeteners are primarily sold in blue packaging. (Id. ¶¶ 28, 30, N.T. 1/26/07 at 91:16-17.) The primary color used in the packaging of Splenda, the leading sucralose brand, is yellow, and the individual packets of Splenda are primarily yellow. (Id.

at 51:7-10, 52:3; Pl. Exs. 1(a), 1(b), 1(c), 2(a) and 2(b).)

Private-label products are typically products manufactured or provided by one company for offer under another company's name.  Such products are generally made with the same active ingredient as, or otherwise are similar to, the particular name-brand or national-brand product with which the private-label product competes.  (N.T. 1/26/07 at 182:12-14; Gelov Decl. ¶ 7.)  Private-label products are available in a wide range of industries and are often positioned as lower cost alternatives to national-brand products.  "Private-label products generally are about [25%] less expensive than national-brand" products.  (Declaration of David Canaan, 1/12/2007, "Canaan Decl." ¶¶ 13, 15.)  "As of 2005, private-label sales represented [20%] of all U.S. supermarket, drug chains, and mass merchandisers' sales and totaled $50 billion."  (Id. ¶ 14.)

Store-brand products are a type of private-label products, in which the store name, such as Giant, Safeway, or Food Lion, is the brand name.  Store-brand products have been used by retailers since 1883, when they were first introduced by the supermarket pioneer, Barney Kroger.  (N.T. 1/26/07 at 190:8-9, Canaan Decl. ¶ 22.)  Consumers have become highly aware of store-brand products.  The Private Label Manufacturers Association (PLMA) reported that in 2005, more than 90% of consumers polled were familiar with store-brands and 83% bought them regularly.  (Id. ¶ 22.)

Store-brands are typically found on store shelves next to the analogous national-brand product.  The packaging of store-brand products often includes reference points to invite the consumer to compare the store-brand product to the national-brand product.  These reference points often include similar product packaging and "compare to" statements on the packaging.  Stores also employ tags on store shelves that explicitly invite consumers to compare the store-brand product with a national-brand product.  (Def. Exs. A19-A30; Gelov Decl. ¶¶ 14-16.)  Stores develop private-

label products for several reasons, including enhancing the retailer's image, strengthening its relationship with consumers, and inspiring consumer loyalty.  (Canaan Decl. ¶ 19.)

In the artificial sweetener market, there are a number of private-label products that compete with Sweet'N Low and Equal.  Nearly all grocery store chains sell private-label saccharin and aspartame sweeteners that compare to the national-brand products.  (Gelov Decl. ¶¶ 26, 31.)

McNeil has devoted substantial resources to market and promote Splenda products.  McNeil has spent nearly $250 million to promote and publicize the brand to consumers.  Through its branding campaign, McNeil has highlighted the yellow Splenda packaging which includes the Splenda trademark in gradated blue italicized lettering on a white cloud.  A Splenda package has been featured in nearly every Splenda television commercial and print advertisement since its launch.  (N.T. 1/26/07 at 54:18-56:24.)

McNeil began selling boxes of individual Splenda packets in 2000.  The boxes come in 100 and 200-count sizes and are identical except for the size of the box.  The box is oriented horizontally.  The background is yellow with a mottled effect, while the lettering on the box is primarily blue.  The trade name "Splenda" appears at the top-center of the front of the box in italicized blue lettering that increases in intensity from light to dark blue.  The trade name is also surrounded by a white, oval-shaped cloud, and is underlined by a blue half-circle and the words "No Calorie Sweetener."  On the front, lower-right side of the box, there is a photograph of a white cup of coffee and saucer, with an individual Splenda packet resting on the saucer.  On the front, left side of the box, there is a photograph of a glass and pitcher of iced tea with slices of lemon.  In the bottom-left corner is a circular element that contains the words, "Made From Sugar, Tastes Like Sugar."  (Def. Ex. K; Pl. Ex 1(a).)

McNeil also sells Splenda in its granular form packaged in bags.  The bag has a mottled yellow background.  The trade name "Splenda" appears in the top-center of the bag in italicized blue lettering that increases in intensity from light to dark blue.  The trade name is also surrounded by a white, oval-shaped cloud, and is underlined by a blue half-circle and the words "No Calorie Sweetener."  On the lower half of the bag, there is a photograph of a piece of pie on a white plate, a bowl of cereal with raspberries, and a white scoop containing the Splenda product in its granular form.  (Pl. Ex. 1(c).)

Manufacturers occasionally refresh their trade dress to make their product look more contemporary.  This refreshing of a trade dress tends not to consist of major changes, but rather includes evolutionary changes in order to keep the good will of the product's consumer base.  (N.T. 1/26/07 at 46:23-47:16.)

McNeil refreshed the Splenda trade dress in late 2006.  Changes were made to the packaging for the 100 and 200-count boxes, the individual packets, and the packaging of the granular sucralose product.  (Id. at 53:3-4, 121:22-24.)  The refreshed Splenda 100 and 200-count box is still yellow, but the yellow is brighter, and does not have the mottled effect that appeared on the original Splenda packaging.  The product name "Splenda" is now outlined in white.  Stars appear above the product name and on the left side of the box.  The photograph of the white coffee cup and saucer has been moved to the bottom center, and a teaspoon has been added.  The photograph of a pitcher and glass of iced tea was replaced with a photograph of a glass of iced tea with a lemon wedge, and several raspberries.  The refreshed package also depicts two individual packets of Splenda to the right of the coffee cup and saucer.  (Pl. Ex. 2(a).)

The refreshed Splenda bag of granular sucralose is still yellow, but the yellow is brighter, and

8

does not have the mottled effect that appeared on the original Splenda packaging.  The product name "Splenda" is now outlined in white and stars appear above the product name and on the front, left side of the bag.  The photographic elements have been altered.  In the refreshed packaging, it now contains a photograph of a slice of mixed berry pie, a bowl of mixed fruit, and a cup of coffee.  (Pl. Ex. H.)

In mid-2006, private-label or store-brand sucralose products began to appear in the market. Heartland manufactures a number of store-brand artificial sweetener products for various retailers. (Gelov Decl. ¶¶ 43-44.)  Giant, Stop & Shop, and Tops are all owned by Ahold, and the packaging of the store-brand sucralose products sold by each of these stores is identical except that the packaging contains the respective store's name or logo.  (N.T. 1/26/07 at 60:17-21.)

The Ahold store-brand box of individual sucralose packets is oriented horizontally.  The box has a yellow background color that is more intense at the top than at the bottom.  The lettering on the box is either blue or white.  The product name, "Sweetener," appears at the top center, in italicized blue font that increases in intensity from light blue to dark blue.  The product name is outlined in white.  There is a banner below the product name that contains the text, "Calorie Free." The store logo appears at the top-center above the product name.  On the lower-right corner there is a photograph of a white cup of coffee and saucer, a glass of an iced beverage (possibly lemonade) with a lemon slice, and several lemons.  There is a white rectangular border on the front of the box. The 100 and 200-count boxes are identical except for their size.  (Pl. Ex. 3(a); Def. Ex. TTT.)

The Ahold stores also sell a store-brand granular sucralose product packaged in bags.  The bag has a yellow background that increases in intensity from light yellow on the top, to a darker yellow on the bottom.  Lettering on the bag is primarily blue and white.  The product name

"Sweetener" appears on the front of the bag at the top-center in a blue italicized font that increases in intensity from light to dark. The product name is also outlined in white. The store name/logo appears at the top-center of the bag, above the product name. Below the product name is a blue banner containing the words "Calorie Free." The front of the bag displays a photograph of a slice of cheesecake on a white plate, a bowl of cereal with raspberries, and cup of coffee and saucer, and also includes a white rectangular frame. (Pl. Exs. 3(c), and 4(c).)

_____The majority of sugar and sugar substitute packages contain pictures of foods and/or drinks that are made with sweetener, into which sweetener is added, or onto which sweetener is sprinkled. For example, packages depict hot and cold beverages, such as coffee, tea, iced tea, or lemonade; fruit; cereal; and baked goods, such as cake, bread, or pie. (Gelov Decl. ¶ 36; Def. Exs. AA, BB, KK, CC1, CC2, and UUU; Gelov Decl. Ex. A8-9.)

Heartland did not design any of the packaging at issue in this matter. Rather, Ahold designed the packaging for its products. Heartland supplied only the net weight, nutritional facts, ingredient statement, and the sugar conversion chart. (N.T. 2/7/07 at 8:9-12:12.)

As of February 29, 2008, Ahold redesigned the packaging for its store-brand sucralose products. The redesign was intended to emphasize a common packaging design for all Ahold no-calorie sweeteners and to distinguish the packaging of Ahold's sucralose product from the Splenda trade dress. (Declaration of Belinda Simmons, 2/29/208, "Simmons Decl." ¶ 4.) Heartland has begun the process required to obtain boxes and bags incorporating the redesigned packaging. (Supplemental Declaration of Teodor Gelov, 3/3/08, "3/3/08 Gelov Decl." ¶ 3.) However, Heartland has a substantial inventory of finished Ahold product, i.e., packaging that has been filed with individual packets or granular sucralose, in the original Ahold packaging. (3/3/08 Gelov Decl. ¶ 9.)

10

Heartland also has a substantial inventory of unfinished original Ahold packaging, i.e., packaging using the original Ahold design that has not been filed with individual packets or granular sucralose. (3/3/08 Gelov Decl. ¶ 9.)  As of April 2008, Heartland's inventory of finished Ahold product had a sales value of $339,978.12.  (Supplemental Declaration of Teodor Gelov, April 2008, "April 2008 Gelov Declaration" ¶ 4.)

## III.   LEGAL STANDARD

A party seeking a preliminary injunction must demonstrate that each of the following factors favors the requested relief:

> (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.

Shire US, Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003) (citations omitted).  Preliminary injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994) (citation omitted).  The moving party must produce evidence sufficient to demonstrate that all four factors favor preliminary relief before a court may issue an injunction.  Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 192 (3d Cir. 1990).  When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is "particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980).[2]

---

[2]The parties dispute the nature of the relief sought in this case, i.e., whether it is mandatory or prohibitory, and whether, based on the nature of this relief, McNeil must satisfy a heightened burden of proof.  In its Renewed Application, McNeil states that it "simply requests an injunction prohibiting the continued manufacture and distribution of the offending products (including the

## IV.    DISCUSSION

A.    <u>Likelihood of Success on the Merits</u>

The first factor of the preliminary injunction analysis is the likelihood of success on the merits.  McNeil seeks a preliminary injunction pursuant to its Lanham Act claim.  The Lanham Act establishes a cause of action for trade dress infringement.  <u>TrafFix Devices, Inc. v. Mktg. Displays, Inc.</u>, 532 U.S. 23, 28-29 (2001).  "'Trade dress' refers to the design or packaging of a product which serves to identify the product's source."  <u>Shire US</u>, 329 F.3d at 353 (citation omitted).  It is "the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique."  <u>Rose Art Indus., Inc. v. Swanson</u>, 235 F.3d 165, 171 (3d Cir. 2000) (citations omitted).

To establish trade dress infringement under the Lanham Act, a plaintiff must prove that (1) the trade dress is distinctive, either because it is inherently so or because it has acquired secondary meaning; (2) it is nonfunctional; and (3) the defendant's use of the trade dress is likely to cause consumer confusion.  <u>Rose Art Indus.</u>, 235 F.3d at 172 (quoting <u>Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.</u>, 40 F.3d 1431, 1439 (3d Cir. 1994)).  In <u>McNeil II</u>, the Third Circuit held that McNeil

destruction of any such packages that have been manufactured but not yet shipped from Heartland's warehouses)."  (Renewed App. for Pre. Inj. at 4 n.2.)  However, in its Reply Brief, McNeil states that it "only seeks an order requiring Heartland to immediately cease distributing its inventory of products in the original Ahold packaging and to refrain from further distribution of that inventory until this matter reaches a final resolution on the merits," and that "[i]f the Court were to grant McNeil's request, Heartland faces essentially no risk as to its existing inventory.  It can simply hold onto those products and, if the injunction is later vacated, resume distributing them." (Reply Br. at 22-23.)  We construe these statements in the Reply Brief to withdraw any request that Heartland destroy its existing inventory of products in the original Ahold packaging.  Consequently, the only relief sought by McNeil is an injunction barring the continued manufacture and distribution of the offending products.  This requested relief is clearly prohibitory, not mandatory, and McNeil, therefore, need not demonstrate a heightened burden of proof to warrant its requested injunctive relief.

has demonstrated a likelihood of success on the merits on the issue of consumer confusion with respect to the 100 and 200-count Ahold boxes and the Ahold bag of granular sucralose.  McNeil II, 511 F.3d at 369.  Thus, we need only examine the first two elements to determine if McNeil is likely to succeed on the merits of its Lanham Act claim with respect to these products.  We find that McNeil has demonstrated a likelihood of success on the merits with respect to the remaining elements of a Lanham Act violation and, consequently, this factor of the preliminary injunction analysis favors granting the requested relief.

1.   Distinctiveness

a.  Inherent distinctiveness

Trade dress is inherently distinctive if "its intrinsic nature serves to identify a particular source."  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210 (2000) (quotation omitted). A product's packaging primarily serves the purpose of source identification.  Id. at 212.  Courts apply the test articulated in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 10-11 (2d Cir. 1976), to determine inherent distinctiveness.  See Paddington Corp. v. Attiki Imps. & Distribs., Inc., 996 F.2d 577, 583 (2d Cir. 1993) (citation omitted); Sweetzel, Inc. v. Hawk Hill Cookies, Inc., Civ. A. No. 95-2632, 1995 WL 550585, at *7 (E.D. Pa. Sept. 14, 1995); see also Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 773 (1992) (stating in dicta that "[the lower court] was quite right . . . to follow the Abercrombie classifications consistently and to inquire whether trade dress for which protection is claimed under § 43(a) [of the Lanham Act] is inherently distinctive.");  Wal-Mart, 529 U.S. at 210-13 (discussing without disapproval the Abercrombie test for inherent

distinctiveness).³

Under the <u>Abercrombie</u> test, adapted semantically for the trade dress context, a trade dress is classified in categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary or fanciful.  <u>Two Pesos</u>, 505 U.S. at 768 (citing <u>Abercrombie</u>, 537 F.2d at 9).  A product packaging trade dress that is suggestive, arbitrary, or fanciful is inherently distinctive.  <u>See Id.</u> ("The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection.").  An arbitrary or fanciful trade dress neither describes nor suggests anything about the product, while a suggestive trade dress requires consumer "imagination, thought, or perception" to demonstrate what the product is.  <u>A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 221-22 (3d Cir. 2000) (quoting <u>A.J. Canfield Co. v. Honickman</u>, 808 F.2d 291, 297 (3d Cir. 1986)).  A trade dress is descriptive if it "forthwith convey[s] an immediate idea of the ingredients, qualities or characteristics of the goods." <u>Id.</u> (quotation omitted).

The United States Court of Appeals for the Second Circuit has made two observations that are persuasive and applicable to this case.  First, the Second Circuit noted that because "the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive."  <u>Paddington</u>, 996 F.2d at 583.  The Second Circuit also stated that:

_____

³While the Third Circuit has rejected the application of the <u>Abercrombie</u> test to determine inherent distinctiveness in actions for infringement of trade dress based on product configuration/product design, in its rationale for doing so, it specifically distinguished product configuration/product design trade dress from product packaging trade dress. <u>Duraco Products</u>, 40 F.3d at 1440-41.  As this case concerns product packaging trade dress, the <u>Abercrombie</u> test is the appropriate test.

> Trade dresses often utilize commonly used lettering, styles, geometric shapes, or colors, or incorporate descriptive elements, such as an illustration of the sun on a bottle of suntan lotion.  While each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of the court's analysis of distinctiveness.  If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements.

Id. at 584  (citing Roulo v. Russ Berrie & Co., 886 F.2d 931, 936 (7th Cir. 1989)).

Applying the Abercrombie test, the overall Splenda trade dress is arbitrary or fanciful and thus inherently distinctive.  We reach this conclusion despite the fact that many of the pictorial elements of the Splenda trade dress are descriptive or suggestive.[4]  However, regardless of whether these particular elements are descriptive or suggestive, we look at the overall combination of the pictorial elements and the other non-pictorial elements of the Splenda trade dress, such as the lettering styles, colors and layout of the Spenda packaging.  Following this approach, the overall combination of the Splenda trade dress is arbitrary or fanciful.  The combination of pictorial elements, colors, labeling, and layout (including the prominent placement of the product name surrounded by a distinctive white cloud) identify the products as originating with the makers of Splenda.

Heartland's argument that Splenda's trade dress cannot be inherently distinctive because, in its opinion, the Splenda trade dress is no more than a combination and refinement of common

---

[4]A picture of a cup of coffee or iced tea may for some consumers immediately convey the idea that the product contained in the packaging is used to sweeten these beverages, and thus these images would be classified as descriptive.  For other consumers, however, they may have to think about the various pictorial elements before inferring that the packaging probably contains a sweetener, and thus the pictorial elements may be suggestive.  However, because other producers use similar images, it is more likely that these images are descriptive.  See Dranoff-Perlstein Assocs. v. Sklar, 967 F.2d 852, 858 (3d Cir. 1992) (stating that "[f]requent use of a term by sellers of similar products . . . tends to indicate that the term is descriptive or generic rather than suggestive").

elements already found in the packaging of other sweetener products is unpersuasive. Specifically, Heartland contends that McNeil chose yellow for the Splenda packaging to capitalize on consumers' association of yellow with sugar, that McNeil followed the established custom of depicting coffee and iced tea, fruit and baked goods on Splenda's packaging, that virtually every no-calorie sweetener employs blue italicized lettering on its packaging, and that Splenda's color scheme of yellow background with blue and white lettering mimicked the color scheme of existing sweeteners. Heartland relies on Paddington, which states that "where it is the custom of an industry to package products in a particular manner, a trade dress in that style would be generic and therefore not inherently distinctive," Paddington, 996 F.2d at 583, and other non-binding district court cases. See Turtle Wax, Inc. v. First Brands Corp., 781 F. Supp. 1314 (N.D. Ill. 1991) (holding that plaintiff's trade dress for an automobile polish was merely a combination and refinement of elements already prevalent in the relevant product market); Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 41-42 (1st Cir. 2001) (holding that plaintiff's trade dress in its candle labels, which consisted of a combination of functional and common features, was not so unique and unusual as to warrant a finding of inherent distinctiveness); Blue Coral, Inc. v. Turtle Wax, Inc., 664 F. Supp. 1153, 1163 (N.D. Ill. 1987) (finding plaintiff's wheel cleaner trade dress to be merely a refinement of commonly adopted and well known form of ornamentation for similar products and thus not inherently distinctive); Florida Breckenridge, Inc. v. Solvay Pharms., Inc., Civ. A. No. 97-8417, 1997 WL 695413, at *5 (S.D. Fla. Jul. 18, 1997) (holding that plaintiff failed to demonstrate likelihood of success on the merits on the issue of inherent distinctiveness because, even though the combination of elements in plaintiff's trade dress is distinctive and arbitrary, third party use of these elements is extensive); Mana Products, Inc. v. Columbia Cosmetics Mfg., 65 F.3d 1063, 1070 (2d Cir. 1995)

16

(holding plaintiff's cosmetic compacts were not inherently distinctive where other compact distributors and retailers used identical packaging and containers); and Specialty Surgical Instrumentation, Inc. v. Phillips, 844 F. Supp. 1211, 1216 (M.D. Tenn. 1994) (holding plaintiff's trade dress for its surgical instruments was not inherently distinctive because the elements of the dress are common in the surgical instruments market and employed by plaintiff's competitors).

These district court cases, however, are fact specific as they rely on the particular trade dress at issue and the nature of the particular market in which the respective products compete. While it is true that the packaging of other sweetener products often contain depictions of coffee, iced tea, baked goods, fruit, and/or cereal, these depictions do not diminish the inherent distinctiveness of the Splenda trade dress when we consider the trade dress as a whole. Additionally, the fact that other sweetener products used a yellow, blue, and white color scheme prior to the introduction of Splenda does not detract from Splenda's inherent distinctiveness. In the no-calorie sweetener market, Splenda's principal competitors do not use this color scheme: Equal uses a primarily blue color scheme, while Sweet'N Low uses primarily pink. Consequently, the use of the yellow, blue, and white color scheme is not an industry custom such that Splenda's use of it precludes us from finding that its trade dress is inherently distinctive. Thus, we find that McNeil has demonstrated a likelihood of success on the issue of whether the Splenda trade dress is inherently distinctive.

b.   *Acquired secondary meaning*

Even if McNeil had not demonstrated inherent distinctiveness, it could still satisfy the distinctiveness element of a Lanham Act claim by demonstrating acquired secondary meaning. "Secondary meaning exists when [a trade dress] 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those

17

products or services.'" Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000) (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978)).[5]  Secondary meaning is generally acquired through extensive advertising, which creates an association in the minds of consumers between a trademark or trade dress and the source of the products advertised under that trademark or trade dress.  Id.  To determine whether a trade dress has acquired secondary meaning, we consider the following non-exhaustive list of factors: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion."  Id. (citation omitted).

        We find that McNeil is likely to succeed on the merits in demonstrating that the Splenda trade dress has acquired secondary meaning.  First, the extent of McNeil's sales and advertising of its Splenda products clearly favors a finding of secondary meaning.  McNeil has spent approximately $250 million on Splenda advertising and promotion.  Sales of Splenda have grown more than tenfold in just six years, from approximately $32 million in 2001 to approximately $410 million in 2006.  Splenda's market share has also grown tremendously and in 2006, only 6 years since it was first introduced, its sales comprised more than 60% of the low-calorie sweetener market.

        Heartland challenges our consideration of McNeil's advertising expenditures for Splenda in

---

[5]The exact name of a business or individual that produces the product or provides the service at issue need not be known by the public in order for there to be secondary meaning.  Dranoff-Perlstein, 967 F.2d at 858.  Rather "'[i]t is sufficient if the public is aware that the product [or service] comes from a single, though anonymous source.'"  Id. (quoting Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 380 (7th Cir. 1976).  Consequently, any argument that McNeil cannot demonstrate secondary meaning because consumers may not be aware that it is the company that markets Splenda is unavailing.

analyzing whether the Splenda trade dress has acquired secondary meaning, contending that such expenditures are not probative of acquired secondary meaning because McNeil did not use "look for" advertising, i.e., advertising that encourages consumers to identify the claimed trade dress with a particular producer. This argument is unavailing. The Third Circuit has not held that only "look for" advertising can be considered when analyzing whether a trademark or trade dress has acquired secondary meaning. Moreover, while "look for" advertising may more readily demonstrate secondary meaning than other forms of advertising, it seems illogical to conclude in the context of a product packaging trade dress case that just because McNeil's advertisements do not contain language saying "Look for Splenda in this packaging," they are not probative of secondary meaning. Rather, we find that the implicit message to consumers in advertisements for Splenda in which its packaging appears is that a product in this packaging comes from the producers of Splenda. We have previously found that, through its branding campaign, McNeil has highlighted the yellow Splenda packaging and that a Splenda package has been featured in nearly every Splenda television commercial and print advertisement. See McNeil I, 512 F. Supp. 2d at 223. Therefore, we find that McNeil's extensive advertising of Splenda weighs in favor of a finding of secondary meaning.

Heartland also challenges our consideration of Splenda's sales in analyzing whether the Splenda trade dress has acquired secondary meaning, arguing that McNeil has not presented any evidence that Splenda's retail success resulted in any way from the "source-identifying capacity" of Splenda's packaging. Heartland relies on Duraco Prods., in which the Third Circuit stated:

> Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature or combination of features. And unlike with a trademark, where repeated purchases of

19

> a product support an inference that consumers have associated the mark with the
> producer or source, one can much less confidently presume that a consumer's
> repeated purchase of a product has created an association between a particular
> product configuration and the source. . . .  In this respect product configuration again
> differs dramatically from trademark and from product packaging, since the success
> of a particular product . . . does not readily lead to an inference of source
> identification and consumer interest in the source.

Duraco Prods, 40 F.3d at 1452-53.  As this passage demonstrates, the Third Circuit made a clear

distinction between product configuration trade dress and product packaging trade dress, and only

questioned the probative value of sales in connection with product configuration trade dress.  This

case, in contrast, involves product packaging, for which sales do readily lead to an inference of

source identification and consumer interest in the source.  Id. at 1453.  Accordingly, we reject

Heartland's challenge to our consideration of Splenda's sales.

      Other factors also weigh in favor of finding that the Splenda trade dress has acquired

secondary meaning.  For one, McNeil has used the Splenda trade dress for over six years, beginning

with the product's launch in 2000, and this supports a finding of secondary meaning.  While McNeil

has refreshed its packaging over time, the changes have been minor and, thus, do not negate our

determination that this factor weighs in McNeil's favor.

      The fact of copying also weighs in favor of finding secondary meaning.  Based on the

similarity of the respective products' packagings, the Splenda trade dress was clearly mimicked in

the packaging design of the Ahold products.  Heartland's contention that this factor should not weigh

in favor of finding secondary meaning because it did not design the Ahold products is without merit.

In this case, who copied the Splenda trade dress is irrelevant, what matters is only that the Splenda

trade dress was copied.

      Finally, Heartland argues that McNeil's evidence of secondary meaning is insufficient

because it has failed to present any consumer surveys or consumer testimony.  We find this argument to be without merit.  While these forms of evidence may be preferred, they are not required.  See Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc., 921 F.2d 467, 476 (3d Cir. 1990) ("While consumer surveys are useful, and indeed the most direct method of demonstrating secondary meaning and likelihood of confusion, they are not essential where, as here, other evidence exists.").

In conclusion, McNeil's substantial advertisement expenditures promoting Splenda, Slenda's phenomenal commercial success, the length of use of the Splenda trade dress, and the evidence that other sucralose products have copied the Splenda trade dress, demonstrate a likelihood of success on the merits in establishing that the Splenda trade dress has acquired secondary meaning.

### 2.   Nonfunctionality

In addition to demonstrating distinctiveness and likelihood of consumer confusion, McNeil must also demonstrate that the Splenda trade dress is nonfunctional in order to prevail on the merits of its Lanham Act claim.  See TrafFix Devices, Inc., 532 U.S. at 29 ("[T]rade dress protection may not be claimed for product features that are functional.").  A functional feature is one that is essential to the use or purpose of the device, or affects the cost or quality of the device.  Id. at 32.  Alternatively, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'"  Id. (quoting Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995)).  We find the Splenda trade dress as a whole is not essential to the use or purpose of the product and that it does not affect the cost or quality of the product.  As such, the Splenda trade dress is non-functional.

Heartland's arguments to the contrary are unavailing.  Heartland contends that certain aspects of Splenda's packaging, such as use of the color yellow, photographs of food and beverages, and the

size and shape of the packaging, are functional and thus cannot be protected under the Lanham Act. However, trade dress consists of the "total image or overall appearance of a product." Rose Art Indus., 235 F.3d at 171 (citing Two Pesos, 505 U.S. at 765 n.1). The Third Circuit has instructed that "'[t]rade dress is a complex composite of features and the law of unfair competition in respect to trade dress requires that all of the features be considered together, not separately.'" Duraco Prods., 40 F.3d at 1439 (quoting American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1141 (3d Cir. 1986)). In this case, McNeil seeks an injunction preventing Heartland from using packaging that is confusingly similar to Splenda's packaging. It is not seeking to enjoin Heartland from using the color yellow, from depicting food and beverages on its packaging, or from distributing its products in packaging of a certain size and shape. If McNeil had made such a request, then perhaps we would be required to examine each of these elements individually to determine whether or not they are functional. However, it has not made such a request and, thus, we need only determine whether the overall product packaging is functional. In doing so, we find that Splenda's packaging is not essential to the use or purpose of the product, and that it does not affect the cost or quality of the product. Accordingly, we conclude that McNeil has demonstrated a likelihood of success on the merits in establishing that Splenda's packaging is not functional.

Having demonstrated a likelihood of success on the merits with respect to each element of a Lanham Act claim, McNeil has demonstrated a likelihood of success on its Lanham Act claim as a whole, and, thus, the first factor in the preliminary injunction analysis favors granting the requested preliminary injunction.

B.      Irreparable Harm to the Moving Party

The second factor in the preliminary injunction analysis is the extent to which the moving

party will suffer irreparable harm without the requested injunctive relief.  Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it."  <u>Opticians</u>, 920 F.2d at 195 (quoting <u>Morton v. Beyer</u>, 822 F.2d 364, 372 (3d Cir. 1987)).  "Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will."  <u>Id.</u> Unauthorized use of a trade mark, and by analogy a trade dress, results in a loss of control by the owner and creates a potential for damage to the owner's reputation.  <u>Id.</u> at 196.  Potential damage to reputation constitutes irreparable injury.  <u>Id.</u>  This injury exists even if the infringer's products do not tarnish the owner's reputation or even divert any sales.  <u>Id.</u> at 195 (citing <u>Ambassador East, Inc. v. Orsatti, Inc.</u>, 257 F.2d 79, 82 (3d Cir. 1958)).  Additionally, likely confusion can also be the basis for an irreparable injury, and the Third Circuit has held that a finding of a likelihood of confusion leads to the "inescapable conclusion" that there is also irreparable injury.  <u>Id.</u> 196-97.

Given the likelihood of confusion by consumers caused by the Ahold products, McNeil has suffered and continues to suffer irreparable harm.  It is irrelevant that there is no evidence that Heartland's products are inferior to Splenda because, by Heartland's use of product packaging that is confusingly similar to Splenda's trade dress, McNeil has suffered a loss of control over the reputation of its product, and, consequently, there is a potential that its reputation will be damaged.  We find, therefore, that this factors weighs in favor of granting the requested relief.

C.      <u>Harm to the Nonmoving Party</u>

In deciding whether injunctive relief is appropriate, we must balance the hardships to the respective parties.  <u>Opticians</u>, 920 F.2d at 197.  The balancing test is intended to ensure that the issuance of an injunction would not harm the trade dress infringer more than a denial would harm the party seeking an injunction.  <u>Id.</u> (citation omitted).

23

Heartland asserts that McNeil's requested injunctive relief would cause it to lose sales revenue of approximately $1,000,000.  However, these damages do not constitute irreparable harm.  See Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir. 2004) (holding that being required to rename a product, change labels and product inserts, re-launch advertising, destroying inventory, and recalling products already distributed are compensable by money damages and thus do not constitute irreparable harm as a matter of law).  Indeed, any such financial losses are to be considered when establishing and setting the bond for any injunction, not when deciding whether to grant the injunction.  Id. (stating that "[d]istrict courts should consider financial damages when establishing and setting the bond for an injunction, not when deciding whether to grant it").  As Heartland has identified no irreparable harm that it would suffer as a result of the requested injunctive relief, we find that the balance of hardships in this case favors McNeil.

      D.    Public Interest

The final prong in the preliminary injunction analysis is a consideration of the public interest.  Opticians, 920 F.2d at 197.  The Third Circuit has held that "[i]n a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.'" S & R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 379 (3d Cir. 1992) (quoting Opticians, 920 F.2d at 197).  The Third Circuit has also noted that the most basic public interest at stake in all Lanham Act cases is "the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." Kos Pharms., 369 F.3d at 730.  We find that the public interest favors granting McNeil's request for a preliminary injunction given that the Ahold products are likely to confuse consumers.

Having considered each of the four factors and finding that each weighs in favor of granting the requested injunctive relief, we find that injunctive relief is warranted in this case, and that

24

Heartland should be enjoined from continuing to manufacture and/or distribute products in the original Ahold packaging.  We next turn to the issue of what would be an appropriate bond.

      E.     <u>Appropriate Bond</u>

Pursuant to Federal Rule of Civil Procedure 65, a preliminary injunction will issue only "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The amount of the bond is committed to the discretion of the district court.  <u>Sprint Commc'ns Co. L.P.  v. CAT Commc'ns Int'l, Inc.</u>, 335 F.3d 235, 239-40 (3d Cir. 2003).

We calculate the amount of the bond as follows.  First, we consider separately Heartland's two types of inventory: (1) finished goods, i.e., packaging that has been filled with sucralose or individual packets of sucralose; and (2) unfinished goods, i.e., packaging that has not been filed with sucralose or individual packets of sucralose.  With respect to the finished goods, the appropriate measure of the potential damage to Heartland if the injunction were to be issued in error is the sales value of these goods.  The most recent Declaration of Teodor Gelov, Heartland's President, states that the sales value of these goods, as of April 2008, is approximately $340,000.  With respect to the unfinished goods, the appropriate measure of the potential damage to Heartland if the injunction were to be issued in error is the cost of these goods.  In other words, the bond amount with respect to the unfinished goods should be equal to the price Heartland paid its suppliers for this packaging.  The parties have not presented any evidence on this amount.

As the value of the finished goods has certainly changed since April 2008, and the parties have not submitted evidence as to the cost of the unfinished inventory, we set the bond at $500,000.  The injunctive relief is effective as soon as McNeil posts the bond in this amount.  In the meantime,

the parties may file, within 10 days of the date of our order, a motion for reconsideration of the amount of the bond, along with supporting evidence of the sales value of Heartland's current inventory of finished goods and the specific cost of its unfinished inventory.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MCNEIL NUTRITIONALS, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HEARTLAND SWEETENERS LLC, and | : | |
| HEARTLAND PACKAGING CORP.   : | | NO. 06-5336 |

**ORDER**

**AND NOW**, this 26th day of June 2008, upon consideration of Plaintiff's Renewed Application for Preliminary Injunction (Docket No. 69), Defendants' response thereto, the evidentiary hearing held on January 26, 2007, oral argument held on March 13, 2007, and all other papers filed in connection with Plaintiff's request for a preliminary injunction, **IT IS HEREBY ORDERED** that Plaintiff's Application is **GRANTED** as follows:

1.      Defendants Heartland Sweeteners LLC and Heartland Packaging Corp. are preliminarily enjoined from manufacturing and/or distributing 100 and 200-count boxes of individual packets in the original Ahold packaging, and bags of granular sucralose in the original Ahold packaging;

2.      This Order shall not go into effect until Plaintiff McNeil Nutritionals, LLC posts a bond in the amount of $500,000 with the Clerk of Court.

3.      The parties may file, within 10 days of the date of this Order, a Motion for Reconsideration as to the appropriate amount of the bond McNeil should post, along with any supporting evidence as to the sales value of Heartland's current inventory of finished goods and the specific cost of its unfinished inventory.

BY THE COURT:


s/ John R. Padova, J._____
John R. Padova, J.